FILED
2015 Jun-29  PM 06:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                      April 15, 2015

**1**

```
     IN THE UNITED STATES DISTRICT COURT
  FOR THE NORTHERN DISTRICT OF ALABAMA
             SOUTHERN DIVISION

KAREN LOPEZ-EASTERLING,
     Plaintiff,

vs.          Case No. 2:14-CV-01493-RDP

CHARTER COMMUNICATIONS, LLC,
     Defendant.

     *   *   *   *   *   *
     DEPOSITION OF KAREN LOPEZ-
EASTERLING, taken pursuant to notice and
stipulation on behalf of the Defendant,
at Maynard, Cooper & Gale, 1901 Sixth
Avenue North, Suite 2400, Birmingham,
Alabama, before Bridgette Mitchell,
Shorthand Reporter and Notary Public in
and for the State of Alabama at Large, on
April 15, 2015, commencing at 9:43 a.m.
```

**2**

```
1                 APPEARANCES
2
3
4    FOR THE PLAINTIFF:
5    David R. Arendall, Esquire
6    ARENDALL & ARNOLD
7    2018 Morris Avenue, Third Floor
8    Birmingham, Alabama  35203
9
10   FOR THE DEFENDANT:
11   Rita Srivastava, Esquire
12   MORGAN, LEWIS & BOCKIUS
13   77 West Wacker Drive, Fifth Floor
14   Chicago, Illinois  60601
15
16   ALSO PRESENT:
17   Desiree Peri (via phone) in-house counsel
18   for Charter Communications
19   Nicole Johnson, Charter Communications
20
21
22
23
```

**3**

```
1                 STIPULATIONS
2        It is hereby stipulated and
3   agreed by and between counsel
4   representing the parties that the
5   deposition of KAREN LOPEZ-EASTERLING is
6   taken pursuant to the Federal Rules of
7   Civil Procedure and that said deposition
8   may be taken before Bridgette Mitchell,
9   Shorthand Reporter and Notary Public in
10  and for the State of Alabama at Large,
11  without the formality of a commission;
12  that objections to questions, other than
13  objections as to the form of the
14  questions, need not be made at this time,
15  but may be reserved for a ruling at such
16  time as the deposition may be offered in
17  evidence or used for any other purpose as
18  provided for by the Federal Rules of
19  Civil Procedure.
20       It is further stipulated and
21  agreed by and between counsel
22  representing the parties in this case
23  that said deposition may be introduced at
```

**4**

```
1    the trial of this case or used in any
2    other manner by either party hereto
3    provided for by the Federal Rules of
4    Civil Procedure.
5
6                 INDEX
7    EXAMINATION              Page
     By Ms. Srivastava................. 6
8    By Mr. Arendall.................. 149
     By Ms. Srivastava................ 156
9    By Mr. Arendall.................. 171
10   EXHIBITS                Page
     Defendant's Exhibit 1........... 18
11      Employee Acknowledgement Form
     Defendant's Exhibit 2........... 19
12      Employee Handbook Effective
        Date 3/3/10, last revised
13      3/1/14
     Defendant's Exhibit 3........... 23
14      Training transcript
     Defendant's Exhibit 4........... 23
15      Enterprise eTime
     Defendant's Exhibit 5........... 35
16      Timekeeping policy
     Defendant's Exhibit 6........... 103
17      Plaintiff's answers to
        Defendant's first set of
18      Interrogatories
     Defendant's Exhibit 7........... 116
19      Interrogatories 2, 3, 4 & 10
     Defendant's Exhibit 8........... 136
20      4/5/13 e-mail re: eTime
     Defendant's Exhibit 9........... 138
21      Counselings/infractions
22
23
```

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                          April 15, 2015

---

5

1        VIDEOGRAPHER:  This marks the
2    beginning of Videotape No. 1 of the
3    deposition Karen Lopez-Easterling in the
4    matter of Karen Lopez-Easterling versus
5    Charter Communications, LLC, Case
6    No. 2:14-CV-01493-RDP, filed in the
7    United States District Court for the
8    Northern District of Alabama Southern
9    Division.  The date is April 15, 2015.
10   Time is now 9:43 a.m.
11       All attorneys present, will you
12   please state your names and whom you
13   represent.
14       MS. SRIVASTAVA:  My name is Rita
15   Srivastava.  I'm outside counsel for
16   Charter Communications.  And
17   participating via telephone is Desiree
18   Peri, who's in-house counsel for Charter
19   Communications.
20       MR. ARENDALL:  David Arendall for
21   the plaintiff.
22       VIDEOGRAPHER:  Court reporter,
23   will you please swear in the witness.

---

6

1        KAREN LOPEZ-EASTERLING, having
2    first been duly sworn or affirmed to
3    speak the truth, the whole truth, and
4    nothing but the truth, testified as
5    follows:
6            EXAMINATION
7    BY MS. SRIVASTAVA:
8    Q. Ms. Lopez, we met off the record but,
9       again, my name is Rita Srivastava.  I'm
10      an attorney with Morgan, Lewis.  We
11      represent Charter Communications in this
12      case.  My questions and your answers are
13      being recorded by Bridgette, our court
14      reporter, so it's important that you
15      speak clearly and that you give a verbal
16      response to any questions that I ask.
17      Okay?
18   A. Okay.
19   Q. She can't record if we're both speaking
20      at once, so it's important that we not
21      speak over each other.  If I ask a
22      question and you don't understand it,
23      it's important for you to tell me that

---

7

1    you don't understand it, and I'm happy to
2    rephrase.  I'm going to assume that you
3    understand the question if you don't ask
4    for clarification.  Is that fair?
5    A. Yes.
6    Q. And we can take breaks.  You can use the
7       ladies' room, grab water and whatnot, but
8       I just ask that if there's a question
9       pending that you first answer that
10      question and then take a break.  Is that
11      all right?
12   A. Yes.
13   Q. Okay.  And there may be points during the
14      deposition where David will object to
15      certain questions that I ask.  Unless he
16      instructs you not to answer, you can go
17      ahead and answer that question.  All
18      right?
19   A. Okay.
20   Q. Is there anything that would prevent you
21      from answering honestly and truthfully
22      today?
23   A. No.

---

8

1    Q. Have you taken any medicine today?
2    A. No.
3    Q. Under the influence of any alcohol today?
4    A. No.
5        MR. ARENDALL:  Rita, let me
6    interrupt just a moment.
7        MS. SRIVASTAVA:  Uh-huh.
8        MR. ARENDALL:  Did we do the
9    usual stipulations?  What they are
10   locally is we're reserving objections and
11   we just object to form.  And I just want
12   to make it clear on the record.  I
13   thought we were, but I thought I didn't
14   hear that asked.  Okay.  Go ahead.
15       MS. SRIVASTAVA:  That's fine.
16   Q. (By Ms. Srivastava) Within the last ten
17      years, have you been convicted of a
18      crime?
19   A. Ma'am?  I'm sorry.
20   Q. Within the last ten years, have you been
21      convicted of a crime?
22   A. No.
23   Q. No.  Okay.  Have you ever filed for

---

2 (Pages 5 to 8)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

9

1    bankruptcy?
2    **A.** Yes.
3    **Q.** When did you file for bankruptcy?
4    **A.** 2005.
5    **Q.** Okay.  Has that been discharged?
6    **A.** Yes.
7    **Q.** When was it discharged?
8    **A.** Not sure of the year.  2010, maybe 2008.
9    **Q.** 2008 or 2010?
10   **A.** Correct.
11   **Q.** Do you remember at what point during the
12     year -- fall, winter, spring?
13   **A.** Summer.
14   **Q.** Summer?  Okay.  Do you understand that
15     you're under oath and that this
16     transcript can be used at trial?
17   **A.** Yes.
18   **Q.** Did you do anything to prepare for
19     today's deposition?
20   **A.** Just saw my lawyer.  I mean, we just
21     discussed some things.
22   **Q.** Okay.  I don't want to know the substance
23     of your communications, but when did you

10

1    meet with your attorney?
2    **A.** Yesterday.
3    **Q.** Okay.  How long did you meet with your
4      attorney for?
5    **A.** Couple hours.
6    **Q.** Did you review any documents as part of
7      that meeting?
8    **A.** Yes.
9    **Q.** Do you remember what those documents
10     were?
11   **A.** Not really.  I don't remember.
12   **Q.** Okay.  Did you review any videos as part
13     of that preparation?
14   **A.** No.
15   **Q.** Have you spoken with anybody else about
16     this lawsuit?
17   **A.** No.
18   **Q.** Did you tell anyone that you'd be
19     appearing here today for your deposition?
20   **A.** My current job.
21   **Q.** Told your supervisor?
22   **A.** Yes.
23   **Q.** Okay.  What was your last role at

11

1    Charter?
2    **A.** Front counter lead.
3    **Q.** When did you first start working for
4      Charter?
5    **A.** Like, the first time because -- I was
6      first employed in 1996.
7    **Q.** Okay.
8    **A.** But it was acquired several times, so it
9      changed names.
10   **Q.** Okay.  Can you very briefly walk me
11     through your work history with Charter?
12   **A.** I started in November 1996.  I was
13     customer service and dispatcher, just
14     take phone calls, sell the product.  It
15     was then acquired by AT&T.  Again, I was
16     a dispatcher.  Then it was acquired by
17     Charter, and I was a dispatcher.  2011, I
18     was -- I became the customer service
19     lead.
20   **Q.** There was a time when your employment
21     with Charter ended prior to 2011; right?
22   **A.** Yes.  I took a year off, yes.  2009.
23   **Q.** Okay.  And what did you do in 2009?

12

1    **A.** I was living in Tampa for a year.
2    **Q.** And when did you move back to Alabama?
3    **A.** 2010.
4    **Q.** Did you reapply for a job at Charter
5      then?
6    **A.** Yes.
7    **Q.** What job did you reapply for?
8    **A.** Dispatch.
9    **Q.** With which Charter office?
10   **A.** Vestavia Hills.
11   **Q.** Do you remember if you interviewed?
12   **A.** Yes.
13   **Q.** Who did you interview with?
14   **A.** Brenda Gads -- Gadsden.  Gadsden.
15   **Q.** Do you remember what her role was?
16   **A.** She was dispatch manager.
17   **Q.** Did you interview with anybody else?
18   **A.** No.
19   **Q.** No?
20   **A.** No.
21   **Q.** Okay.  When did you start working for
22     Charter in 2010?
23   **A.** Maybe April of that year.

3 (Pages 9 to 12)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                        April 15, 2015

---

**13**

1  **Q.** Did you start working in the dispatch
2     position?
3  **A.** Yes.
4  **Q.** What were your duties in the dispatch
5     position?
6  **A.** Route the daily work, communicate with
7     the field technicians.
8  **Q.** Do you remember what your hourly rate was
9     when you were hired as a dispatch?
10 **A.** Eighteen -- maybe eighteen.
11 **Q.** Dollars an hour?
12 **A.** Yes.
13 **Q.** Did you understand when you were hired
14    that you would be paid time and a half
15    for all hours that you worked over 40?
16 **A.** Yes.
17 **Q.** Was that your understanding throughout
18    your employment with Charter?
19 **A.** Yes, that was my understanding.
20 **Q.** When you started in 2010, did you have
21    any new-hire training?
22 **A.** No, not that I'm aware of.
23 **Q.** At some point when you were working in

---

**14**

1     dispatch, did you get a promotion?
2  **A.** No.
3  **Q.** Did you switch roles?
4  **A.** Yes.
5  **Q.** When did you switch roles?
6  **A.** October of that year.
7  **Q.** October of 2010?
8  **A.** I believe so.
9  **Q.** Okay.  Just to the best of your
10    recollection.  What role did you move
11    into in October 2010?
12 **A.** Front -- front counter lead.
13 **Q.** Where was that position?
14 **A.** Vestavia Hills office.
15 **Q.** And what were your responsibilities in
16    the front counter lead role?
17 **A.** It was process the payments in the drop
18    box, take payments, sell Charter service,
19    and help with customers that came in that
20    had issues.
21 **Q.** What was the difference between a front
22    counter lead and a front counter
23    position?

---

**15**

1  **A.** It was more of maybe make more decisions
2     as far as with customers' issues, maybe,
3     you would want to say that.
4  **Q.** Okay.  And what hours was the Vestavia
5     Hills branch open?
6  **A.** Eight to five at the time, because it
7     changed a couple times.  Eight to five,
8     eight to six, maybe.
9  **Q.** Okay.  So that changed throughout the
10    course of your employment with Charter?
11 **A.** Yes.  The hours kind of changed, yes.
12 **Q.** What was your regularly-scheduled shift?
13 **A.** Eight-thirty to five-thirty, eight to
14    five.  Again, it changed several times,
15    so . . .
16 **Q.** Okay.  How many days a week did you work?
17 **A.** Five.
18 **Q.** Did you work five days a week throughout
19    your time with Charter?
20 **A.** Yes.
21 **Q.** Did you under- -- what was your
22    understanding generally about the breaks
23    that you were entitled to?

---

**16**

1  **A.** My understanding was that I get one full
2     hour lunch.
3  **Q.** Were you entitled to any other breaks in
4     addition to your lunch break?
5  **A.** Was I -- I'm sorry.
6  **Q.** Were you entitled to any other breaks in
7     addition to your lunch break?
8  **A.** There are two 15-minute breaks.
9  **Q.** Was that one 15-minute break in the
10    morning and one in the afternoon?
11 **A.** One in the afternoon, correct.
12 **Q.** Who was your supervisor when you were at
13    Vestavia Hills?
14 **A.** Nicole Johnson.
15 **Q.** Was Nicole your supervisor the entire
16    time you were at Vestavia Hills?
17 **A.** Yes.
18 **Q.** Okay.
19 **A.** The front counter, yes.
20 **Q.** Did Nicole Johnson actually sit at
21    Vestavia Hills?
22 **A.** I'm sorry?
23 **Q.** Was Nicole Johnson actually stationed at

---

4 (Pages 13 to 16)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                               April 15, 2015

17

1       Vestavia --
2   **A.** Yes.
3   **Q.** -- Hills?
4   **A.** Yes.
5   **Q.** Was she there five days a week?
6   **A.** Sometimes she had other locations she
7       needed to attend.
8   **Q.** Do you know what those other locations
9       were?
10  **A.** Northport -- no.  Jasper, Gardendale.
11  **Q.** Do you have any estimate of how many days
12      Ms. Johnson was at Vestavia Hills versus
13      how many days she was not?
14  **A.** She'd probably be there probably three
15      days.  Again, it would change depending
16      on how they needed her in different
17      locations.
18  **Q.** So whether or not Nicole was present on
19      site would vary depending on the week?
20  **A.** Right.
21  **Q.** When Ms. Johnson wasn't on site, were you
22      able to reach her?
23  **A.** By -- by phone, yes.

18

1   **Q.** By e-mail as well?
2   **A.** E-mail, yes.
3   **Q.** Did you ever use the phone to reach
4       Ms. Johnson when she was off site?
5   **A.** Yes.
6   **Q.** Did you ever use e-mail to reach her when
7       she was off site?
8   **A.** Yes.
9   **Q.** And you stayed in the front counter lead
10      position for how long?
11  **A.** When I was hired in 2010 till 2014.
12  **Q.** Okay.  I just wanted to go back.  You
13      said that when you were hired on you
14      didn't remember doing any new-hire
15      training; right?
16  **A.** Right.
17  **Q.** Okay.  I'm just going to offer up a
18      document to maybe help aid that --
19  **A.** Uh-huh.
20  **Q.** -- recollection.  Just one second.
21          MS. SRIVASTAVA:  This is
22      Exhibit 1.
23          (Defendant's Exhibit 1 was

19

1           marked for identification.)
2           MS. PERI:  This is Desiree Peri.
3   I apologize for the interruption.  Would
4   it be possible to move the mic for the
5   phone closer to Ms. Lopez-Easterling?
6   It's a little hard to hear her.
7           MS. SRIVASTAVA:  Yes.
8           MS. PERI:  Thank you.
9           (Defendant's Exhibit 2 was
10          marked for identification.)
11  **Q.** (By Ms. Srivastava) Ms. Lopez, the first
12      document that the court reporter handed
13      you is an employee acknowledgment form.
14      Is that your signature at the bottom?
15  **A.** Yes.
16  **Q.** Do you mind reading the date on the right
17      of it?
18  **A.** 4/12/2010.
19  **Q.** Okay.  Take a minute, review the
20      document.
21  **A.** Okay.
22          (Witness reviews document.)
23  **Q.** Does that help refresh your recollection

20

1       as to whether or not you reviewed any
2       employee handbooks when you started
3       working at Charter?
4   **A.** Again, until I see it -- I might have.  I
5       don't remember.
6   **Q.** Don't remember?
7   **A.** It's been a while, so . . .
8   **Q.** Do you mind taking a look at the second
9       document we handed you, which is an
10      employee handbook from Charter?
11  **A.** Uh-huh.
12  **Q.** It's marked at the bottom Charter
13      0001257 --
14  **A.** Uh-huh.
15  **Q.** -- to 1330.  Do you mind turning to the
16      page on the bottom that's marked 1268?
17  **A.** Yes.
18  **Q.** And take a minute and just read through
19      the paragraphs under timekeeping.
20          (Witness reviews document.)
21  **A.** Okay.
22  **Q.** Okay.  It says that it's Charter's
23      practice and obligation to pay all the

5 (Pages 17 to 20)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                April 15, 2015

---

21

1    employees for any and all hours worked
2    including any overtime.  Is that your
3    understanding of Charter's policy?
4    A. Yes, it was my understanding.
5    Q. And the next sentence says hourly
6    employees must maintain an accurate
7    record of all hours worked each day and
8    all time off taken.  Was that your
9    understanding of Charter's policy?
10   A. Yes, that's my understanding.
11   Q. Okay.  The next sentence says hourly
12   employees may not, under any
13   circumstances, work off the clock, e.g.,
14   during meal breaks or outside of the
15   regular work schedule; is that correct?
16   A. That's correct.
17   Q. Was that your understanding of Charter's
18   policy?
19   A. That was my understanding.  However,
20   maintaining their proper record, to me,
21   my understanding was let my supervisor
22   know.  So as far as I knew, if I let my
23   supervisor know, that was my way of

---

22

1    letting them know that I worked off the
2    clock on my lunch.
3    Q. How did you keep your time when you were
4    working at the front desk?
5    A. Clock in and clock out.
6    Q. How did you clock in and clock out?
7    A. Like, I'm not understanding the question.
8    Q. What did you use to keep your time when
9    you were clocking in and clocking out?
10   A. Oh, what's -- it's -- I don't know what
11   it's called, the E -- eTime, maybe?  Is
12   it eTime that they use?
13   Q. There was an eTime --
14   A. Yes.
15   Q. -- timekeeping --
16   A. Yes.
17   Q. -- system?  Okay.  Was that in place the
18   whole time that you worked at Charter
19   from 2010 forward?
20   A. Yes.
21   Q. Okay.  How did you use eTime?
22   A. I think it was a code, a name.  At this
23   point, I don't remember.  But it -- you'd

---

23

1    have to put some -- a password, I guess.
2    Q. Do you remember having a training on
3    eTime?
4    A. Yes.
5    Q. Okay.  Do you remember when that was?
6    A. Don't remember the dates, no, ma'am.
7    Q. This may help.  Court reporter will get
8    it --
9    A. Okay.
10   Q. -- to you in a moment.
11        (Defendant's Exhibits 3 and 4
12        were marked for identification.
13   Q. So the first document's a training
14   transcript for you.  It's marked
15   Charter 00000701 to 704.  If you turn to
16   the third page of it, about halfway down
17   there is a course marked eTime HTML Time
18   Stamp Hourly View Time Entry, and it
19   notes 6/10/2010.
20   A. 6/10?
21   Q. Yeah.
22   A. Okay.
23   Q. Does June 2010 sound like when you would

---

24

1    have done your eTime training?
2    A. Sure.  I don't remember.
3    Q. How did you do trainings when you were
4    working at Charter?
5    A. Through the computer.
6    Q. Through your own --
7    A. Their --
8    Q. -- computer?
9    A. -- was a computer, yes.
10   Q. Okay.  So then you would log on?
11   A. Right.
12   Q. Okay.  And complete the training?
13   A. Yeah.
14   Q. Okay.  And the second document,
15   Enterprise eTime, Using the Hourly View
16   Time-Entry Method for the HTML Client.
17   Does that look like the timekeeping
18   training that you would have done?
19   A. Sure.
20   Q. So if you go to the fifth page of that,
21   it's marked Charter 0001086.  There's a
22   slide that says, What is Enterprise
23   eTime.

---

6 (Pages 21 to 24)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                          April 15, 2015

```
                                              25
 1  A. Which one?
 2  Q. Yeah, that one.  So there's a log-on for
 3     username --
 4  A. Username and password.
 5  Q. -- and password.  Is that how you would
 6     log on to --
 7  A. Yes.
 8  Q. -- eTime?
 9  A. Uh-huh.
10  Q. Okay.  And you do it from your Charter
11     PC?
12  A. Yes.
13  Q. Okay.  If you skip ahead to the page that
14     ends in Charter 00001089, there's a slide
15     marked Enterprise eTime Time-Entry
16     Method.
17  A. Yes.
18  Q. Is that how you would record your time?
19  A. Yes.
20  Q. Okay.  Would you access the eTime
21     computer and the eTime program on your
22     own?
23  A. Yes.
```

```
                                              26
 1  Q. Okay.  Did you put in your own time?
 2     Did you ever --
 3  A. I don't keep the time.  I mean, like, I
 4     just clock in.
 5  Q. You clock in through eTime?
 6  A. Yes.  But I wouldn't do this
 7     (indicating).
 8  Q. Okay.
 9  A. I mean, I don't -- I mean, I don't even
10     put my hours in there.  You just --
11  Q. Okay.
12  A. -- kind of, like, clock in yes and clock
13     out no.
14  Q. Okay.
15  A. But this --
16  Q. So you --
17  A. -- wouldn't be me --
18  Q. Okay.
19  A. -- like -- yeah.
20  Q. So you would clock in when you arrived at
21     the Vestavia Hills location --
22  A. Yes.
23  Q. -- for the day?  Okay.
```

```
                                              27
 1  A. Yes.
 2  Q. And you would clock out when?
 3  A. At the end of my shift.
 4  Q. Okay.  Would you clock out for lunch?
 5  A. Yes.
 6  Q. Okay.  Was that your responsibility, to
 7     clock out for lunch?
 8  A. Yes.
 9  Q. Okay.  Would you clock in at the end of
10     your lunch break?
11  A. Sometimes I would forget because, again,
12     if I was doing something with a customer,
13     I would forget to clock in.
14  Q. On the days when you didn't forget to
15     clock in for your lunch break, was it
16     your responsibility to clock in when
17     you --
18  A. Yes.
19  Q. -- got back to work?  What would happen
20     on those occasions where you would forget
21     to clock back in?
22  A. My supervisor would let me know that I
23     didn't.
```

```
                                              28
 1  Q. And then what would you do?
 2  A. Well, then it was my supervisor's
 3     responsibility to correct -- make the
 4     corrections.
 5  Q. Okay.  And did your supervisor make the
 6     corrections, as best that you know of?
 7  A. At times she did.  And other times, I
 8     mean, it wasn't recorded, but . . .
 9  Q. What wasn't recorded?
10  A. Like if -- if one of the employees would
11     ask me if I can help with a customer, I
12     wouldn't clock out -- I mean I wouldn't
13     clock back in because I didn't think I
14     had to, it wasn't told that I had to.  So
15     I would help the customer and do whatever
16     I needed, then go back to my lunch.  So
17     what I'm saying is, that during that
18     lunch hour, it wasn't going back to,
19     Okay, well, Karen, you rightfully didn't
20     take a full hour lunch, so that was not
21     paid.
22  Q. Okay.  And we're going to come back and
23     explore that in a little more detail.
```

```
                                  7 (Pages 25 to 28)
```

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                      April 15, 2015

---

29

1    But on the regular days when you were
2    supposed to clock back in, if you just
3    forgot to clock back in, would your
4    supervisor then clock in for you?
5    **A.** Yes.
6    **Q.** Okay.
7    **A.** She would have to fix that.
8    **Q.** Okay.  Then you would clock in at the --
9    clock out at the end of the day?
10   **A.** Yes.
11   **Q.** Okay.  Did you understand that your
12   payroll was run from the hours that you
13   clocked in and clocked out of eTime?
14   **A.** Correct.
15   **Q.** Okay.  Did you ever have issues with
16   being paid from the hours that you
17   clocked in and out of eTime?
18   **A.** Rephrase the question.
19   **Q.** Yeah.
20   **A.** I mean, I don't --
21   **Q.** Yeah, of course.  Were you always paid
22   for the hours that you put into eTime?
23   **A.** Yes.

---

31

1    that I worked, yeah, sure, that was paid
2    for.
3    **Q.** Okay.
4    **A.** What I'm saying is that those that I
5    worked that I took a shorter lunch, that
6    was not paid for.
7    **Q.** Okay.  So my question is a little
8    different.  I'm actually asking you were
9    you paid for the time that you recorded
10   in eTime.
11   **A.** Yes.
12   **Q.** Okay.  Did you ever have occasion to work
13   overtime after the close of your shift?
14   **A.** Yes, I have.
15   **Q.** Okay.  What would you do in those
16   instances in terms of recording time in
17   eTime?
18   **A.** Well, it would show because it would show
19   when I clocked out.  Like if I got off at
20   five and I was still there at 5:30, then
21   I clock out at 5:30.
22   **Q.** You'd clock out after the close of your
23   shift, then?

---

30

1    **Q.** Okay.  Did you ever have any errors on
2    your paycheck, hours missing, anything --
3    **A.** I really --
4    **Q.** -- like that?
5    **A.** -- didn't, I mean, pay attention to -- it
6    was direct deposit, so I never printed
7    out a sheet.
8    **Q.** So it's your belief that you were paid
9    for all the time that you put down in
10   eTime?
11   **A.** I mean, I might have.  I mean, again, I
12   didn't print out my sheet for my -- what
13   I got paid because it was direct deposit,
14   so it just went -- whatever I was -- I
15   worked, it went into my account.
16   **Q.** You didn't notice any hours missing,
17   being paid for 30 when you really worked
18   40?
19   **A.** I didn't look at my pay -- I didn't look
20   at my pay stub.
21   **Q.** So you don't know if you were accurately
22   paid for your time worked?
23   **A.** I mean -- I mean, I knew the 40 hours

---

32

1    **A.** Yes.
2    **Q.** Okay.  And were you paid overtime for
3    that time you worked --
4    **A.** Yes.
5    **Q.** -- after the close of your shift?
6    **A.** Uh-huh.  (Witness nods head.)
7    **Q.** Did you ever come in to work on the
8    weekends?
9    **A.** We rotated weekends.
10   **Q.** Okay.  Did you ever come in to work on a
11   holiday?
12   **A.** Did I ever --
13   **Q.** Ever come in to work on a holiday?
14   **A.** If I was scheduled --
15   **Q.** Okay.
16   **A.** -- I mean, yes.  Yes.
17   **Q.** Did you get premium pay for that?
18   **A.** Yes.
19   **Q.** Okay.  And were you paid overtime for
20   those occasions where you worked on
21   holidays?
22   **A.** Yes.
23   **Q.** If you had questions about your pay, who

---

8 (Pages 29 to 32)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

---

33

1   would you go to?
2   **A.** My supervisor.
3   **Q.** Anyone else?
4   **A.** No.
5   **Q.** Okay.  Did you have HR on site at --
6   **A.** There was --
7   **Q.** -- Vestavia Hills?
8   **A.** Yes.
9   **Q.** Who was on site?
10  **A.** What's her name?  Carla or -- there was
11      another guy's name.  I don't remember his
12      name.
13  **Q.** Okay.  Did you ever go to Carla with
14      questions about your pay?
15  **A.** No.
16  **Q.** Did you ever go to Carla with other
17      issues?
18  **A.** Yes.
19  **Q.** What kind of issues would you go to Carla
20      with?
21  **A.** It was an incident about somebody saying
22      that I was seeing someone.  But, again, I
23      went to my supervisor first and then I

---

34

1      was referred to Carla.  But it's my
2      understanding that you go to your
3      supervisor first in chain of command.
4   **Q.** Did you know who your supervisor's boss
5      was?
6   **A.** Yes.
7   **Q.** Who was that?
8   **A.** First was Colette Crawford, and then it
9      was Linda Tidmore.
10  **Q.** Did you think that you could go to
11      Colette Crawford or Linda Tidmore with
12      any questions?
13  **A.** I'm sure I could have but, again, as
14      stated, to see your supervisor and she
15      was my supervisor.
16  **Q.** What stated that you should go see your
17      supervisor first?
18  **A.** I mean, my understanding was that
19      anything -- you had any questions, you go
20      to your supervisor.
21  **Q.** Okay.
22  **A.** And it's -- states it right here.
23  **Q.** You're looking back at the employee

---

35

1   handbook?
2   **A.** (Witness nods head.)  See, this one is
3      new.  I wasn't there for this one,
4      so . . .
5   **Q.** Okay.  I've got the older ones.  Just
6      give me a second.
7   **A.** This is new.
8          MS. SRIVASTAVA:  Mark this as 5.
9          (Defendant's Exhibit 5 was
10         marked for identification.)
11  **A.** Yeah.  States it right here, supervisor.
12      It doesn't mention anyone else but the
13      supervisor.
14  **Q.** And which page are you on?
15  **A.** On -- you go by the Charter --
16  **Q.** Uh-huh.
17  **A.** -- 268.
18  **Q.** Uh-huh.
19  **A.** You should consult your supervisor.
20  **Q.** Uh-huh.  And did you ever consult your
21      supervisor when you were working at
22      Charter about any questions about your
23      pay?

---

36

1   **A.** I let her know several times that I was
2      interrupted on my lunch, they would come
3      find me to help them out.
4   **Q.** Did you ever tell your supervisor that
5      you weren't being paid for that time?
6   **A.** She was aware.  I mean, if I told her
7      that I was working on my lunch, my
8      understanding was that she knew that I
9      needed to get paid.
10  **Q.** Okay.  So did you say to Nicole, I'm not
11      being paid for this time?
12  **A.** Yes, I have.
13  **Q.** You have said that before?
14  **A.** Uh-huh.  (Witness nods head.)
15  **Q.** Okay.  Do you remember when you said that
16      before?
17  **A.** I don't know dates and times.
18  **Q.** Can you give me your best and fullest
19      recollection of what that conversation
20      was?
21  **A.** I believe it was one of the employees --
22      I was actually outside of the building
23      and she came and got me.  Nicole was not

---

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                              April 15, 2015

---

37

1   at the office at the time.  She was in
2   one of the other locations.  But we had
3   had this conversation before where I told
4   her, you know, they come get me when
5   I'm -- I'm at lunch.
6   **Q.** So what happened in this one instance
7   when the employee came to get you?
8   **A.** I'm sorry?
9   **Q.** What happened during this one instance
10  where the employee came to get you?
11  **A.** I mean, I just -- I helped them out.  I
12  mean, I have to go to the front.  You
13  know, business needs.  If they need --
14  the customer is there, I need to -- I'm
15  told that I need to help.
16  **Q.** Who was the employee that came to get
17  you?
18  **A.** I don't recollect the name.
19  **Q.** Do you remember when this happened?
20  **A.** I don't know what year.  Either -- it
21  would happen with Gina Hinkle.  It would
22  happen with DeAndre.  I mean, several of
23  them would come find me.

---

38

1   **Q.** Okay.  And we'll come back to that.
2   **A.** Okay.
3   **Q.** But for this one particular instance, do
4   you remember who it was that came --
5   **A.** No.
6   **Q.** -- to get you?
7   **A.** No, ma'am.
8   **Q.** Okay.  Do you remember where you were
9   taking your lunch break at the time?
10  **A.** I was outside, actually, smoking a
11  cigarette.
12  **Q.** Okay.  You're a smoker?
13  **A.** Yes.
14  **Q.** So you were on your lunch break smoking a
15  cigarette?
16  **A.** Yes.
17  **Q.** Okay.  Had you already clocked out?
18  **A.** Yes.
19  **Q.** Okay.  Did you go back inside to help a
20  customer?
21  **A.** I did.
22  **Q.** Do you remember what this employee whose
23  name you don't know said?

---

39

1   **A.** It was -- customer wanted to see -- they
2   wanted to make a payment arrangement on
3   their account.
4   **Q.** And what did you say to this employee?
5   **A.** That I would have go inside and look at
6   the computer because I can't make a
7   payment arrangement if I don't know --
8   there's, like, the days past in the
9   account, if they're how many days past
10  due.  So I would have to literally go
11  inside and look at the computer.
12  **Q.** Did you go inside and look at the
13  computer?
14  **A.** Yes, ma'am.
15  **Q.** Do you know how long you spent looking at
16  the computer?
17  **A.** I don't remember time.  It -- it was -- I
18  don't know -- more than 20 minutes.  I
19  don't . . .
20  **Q.** Twenty minutes?
21  **A.** It was more than 20 minutes, because the
22  customer didn't agree of how much they
23  want to pay, so then you get into talking

---

40

1   to the customer and . . .
2   **Q.** What happened after that 20 minutes?
3   **A.** I instructed the employee what they
4   needed to do, the amount that it would be
5   okay for the customer to pay to turn the
6   services back on, and I just went back to
7   my lunch.
8   **Q.** You went back to your lunch break after
9   that?
10  **A.** Yes.
11  **Q.** Do you remember how long you had been
12  outside smoking before this employee
13  allegedly came to you?
14  **A.** No.
15  **Q.** You don't remember?  Do you remember how
16  long you spent on your lunch break after
17  you helped this customer?
18  **A.** Maybe -- probably had about another 15
19  minutes left.  I don't know.
20  **Q.** Did you tack on any time -- additional
21  time to your lunch break?
22  **A.** No.  If I did that, then we're considered
23  late coming back from lunch.

10 (Pages 37 to 40)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                    April 15, 2015

41

1   **Q.** You didn't clock in to eTime when you
2       came back in to help the customer?
3   **A.** No.
4   **Q.** Why not?
5   **A.** Wasn't told that I had to.  I mean, it
6       was an hour lunch.
7   **Q.** Was it your understanding that you were
8       supposed to be paid for all the time that
9       you did work for Charter?
10  **A.** That was my understanding.
11  **Q.** And you knew that your payroll was run
12      off of what you put in to eTime; right?
13  **A.** Right.
14  **Q.** But you didn't clock in to eTime when you
15      came back from your lunch to help that
16      customer; right?
17  **A.** I did not.
18  **Q.** Okay.  And you didn't clock out of eTime
19      when you went back to your lunch break;
20      right?
21  **A.** I'm sorry.  If you --
22  **Q.** So because you didn't clock in when you
23      came to help the customer --

42

1   **A.** Right.  No.
2   **Q.** -- with --
3   **A.** I was at lunch.
4   **Q.** Right.
5   **A.** It was my lunch.  I was helping the
6       employee with her customer.
7   **Q.** Okay.  And you don't know how much of
8       your lunch break you missed?
9   **A.** No, ma'am.  Most of the time I didn't.  I
10      mean, I would just go in there and help
11      them.  I mean, it wasn't that I was
12      keeping time.  I mean . . .
13  **Q.** In this particular instance, you don't
14      remember how much of your lunch break you
15      missed?
16  **A.** (Witness shakes head.)  I mean, there's
17      another instance -- and I'm sure they
18      probably have it recorded -- that I
19      forgot to clock back in.  And it was an
20      e-mail with -- I guess Linda had told
21      Nicole and copied me that it was my
22      responsibility to clock in and out.  I
23      was helping Valerie.  Yes, it was

43

1       Valerie.  She had a customer.  And I
2       completely forgot to clock back in.  I
3       just stayed in the front helping this
4       customer.  It took me more than 30
5       minutes.  And so I was reprimanded
6       because I didn't clock back in.  I
7       completely forgot.  I just continued to
8       work.  And an e-mail was sent to me
9       that -- or Nicole -- that it is my
10      responsibility to clock in, which I know
11      that but because I got caught up helping
12      this particular customer, I didn't do it.
13  **Q.** Okay.  And we'll come back to that, but
14      just wanted to close out what we were
15      talking about before, that one instance
16      that you remember that you came back in.
17      You didn't put that time in your eTime;
18      right?
19  **A.** No, I didn't.
20  **Q.** Okay.  Did you make your supervisor aware
21      that you had done that?
22  **A.** She -- she knew all the time that I would
23      help the new -- especially if they were

44

1       new hires.  They had lots of questions.
2       If she was not on location, my job was to
3       be the acting supervisor, if you will
4       call that, whenever they had questions,
5       and that's what I did.
6   **Q.** Okay.  So my question was a little
7       different.  I asked if you made Nicole
8       aware during that one time that you had
9       come in and worked 20 minutes of your
10      lunch break.
11  **A.** She was aware.
12  **Q.** How was she aware?
13  **A.** Me telling her that I had to help
14      whatever the person it was.  That's me
15      telling her I had to work on my lunch --
16      during my lunch or however you say it.
17  **Q.** So that day that you went in to help the
18      customer, did you call Nicole?
19  **A.** No, ma'am.
20  **Q.** Was Nicole on site that day?
21  **A.** No.
22  **Q.** Okay.
23  **A.** Most of the time when I had to help them,

11 (Pages 41 to 44)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                      April 15, 2015

---

**45**

1    she was not on site. She was either at
2    the other locations with -- you know, she
3    had to be in the other locations.
4    **Q.** Okay. So if Nicole was not on site, she
5    couldn't see what you were doing during
6    your lunch break; right?
7    **A.** No, ma'am.
8    **Q.** And that one incident that we talked
9    about earlier, you didn't call Nicole?
10   **A.** No.
11   **Q.** Did you try and record that 20 minutes
12   for your lunch break at the end of the
13   day or on another day?
14   **A.** I wasn't told that I needed to do that.
15   **Q.** Did you ask --
16   **A.** My understanding was, according to this,
17   you let your supervisor know, and that's
18   what I did. It didn't tell me that I
19   have to write it down, clock in, or clock
20   out. I was not aware that I was supposed
21   to do that.
22   **Q.** Were you aware that you supposed to
23   record all the time you worked for

---

**46**

1    Charter in the eTime system?
2    **A.** I mean, yeah, when I clock -- okay. What
3    I'm saying is, on my lunch, if I clock
4    out of lunch and I'm asked to assist, I
5    was not aware that I needed to clock back
6    in -- back in. But if I did that, if I
7    helped on my lunch, I would let my
8    supervisor know, Hey, such and such
9    needed my help and this is what it was,
10   the customer, you know.
11   **Q.** So going back to that one day, you didn't
12   let your supervisor know that day;
13   correct?
14   **A.** Not the day -- not the day that it
15   happened, no, ma'am.
16   **Q.** Okay. Did you ever let Nicole know later
17   in that week, Hey, I worked 20 hour -- 20
18   minutes during my lunch break on Monday
19   and I didn't get paid for it?
20   **A.** It wasn't like I worked 20 minutes on my
21   lunch. It's, like, somebody came and got
22   me, such and such came and got me because
23   they had a question with such and such

---

**47**

1    customer. So that was me letting her
2    know I was interrupted during my lunch.
3    **Q.** Did you think that you should be paid for
4    that time?
5    **A.** It was -- I was entitled for an hour
6    lunch.
7    **Q.** So did you think you were supposed to be
8    paid for that time?
9    **A.** Yes.
10   **Q.** But you didn't record it?
11   **A.** I -- again, I figured it was my
12   supervisor's responsibility to do that.
13   **Q.** Was it your supervisor's responsibility
14   to record overtime when you worked past
15   the close of your shift?
16   **A.** She's responsible in the timekeeping.
17   **Q.** Did you have a responsibility for your
18   timekeeping?
19   **A.** Yeah. I clocked in and out. And if
20   there was a problem with eTime, I would
21   let her also know there was a problem
22   with eTime.
23   **Q.** What were the problems with eTime that

---

**48**

1    you had?
2    **A.** There was times that it -- it just
3    wouldn't work or whatnot or the system
4    was down. I guess that's what they call
5    it. If it was down then, you know,
6    she -- you were supposed to let her know
7    when eTime was not up and running
8    or . . .
9    **Q.** How often did that happen that you had
10   issues with eTime?
11   **A.** Not very often. Normally everybody would
12   be down as well and just not me. It was
13   just overall.
14   **Q.** What would happen on those occasions?
15   **A.** Just let her know and she would, I guess,
16   write it down, that's a -- record it and
17   know that, you know, eTime was down or
18   whatever.
19   **Q.** When eTime was down, were you -- and
20   Nicole would clock in for you or fix that
21   issue, were you then paid correctly for
22   that time?
23   **A.** Yes.

---

Gore Perry Reporting and Video

FAX 314-241-6750              314-241-6750              www.goreperry.com

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                        April 15, 2015

---

49

1  **Q.** Okay.  You said earlier that there were
2     two HR folks at Vestavia Hills; right?
3  **A.** Yes.
4  **Q.** Okay.  So you went to Carla with some
5     questions; correct?
6  **A.** Uh-huh.
7  **Q.** Okay.  Did you ever go to the other
8     gentleman who was at Vestavia Hills with
9     any questions?
10 **A.** You know, I think the way that HR was
11    divided was, like, they had HR for
12    technicians and HR for dispatch. Carla
13    really wasn't our HR rep, if you will.
14    Ours was out of state.  And I don't
15    remember her name.  They had it divided
16    where, you know, the technicians and
17    dispatch, so . . .
18 **Q.** So even though Carla wasn't your rep, you
19    would sometimes go to her with questions?
20 **A.** Yeah.  I mean, that particular time the
21    incident happened, I went to her, yes.
22 **Q.** Okay.
23 **A.** It was brought to her attention.  And I

---

50

1     guess she was assigned to it, maybe, if
2     that's what you call it.
3  **Q.** Uh-huh.  Did you ever go to her with any
4     other questions?
5  **A.** No.
6  **Q.** Okay.  Did you ever go to the other HR
7     folks with any questions?
8  **A.** No.  He wasn't -- he wasn't our HR rep.
9  **Q.** Okay.  And you don't know who your HR rep
10    was?
11 **A.** I don't remember her name.  It was -- it
12    was a lady at maybe St. Louis, maybe.
13 **Q.** Okay.
14 **A.** Or Georgia.  I'm not sure what her name
15    was.  But she wasn't there.  She didn't
16    have an office there local.
17 **Q.** Okay.  How were you made aware of who you
18    could reach out to in HR?
19 **A.** It was probably an e-mail.  Was it
20    e-mail?
21 **Q.** So you received an e-mail saying who --
22    who were your supporting HR people?
23 **A.** I believe so.  I -- yeah.

---

51

1  **Q.** Does Charter have an ethics number or an
2     800 number that you can call --
3  **A.** I think they have a --
4  **Q.** -- if you have --
5  **A.** -- have a website, I believe, yes.
6  **Q.** Do you know what that website is?
7  **A.** I can't really remember, no.  I -- it's
8     called ethics something dot com or --
9  **Q.** Does EthicsPoint sound right?
10 **A.** Yes.
11 **Q.** Okay.
12 **A.** That's it.
13 **Q.** Did you ever use EthicsPoint?
14 **A.** No.
15 **Q.** Why not?
16 **A.** Ethics is for, like, a -- to me,
17    EthicsPoint, ma'am, was if you were
18    having harassment or something.  That's
19    what my understanding was.  I don't think
20    it was anything for time.
21 **Q.** Did you ever try and call your HR rep who
22    was in St. Louis?
23 **A.** (Witness shakes head.)

---

52

1  **Q.** No?
2  **A.** No.
3  **Q.** Okay.  Why not?
4  **A.** Again, I had a supervisor.  I went to her
5     for whatever issues I had.  She's my
6     supervisor.  I mean, chain of command, my
7     supervisor.  I've never really gone
8     outside of that.
9  **Q.** Did you never go outside of that because
10    you believed you couldn't or you just
11    didn't want to?
12 **A.** No.  I just thought she would handle the
13    issue, whatever issue was.  That's what
14    supervisors are there for.
15 **Q.** What kind of issues did you go to your
16    supervisor for?
17 **A.** We discussed attendance or milestones or
18    needing change, I mean, like the everyday
19    business thing, so . . .
20 **Q.** What did you discuss with your supervisor
21    about attendance?
22 **A.** Oh, I was a -- couple times was late, so
23    we discussed that.

---

13 (Pages 49 to 52)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                      April 15, 2015

---

53

1  **Q.** What did you talk about when you
2    discussed being late to work?
3  **A.** She just told me that it needed to
4    improve because, you know, I was the lead
5    and there was other employees there that
6    look up to the lead and that -- what I
7    needed to do to improve, what can she do
8    to help.  It was offered for me to
9    probably change my schedule nine to six
10   so it will help me.
11 **Q.** Did you change your schedule from nine to
12   six?
13 **A.** I believe so.  Yes, I did.
14 **Q.** Did that help you get to work on time?
15 **A.** Yes.
16 **Q.** Those days that you were going to work
17   and you got in a couple minutes late, did
18   you clock in when you got in?
19 **A.** Yes.
20 **Q.** Do you know if those weeks you were paid
21   for 40 hours?  Don't know?
22 **A.** I mean, I'm sure I did.
23 **Q.** As part of these conversations about your

---

54

1    attendance and arriving late, did you
2    ever go over the Charter attendance
3    policies?
4  **A.** Yeah.
5  **Q.** Yes?
6  **A.** Yes.
7  **Q.** Okay.  Do you remember what they said?
8  **A.** I'm not gonna -- I just -- it is to our
9    policy to attend -- I mean, you know, I
10   don't . . .
11 **Q.** Did you ever go over the importance of
12   timekeeping with your supervisor as part
13   of --
14 **A.** She would send --
15 **Q.** -- these attendance meeting?
16 **A.** She had sent several e-mails.
17 **Q.** What were the e-mails about?
18 **A.** Clocking in and clocking out.
19     MR. ARENDALL:  Rita, did you ever
20   make an exhibit of this?
21     MS. SRIVASTAVA:  We did, but we
22   didn't actually look at it.
23     MR. ARENDALL:  Okay.

---

55

1     MS. SRIVASTAVA:  We'll come
2  back --
3     MR. ARENDALL:  I'm just trying to
4  keep my numbering.
5     MS. SRIVASTAVA:  Yeah.
6     MR. ARENDALL:  Okay.
7     MS. SRIVASTAVA:  We'll clarify
8  it.
9  **Q.** (By Ms. Srivastava) What were the e-mails
10   that you have with your supervisor about
11   clocking in and clocking out?
12 **A.** It was overall reminding everybody to
13   make sure to clock in and clock out.
14 **Q.** At the beginning of the day?
15 **A.** At the beginning of the shift and ending
16   of the shift, yes.
17 **Q.** Did it also involve clocking in and
18   clocking out for your lunch break?
19 **A.** Sure.  I'm -- I'm sure it did.
20 **Q.** You mentioned earlier that there were a
21   couple of times where you forgot to clock
22   in at the end of your lunch break; right?
23 **A.** Yes.

---

56

1  **Q.** Okay.  Do you remember having
2    conversations with your supervisor about
3    that?
4  **A.** At the time I didn't know until, I guess,
5    her supervisor Linda would do a -- what
6    do you call it?  I mean, she would go in
7    there and look.  And that's how I knew I
8    didn't clock in.  So I guess Linda
9    contacted her and let her know that I
10   didn't clock in.  But at the time, I
11   didn't know that I had forgotten,
12   so . . .
13 **Q.** Okay.  So you had a conversation with
14   Nicole about this?  You had
15   conversations --
16 **A.** Yes.
17 **Q.** -- with Nicole talking --
18 **A.** Yes.
19 **Q.** -- about --
20 **A.** We discussed that, yes.
21 **Q.** Okay.
22 **A.** Because I was telling her that -- I mean,
23   I told her -- I apologized.  It wasn't

14 (Pages 53 to 56)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                              April 15, 2015

57

1     that I -- you know, I meant to do it.  It
2     was just Valerie had a customer at the
3     time that took more than 30 minutes to
4     handle that customer.
5   Q. Do you remember when this conversation
6     was?
7   A. God, no, I don't.
8   Q. Do you remember what year it was?
9   A. It was last year, probably month -- maybe
10    April.  I'm not sure.
11  Q. April 2014?
12  A. Yeah.
13  Q. Okay.  Did you ever have a conversation
14    about clocking out, late returning from
15    your lunch break prior to April 2014?
16  A. I don't remember.
17  Q. Did you have any other supervisors when
18    you were at Vestavia Hills other than
19    Nicole Johnson?
20  A. No.
21  Q. You mentioned that when Nicole wasn't
22    there you were basically the acting store
23    supervisor for the front lead.

58

1   A. Correct.
2   Q. What did that entail?
3   A. They would have -- when customers came in
4     with issues, I have to kind of make the
5     call what needed to be done as far as
6     payments, collecting monies or payment
7     arrangements or, you know, stuff like
8     that.
9   Q. Were there other people who worked at the
10    front counter with you?
11  A. Yes.
12  Q. How many other people were there?
13  A. Four -- three.  Probably three.
14  Q. Three or four?
15  A. Three or four.  It -- it varies.  I mean,
16    the time limit that I've been there, it
17    would very.  I mean, we would have a full
18    house or we've just been short-handed, so
19    there was probably room for five, maybe,
20    from five to three, so . . .
21  Q. Okay.  So three to five, depending --
22  A. Yeah.
23  Q. -- on --

59

1   A. Yes.
2   Q. -- the day?
3   A. Right.
4   Q. And when Nicole wasn't there, were you in
5     charge of supervising those three to five
6     individuals?
7   A. Correct.
8   Q. Okay.  Did that involve telling them when
9     to take their lunch break?
10  A. I mean, they knew when to take -- it was
11    scheduled.  They had -- it was a schedule
12    made for when they needed to take their
13    lunch.
14  Q. Who made the schedule?
15  A. Nicole.
16  Q. Did the individuals take their lunch when
17    they were scheduled to take their lunch?
18  A. Yes.
19  Q. Would they let you know before they were
20    going to take their lunch break?
21  A. Sometimes they did, sometimes they
22    forgot.  I mean, sometimes I remember,
23    Okay, where's such and such?  And then,

60

1     Oh, yeah, that's right it's their lunch
2     so, yes.
3   Q. Did any of the individuals that you were
4     supervising ever miss a lunch break
5     because they were coming back in and
6     helping customers?
7   A. No.  They took their lunch.
8   Q. When Nicole wasn't on site and you were
9     acting as the store lead, if these
10    individuals had to stay after the close
11    of their shift, would they record
12    overtime for that?
13  A. Yeah, I believe so.
14  Q. Would they get paid for that time?
15  A. I'm sure they did.
16  Q. Would they ask you for permission before
17    they would stay late?
18  A. No.  There was times that they would, I
19    mean, call her and let her know.  I
20    mean -- I mean, there was times that
21    you -- if the store closed at, say,
22    seven o'clock and you're scheduled to
23    seven o'clock, you still -- if locked the

15 (Pages 57 to 60)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                          April 15, 2015

---

61

1    doors, there was still customers in the
2    store.  So there would be times that you
3    had no choice but to help whoever's in
4    that store.  So I don't see that as
5    asking permission other than if you tell
6    the customer, Okay, seven o'clock, you
7    got to go.  You know what I mean?  So it
8    was mostly that -- that incident where,
9    okay, we've got to finish up, we'll lock
10   the doors but there's customers here.  We
11   finish up with them.  And it would go
12   over seven o'clock or five o'clock.
13   **Q.** And in those instances, would you record
14   that in your eTime or have the employees
15   record that in --
16   **A.** They would just --
17   **Q.** -- their eTime?
18   **A.** -- clock in and clock out, yes.  And then
19   you have -- once you finish with their
20   customers, then they have to balance
21   their drawer, cash drawers.
22   **Q.** How long did closing out the cash drawers
23   take?

---

62

1    **A.** Typically only takes 15 minutes.
2    **Q.** Okay.
3    **A.** But not everybody would know how to do it
4    in 15 minutes, so . . .
5    **Q.** On those occasions, would you sometimes
6    help the individuals close out their cash
7    drawers?
8    **A.** Yes.
9    **Q.** Okay.  Then would you record overtime for
10   that?
11   **A.** Yes.
12   **Q.** Okay.  And get paid for that?
13   **A.** Yes.
14   **Q.** Would you call Nicole before you would
15   stay late to ask for permission to stay
16   after the close of your shift if she
17   wasn't on site?
18   **A.** No.
19   **Q.** You just recorded it?
20   **A.** Uh-huh.  (Witness nods head.)
21   **Q.** And that wasn't an issue?
22   **A.** (Witness shakes head.)
23   **Q.** No?

---

63

1    **A.** No.
2    **Q.** So I think David had pointed out that we
3    haven't used one of our exhibits, which
4    was being marked here as Exhibit 5.  And
5    it's a Charter Timekeeping Policy, the
6    effective dates from August 7, 2008 to
7    October 12, 2010.
8    **A.** We're on the first page?
9    **Q.** On the first page.  The top right has got
10   the date.  Take a minute and look through
11   that.
12   **A.** 3.0 policy?
13   **Q.** Uh-huh.
14       (Witness reviews document.)
15   **A.** Okay.
16   **Q.** So in that last paragraph on the first
17   page, it says, In the event that a
18   nonexempt employee performs work during
19   meal breaks or before or after the
20   regular work schedule, the hours worked
21   must be recorded on the employee's
22   electronic timecard and the employee will
23   be compensated.

---

64

1        Was that your understanding?
2        MR. ARENDALL:  I'm going to
3    object because what is this?  Is this an
4    HR policy or is this something that's
5    given to employees?
6        MS. SRIVASTAVA:  It's an HR
7    policy that's kept in the Charter
8    handbook.  It's the prior version of the
9    one that we have.
10       MR. ARENDALL:  So Exhibit 2, the
11   handbook that's dated March 3, 2010, is
12   the predecessor to this policy that says
13   it's revised October 12, 2010?
14       MS. SRIVASTAVA:  Uh-huh.
15       MR. ARENDALL:  Is that a yes?  Is
16   that your understanding?
17       MS. SRIVASTAVA:  That was my
18   understanding.
19       MR. ARENDALL:  Okay.
20       MS. SRIVASTAVA:  Yeah.
21       MR. ARENDALL:  And it's your
22   understanding that 5 is contained in a
23   newer version of the handbook that must

---

16  (Pages 61 to 64)

65

1  be dated October --
2        MS. SRIVASTAVA:  Is this the --
3        MR. ARENDALL:  -- 2010?
4        MS. SRIVASTAVA:  This the -- 5?
5  Right.
6        MR. ARENDALL:  Yeah.
7        MS. SRIVASTAVA:  Yeah.  It's --
8        MR. ARENDALL:  Okay.  So --
9        MS. SRIVASTAVA:  -- my
10  understanding that this is -- this is the
11  prior version, and that this is the later
12  version (indicating).  So this would
13  cover all of Ms. Lopez's employment with
14  Charter.
15        MR. ARENDALL:  Okay.  So 5 is an
16  earlier version of what's contained in
17  the handbook that's labeled 2?
18        MS. SRIVASTAVA:  Exactly.
19        MR. ARENDALL:  Okay.
20        MS. SRIVASTAVA:  Yes.
21        MR. ARENDALL:  Thank you.
22  **Q.** (By Ms. Srivastava) Going back --
23  **A.** What's the question?

66

1  **Q.** -- to the --
2  **A.** I'm sorry.
3  **Q.** -- question.  Yeah.  That's --
4  **A.** Yes, please.
5  **Q.** -- fine.  In the event that a nonexempt
6     employee performs work during meal breaks
7     or before or after the regular work
8     schedule, the work hours -- the hours
9     worked must be recorded on the electronic
10    timecard and the employee will be
11    compensated.  Is that your understanding?
12  **A.** Yes.
13  **Q.** Yes?  I understand from the videographer
14    we have to take a short break.
15  **A.** Okay.
16        VIDEOGRAPHER:  This ends
17  Videotape No. 1 of the deposition of
18  Karen Lopez-Easterling.  The time is now
19  10:40 a.m.
20        (Short recess.)
21        VIDEOGRAPHER:  This is the
22  beginning of Videotape No. 2 in the
23  deposition of Karen Lopez-Easterling.

67

1     The time is now 10:52 a.m.
2  **Q.** (By Ms. Srivastava) Ms. Lopez, I just
3     wanted to go back and ask you a couple
4     more questions about the eTime
5     timekeeping process.  Did you understand
6     that you were supposed to be putting time
7     in on a daily basis when you were putting
8     in -- clocking in and clocking out on
9     eTime?
10  **A.** When you say "put in time," like other
11     than me just going in and password and
12     whatever?  That's my clock-in.
13  **Q.** Exactly.  You did that on a daily basis;
14     right?
15  **A.** Yes.
16  **Q.** Okay.  Did you ever have a chance to
17     review that time at the end of the week
18     or on a biweekly basis to make sure that
19     it was correct?
20  **A.** From time to time I would go in and
21     check.
22  **Q.** Okay.  How would you do that?
23  **A.** I have to do again the user name and the

68

1     password and it will take me to -- to it.
2  **Q.** What would it take you to?
3  **A.** The clock in/clock out.
4  **Q.** So the hours that you had worked?
5  **A.** Yes.
6  **Q.** Okay.  And what did you do then?
7  **A.** Just, I mean -- well, at the end of
8     the -- when you check it, I think you
9     revise -- no, not revise it, but you
10    approve it.  No, you can approve without
11    looking at it, I think.  Yes.
12  **Q.** So you would approve your time?
13  **A.** Yes.
14  **Q.** Would you do that on a weekly basis or a
15    biweekly --
16  **A.** It was --
17  **Q.** -- basis?
18  **A.** -- biweekly.
19  **Q.** Biweekly?  Okay.  Did you understand that
20    when you were approving your time you
21    were certifying that the hours you were
22    recording were true and accurate?
23  **A.** Right.

17 (Pages 65 to 68)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                          April 15, 2015

69

1   Q. Okay.  Would the supervisor that you were
2      giving your eTime submissions to have any
3      way of knowing the number of overtime
4      hours that you worked other than the
5      hours that you reported in your eTime?
6   A. Say that question one more time.
7   Q. Yeah.  So you reported your time through
8      eTime; correct?
9   A. Right, right.
10  Q. Okay.  And there were days when Nicole
11     wasn't at Vestavia Hills; correct?
12  A. Correct.
13  Q. Okay.  So was there any way for Nicole to
14     know the number of overtime hours that
15     you worked other than the time that you
16     put into eTime?
17  A. If I told her, yes.
18  Q. Okay.  Other than you telling her, was
19     there any way for her to know?
20  A. No.
21  Q. Okay.  Did you have the ability to change
22     time in eTime on your own?
23  A. No.

70

1   Q. Okay.  So you clocked in and clocked out
2      on your own?
3   A. Uh-huh.  (Witness nods head.)
4   Q. Okay.  So if you had clocked in for
5      lunch, you would have been able to do
6      that without Nicole's permission;
7      correct?
8   A. To clock in?
9   Q. Yes.
10  A. Yeah.  Uh-huh.
11  Q. And when you were clocking out for lunch,
12     you were able to do that without Nicole's
13     permission.
14  A. Correct.
15  Q. Correct?  When you clocked back in for
16     lunch, you were able to do that without
17     her permission; correct?
18  A. I'm sorry.  You completely threw me off
19     there.
20  Q. Okay.  So you clock out for lunch;
21     correct?
22  A. Yes.
23  Q. Okay.  You clock back in for lunch;

71

1      correct?
2   A. Yes.
3   Q. Okay.  When you do that, do you need to
4      ask Nicole for permission?
5   A. No.
6   Q. No.  So you had the opportunity if you
7      wanted to clock out for lunch at noon?
8   A. Uh-huh.
9   Q. And clock back in at 12:30; correct?
10  A. But why would I clock in at 12:30 when
11     it's an hour lunch, you know.
12  Q. If your -- if your hour-long lunch was
13     shortened for any reason --
14  A. Right.
15  Q. -- you had the ability to clock back in
16     early; correct?
17  A. Not without permission, no.  I was under
18     the understanding that I have get an hour
19     lunch and we are to take the hour, so I
20     didn't believe that I could just go in
21     there and take it upon myself to just
22     clock back in.
23  Q. You didn't believe that you were allowed

72

1      to clock back in during your lunch break?
2   A. No.  I --
3   Q. Did you ever ask if you could clock back
4      in early from your lunch break?
5   A. No.
6   Q. No?
7   A. No.
8   Q. Okay.  Did you ever have a supervisor
9      reject the number of hours that you
10     provided in the eTime system?
11  A. Not that I'm aware of, no.
12  Q. Okay.  Did you ever ask HR whether or not
13     you would be able to put your time in for
14     any time that you say you spent working
15     through your lunch break?
16  A. I didn't go to HR.  I just went to my
17     supervisor.
18  Q. Okay.  I'm going to ask just a couple of
19     questions about preshift work which were
20     originally part of this case.
21  A. Uh-huh.
22  Q. Okay.
23        MR. ARENDALL:  And just for the

18  (Pages 69 to 72)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                      April 15, 2015

73

1    record, we are dropping those claims.
2    We're only pursuing the ones for during
3    the meal breaks.
4          MS. SRIVASTAVA:  Okay.
5    Q. Okay.  And so you had originally claimed
6    you were scheduled to commence work at
7    9 a.m. each morning but arrived some ten
8    to fifteen minutes early to work most
9    days; right?
10   A. I -- if I have to -- if the traffic was
11   good, I would get there earlier, yes.
12   Q. Okay.  And that was originally part of
13   this case; right?
14   A. I believe so.
15   Q. Okay.  It's no longer part of this case.
16   A. No.
17   Q. Correct?  Okay.  Okay.  So we talked a
18   little bit about lunch breaks before, but
19   lets go into it in a bit more detail this
20   time.
21   A. Okay.
22   Q. What was your understanding that you were
23   entitled to with respect to a lunch

74

1    break?
2    A. My understanding is you get an hour --
3    Q. Okay.
4    A. -- lunch.
5    Q. Okay.  How is that lunch break scheduled?
6    Was there a certain time when you were
7    supposed --
8    A. Oh, yes.
9    Q. -- to take your lunch break?
10   A. Yes.  I believe mine was twelve to one,
11   or is it one to two?  One of those two.
12   It was -- I know I like my lunch late,
13   so . . .
14   Q. Okay.  Why do you like your lunches late?
15   A. It just kind of traffic and whatnot if I
16   went somewhere or just not everybody
17   would be in the break room at that time.
18   Q. Did you stagger your lunch breaks with
19   the other people on the front counter?
20   A. Meaning?
21   Q. Meaning did everybody on the front
22   counter go to lunch at the same time?
23   A. No, no.

75

1    Q. No?  Okay.
2    A. No.  They had set lunch breaks --
3    lunchtimes, yes.
4    Q. How were those lunchtimes set up?
5    A. I think it was a 30-minute interval --
6    interval, like maybe one started at
7    eleven, eleven to twelve -- it was also
8    depending how many people we had on
9    staff, so it either could be eleven to
10   twelve, and then the next one would go
11   11:30 to -- so probably 30 minutes in
12   between.
13   Q. Okay.  So one person would go at
14   eleven --
15   A. Yes.
16   Q. -- the next person at 11:30, the next
17   person at twelve?
18   A. (Witness nods head.)
19   Q. Okay.  And you like yours from twelve to
20   one or one to two, you said?
21   A. Yes.
22   Q. Okay.  And you said that one of the
23   reasons you like is because -- you like

76

1    your lunches late is because of traffic?
2    A. Yeah.  If I would go somewhere to get
3    something, yes.
4    Q. Okay.  Where would you go to get lunch if
5    you were --
6    A. There was -- there was, like, an Arby's
7    around the corner or a Ranch House thing.
8    Q. Did you ever bring your lunch?
9    A. Yes.  Actually, I brought my lunch more
10   than I bought lunch, so . . .
11   Q. When you would go out to Arby's or to
12   Ranch House, would you take your full
13   one-hour lunch break?
14   A. I would go pick up and come back.
15   Q. Okay.  How long would that take?
16   A. Probably ten, fifteen minutes at the
17   most.  Like I said, it literally was
18   right around the corner.
19   Q. What would you do when you came back?
20   A. Just go inside and just eat my lunch.
21   Q. Where in the Vestavia Hills store did you
22   take your lunch?
23   A. We either do it in the break room or --

19 (Pages 73 to 76)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

---

77

1    unless they called a cash -- the back
2    room.
3    **Q.** Did you ever take your lunch in your car?
4    **A.** I did once in a blue moon.  I mean, only
5      in the warmer weather.  If it was cold,
6      no, I wouldn't sit in my car.
7    **Q.** So warmer weather you would take your
8      lunch break in your car?
9    **A.** Sometimes, yes.
10   **Q.** When you were eating in your car, would
11     anyone come out to your car to ask you a
12     question?
13   **A.** There was times they would find me, yes.
14   **Q.** Who would do that?
15   **A.** I mean, whatever employee that was -- had
16     a customer that needed a supervisor
17     assistant, yes.
18   **Q.** Okay.  What types of issues would you
19     need supervisor assistance for?
20   **A.** Payment arrangements, turning their cable
21     back on.  If it was a new customer and,
22     you know, they did a credit check to, you
23     know, pay it in advance or not pay the

---

78

1    installation fee, decisions like that
2    that they were not allowed to make the
3    decision on.
4    **Q.** Okay.  Were there ever days when you were
5      able to take your entire one-hour lunch
6      break uninterrupted?
7    **A.** Yes, yes.
8    **Q.** Okay.  What would you do on those days?
9    **A.** Just -- I mean, if I brought my lunch, I
10     eat my lunch and just sit there, play
11     with my tablet, you know, just play with
12     my phone.
13   **Q.** And that was sometimes in the break room?
14   **A.** Right.
15   **Q.** Sometimes was that in the back room?
16   **A.** Back -- back room or my car, whichever.
17   **Q.** Would you ever sit down in the Arby's --
18   **A.** No.
19   **Q.** -- take your lunch --
20   **A.** No.
21   **Q.** -- there?  You always --
22   **A.** I always went through the drive-through.
23   **Q.** Okay.  How many of your lunch breaks

---

79

1    would you say were uninterrupted, where
2    you were able to take them?
3    **A.** Probably one or two.  One or two, yeah.
4    **Q.** One to two a week?
5    **A.** Yes.
6    **Q.** Some weeks would there be more than two
7      lunch breaks that you would get
8      uninterrupted?
9    **A.** Ma'am?
10   **Q.** Were there ever weeks where you would get
11     more than one or two lunch breaks
12     uninterrupted for the entire hour?
13   **A.** That's what I'm saying, yes, two to three
14     times I would be interrupted.
15   **Q.** So my question is actually were there --
16     was there ever a week when you had more
17     than one or two lunch breaks that were
18     uninterrupted?
19   **A.** Yes.
20   **Q.** Okay.  Do you remember which weeks those
21     were?
22   **A.** (Witness shakes head.)
23   **Q.** So tell me a little bit about when your

---

80

1    lunch breaks were interrupted.  Who would
2    come get you?
3    **A.** It could be different of the people that
4      work there.  I mean, if a customer came
5      in and they were -- had questions and
6      they couldn't -- didn't know the -- the
7      answer to it or couldn't make the
8      decision on it, if Nicole wasn't there,
9      then they would come find me.
10   **Q.** Okay.  So if Nicole was there, Nicole
11     would answer those questions --
12   **A.** Right.  Nicole would --
13   **Q.** -- for the employee?
14   **A.** -- take care, yes.
15   **Q.** Okay.  So were your lunch breaks ever
16     interrupted when Nicole was on site?
17   **A.** If she was in a meeting, but that didn't
18     happen often.
19   **Q.** Did employees ever call Nicole when she
20     was off site instead of coming to you
21     with questions when you were on your
22     lunch break?
23   **A.** I think they might have once or twice.  I

---

20  (Pages 77 to 80)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                      April 15, 2015

---

81

1    mean, I'm sure they probably had or -- I
2    don't know. I don't know, because they
3    came and got me, so I'm not -- I'm not
4    sure. I don't think they have.
5    Q. Did you ever tell any of the employees
6    that you were on your lunch break and
7    that you would see them afterwards?
8    A. Well, first of all, they knew I was on my
9    lunch. Second, they said the customer
10   was irate and they wanted to see somebody
11   now.
12   Q. So you didn't say, I'm on my lunch, I'll
13   revisit this after?
14   A. Yeah, I tell them on my lunch but they
15   would go on to, Okay, the customer's
16   irate, they don't want to leave, they
17   want to speak to somebody now.
18   Q. Okay. So then you would go inside and
19   attend to the customer?
20   A. Yes.
21   Q. Okay. How long did that take?
22   A. It was depending on the issue.
23   Q. Did it ever take less than five minutes?

---

82

1    A. At times it would have, yes.
2    Q. Did it ever take more than five minutes?
3    A. Yes.
4    Q. Did it ever take five to ten minutes?
5    A. Yeah. It varied. It varied from either
6    less than five minutes to maybe 30 or
7    more minutes depending on the issue.
8    Q. Okay. So the amount of time you would
9    spend answering customer questions on
10   your lunch break would vary depending on
11   the issue and depending on the day?
12   A. Yes.
13   Q. Did you ever keep any records of how long
14   your lunch breaks were interrupted --
15   A. No.
16   Q. -- for on those days?
17   A. I mean, after a while I just, you know, I
18   just -- I just did it.
19   Q. So you never kept any records?
20   A. No.
21   Q. Did you ever spend time telling --
22   training the other employees on the front
23   desk or trying to help them with issues

---

83

1    so that you wouldn't have to interrupt
2    your lunch break to attend to them?
3    A. Yes. And I'm sure Nicole is well aware
4    some of them you can tell them something
5    over and over and it just did not
6    register. It was constant same-thing
7    issues. I mean, they wouldn't -- I mean,
8    some of them just didn't grasp the
9    training that you give them or, you know,
10   they just like to be -- how can I -- some
11   of them you have to hold their hands.
12   Q. Okay.
13   A. It wasn't because of lack of training,
14   should I say. It just -- it came more
15   naturally to just go find somebody to
16   help them.
17   Q. Is there any way for you to know how much
18   time you spent on your lunch break
19   helping customers?
20   A. No, ma'am. There's -- I mean, there's no
21   way. I didn't record it.
22   Q. And you testified that most often these
23   interruptions were when Nicole wasn't on

---

84

1    site; correct?
2    A. Correct.
3    Q. Okay. You had Nicole's cellphone number?
4    A. I do.
5    Q. Okay. You had her e-mail; right?
6    A. Yes.
7    Q. Okay. Did you ever e-mail her to tell
8    her that you were coming in from your
9    lunch break early to help a customer?
10   A. Nope. I just went in, took care of the
11   customer, and that was it.
12   Q. Okay. So, no, you didn't e-mail her?
13   A. No.
14   Q. Okay.
15   A. I did not.
16   Q. Would you call her before you would go in
17   and help the customer to tell her that
18   you were cutting your lunch break short?
19   A. No.
20   Q. Would you call her afterwards to tell her
21   that you had missed a portion of your
22   lunch --
23   A. No.

---

21 (Pages 81 to 84)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

85

1   **Q.** -- break to help the customer?
2   **A.** (Witness shakes head.)
3   **Q.** So some days you were interrupted for
4       only a few minutes; right?
5   **A.** Some days.
6   **Q.** Yeah.  Other days you were interrupted
7       for longer?
8   **A.** Yes.
9   **Q.** No recollection as to how often it was
10      more five minutes versus how often it was
11      more 30 minutes?
12  **A.** No.
13  **Q.** No?  You mentioned that you got two
14      15-minute breaks, one in the morning, one
15      in the afternoon.  Were you able to take
16      those breaks?
17  **A.** Yes.
18  **Q.** Did you ever take additional breaks in
19      addition to those 15 minutes in the
20      morning or in the afternoon?
21  **A.** No.
22  **Q.** You said you were a smoker; right?
23  **A.** Right.

86

1   **Q.** Did you ever step out for a quick
2       cigarette?
3   **A.** No.  As a matter of fact, I'm a smoker
4       and there was times that I didn't take
5       some of the breaks because it would -- it
6       would be busy.  That Vestavia office
7       location is a busy location.  So, I mean,
8       there was times that I just didn't take
9       my 15-minute break.  I'm not a -- I'm not
10      as a chronic smoker as a smoker would be,
11      so . . .
12  **Q.** Do you remember ever having conversations
13      about people -- with Linda or with
14      Colette Crawford about your attendance?
15  **A.** No.
16  **Q.** You don't remember having any
17      conversation with them about disappearing
18      throughout the day?
19  **A.** Yes.  And that -- whether I would go to
20      dispatch.  Yes, I remember that.
21  **Q.** Okay.  Can you walk me through that?
22  **A.** Yes.  They would try to find me.  I can
23      be at -- maybe at dispatch or wherever,

87

1       but I was in the building.  I was not
2       taking a break.
3   **Q.** Okay.
4   **A.** Also, if I was -- I also did filing in
5       the back room, so . . .
6   **Q.** Okay.  Do you remember when those
7       conversations were?
8   **A.** No.  I mean, it wasn't like an everyday
9       thing.  It was probably once a year,
10      maybe.  I don't know.  It wasn't, like,
11      hey, by the way, you know.  It's -- and
12      it wasn't what -- it wasn't them with me.
13      It was more with my supervisor, so my
14      supervisor let me know.  So, you know, it
15      wasn't that -- let me rephrase this.  It
16      wasn't that Colette or Linda would say,
17      Karen, let's discuss this.
18  **Q.** Uh-huh.
19  **A.** So . . .
20  **Q.** So what did they say to you when they
21      talked to you about these instances of
22      not being able to find you throughout the
23      day?

88

1   **A.** That's what I'm saying; it wasn't said to
2       me.
3   **Q.** Uh-huh.
4   **A.** It was more probably mentioning to my
5       supervisor, like what's she doing or
6       whatever.  But it wasn't -- they didn't
7       pull me to the side and say, Hey, Karen,
8       where are you going?
9   **Q.** So did you talk to Nicole, then, about
10      Colette's questions for you about being
11      missing throughout the day?
12  **A.** Yes.  She -- she would tell me, you know,
13      Colette or Linda wants to know -- want to
14      know where you've been or whatever.
15  **Q.** Uh-huh.  And then you would tell Nicole
16      where you had been?
17  **A.** Yes.
18  **Q.** Okay.  And where had you been?
19  **A.** It could have been numerous.  I could
20      have been at dispatch, anywhere in the
21      building.  I was not outside.  I mean, if
22      it was my break, yes, then she would -- I
23      would let her know that it was my break.

22  (Pages 85 to 88)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                             April 15, 2015

---

89

1   **Q.** Uh-huh.  And were you ever disciplined
2       for that?
3   **A.** Not that I'm aware of.
4   **Q.** So going back to the interruptions that
5       you say happened during your lunch break.
6       If the interruption was just a five-
7       minute lunch break, or a five-minute
8       question, would you go back and resume
9       your lunch break afterwards?
10  **A.** Yes.
11  **Q.** Would you ever tack on that five minutes
12      at the end of your lunch break?
13  **A.** No.
14  **Q.** No?  Why not?
15  **A.** I would be considered late.  I mean, if I
16      clocked out at twelve, I made sure I
17      clocked back in at one.  If I clock in at
18      1:05, it's considered late and then, of
19      course, back in at one.  So, no, you clock
20      back in at one.
21  **Q.** Did you ever ask Nicole what you were
22      supposed do in those instances with
23      respect to clocking in or clocking out?

---

90

1   **A.** No.
2   **Q.** No.  Did you ever ask HR what you were
3       supposed to be doing with respect to
4       clocking in and out during your lunch
5       break?
6   **A.** Like I said earlier, I didn't go to HR.
7       I went to my supervisor.
8   **Q.** So you didn't ask HR?
9   **A.** No.
10  **Q.** Did Nicole ever tell you not to record
11      time worked during your lunch break?
12  **A.** That was never said.
13  **Q.** Did anyone ever tell you not to record
14      time spent worked during your lunch
15      break?
16  **A.** No one ever said that neither.
17  **Q.** Were there ever times when you clocked
18      back in late from your lunch break?
19  **A.** There was an incident, which is recorded,
20      that I was two or three minutes late
21      coming back from lunch.
22  **Q.** What happened in that instance?
23  **A.** I had got a last-minute call from my -- I

---

91

1       want to say maybe my son's school, and I
2       let her know that I got a call and I had
3       to take it, so -- and I got an occurrence
4       for that because it was three minutes
5       past my lunch.
6   **Q.** Okay.  Do you remember when that was?
7   **A.** No, I do not know.
8   **Q.** Okay.
9   **A.** It could have been last year or maybe
10      2013.  I'm not sure.
11  **Q.** What was your understanding of the
12      occurrence policy?
13  **A.** Wow, it's been a while.  Maybe -- I don't
14      know.  I mean, I know if you're late you
15      get -- I'm not sure the amount.  You get
16      0.5 and then you get one point, so I'm
17      not sure how that was -- like, the number
18      of minutes, I'm not sure how it went.  I
19      don't remember.
20  **Q.** Okay.  And you never were disciplined in
21      accordance with the occurrence policy?
22  **A.** Yeah, I was.  Yeah.
23  **Q.** Other than that one time?

---

92

1   **A.** Yes.
2   **Q.** Okay.
3   **A.** Yes.  I left early.  I was sick.
4   **Q.** Okay.
5   **A.** And that was one point.
6   **Q.** Were there any other times when you were
7       disciplined in accordance with the
8       occurrence policy?
9   **A.** I don't remember.
10  **Q.** Don't remember?
11  **A.** I don't remember.
12  **Q.** Okay.
13  **A.** Yeah.  I guess my son was sick, maybe.
14      It was another time that I left my son
15      was sick.  I was sick and then my son was
16      sick and I had to go.  Yes.  So it was
17      one of those.  So I'm sure --
18  **Q.** Okay.
19  **A.** -- there's something in there.
20  **Q.** Okay.  So you never tried to record any
21      time -- any of the time you worked during
22      your lunch break?
23  **A.** No, ma'am.

---

23  (Pages 89 to 92)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                            April 15, 2015

93

1    **Q.** Okay.  How many times would you say that
2        you were counseled or you were
3        disciplined for clocking back in late for
4        lunch?
5    **A.** Less than three.
6    **Q.** One of the things that you mentioned is
7        that you would have conversations with
8        Nicole about customer interruptions;
9        correct?
10   **A.** Uh-huh.  (Witness nods head.)
11   **Q.** Can you tell me what was said?
12   **A.** Just let her know, because sometimes some
13       of the customers, it needed followup, so
14       I would let her know this customer such
15       and such, that it was such and such
16       employee, this is what went on, you know,
17       they came and got me and I took care of
18       it.  But then if they needed followup,
19       then needed followup, so . . .
20   **Q.** How long were these conversations with
21       Nicole?
22   **A.** Not long.  I mean, less than 20 minutes.
23       I'm not sure.  I mean, I don't know.

94

1    **Q.** Do you remember when these conversations
2        happened?
3    **A.** Like, what do you mean?  I'm sorry.
4    **Q.** Like, when did you call Nicole?  You said
5        that sometimes you called, sometimes you
6        didn't; right?
7    **A.** Oh, call her?  No.  I'd call -- like,
8        I -- I would talk to her when she's at
9        the office.
10   **Q.** Okay.  So if you got interrupted by a
11       customer on your lunch break --
12   **A.** Uh-huh.
13   **Q.** -- when would you talk to Nicole about
14       that?
15   **A.** When she was on site on -- at the office.
16   **Q.** Okay.  So when she came back in?
17   **A.** Yes.
18   **Q.** Okay.  On a different day?
19   **A.** Yes.
20   **Q.** Okay.  Do you remember how many times you
21       talked to Nicole about this?
22   **A.** I told her several times.  But, you know,
23       after a while saying something, you

95

1        just -- just don't.
2    **Q.** Okay.  So several times.  Do you remember
3        what year you had these conversations?
4    **A.** No, I do not.
5    **Q.** Was it early in 2010?  Was it in 2014?
6    **A.** I don't have an answer.  I mean, I
7        don't . . .
8    **Q.** You don't recall when the conversations
9        were?
10   **A.** I don't.
11   **Q.** Okay.  You said there were several.  Do
12       you have an estimate if it's more or less
13       than five, more or less than ten?
14   **A.** During -- since I've been there, yeah, I
15       mean, it could have been more than three
16       or four, because I was there for quite a
17       while.
18   **Q.** Okay.  So three to four?
19   **A.** (Witness nods head.)
20   **Q.** Okay.  And you don't remember what year
21       those were in?
22   **A.** Uh-uh.
23   **Q.** Okay.

96

1    **A.** I mean, it's just between the years that
2        I was there.  I'm just going to just --
3    **Q.** Okay.
4    **A.** -- say that because I'm not, you
5        know . . .
6    **Q.** So at some point between 2010 and 2014?
7    **A.** (Witness nods head.)  Uh-huh.
8    **Q.** Okay.  What did you say to Nicole?
9    **A.** I would let her know that such and such,
10       whoever the employee was, came looking
11       for me to help a customer.  And then I
12       would explain to her who the customer
13       was, what -- what the customer needed at
14       the time and what we'd done and . . .
15   **Q.** Did you tell her how often these
16       interruptions were happening when you had
17       these three to four conversations with
18       her?
19   **A.** I mean, I would let her know that I was
20       interrupted.  And we kind of made joke of
21       it, you know, they like to be -- to hold
22       their hands, you know, they know better,
23       you know, stuff like that.  So it really

24  (Pages 93 to 96)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                          April 15, 2015

97

1    wasn't like a training.  It's just more
2    of, again, wanted to have somebody make
3    the decisions and stuff like that.
4    Q. Did you tell Nicole that you missed your
5    lunch break to help the customer?
6    A. I mean, I would tell her that they came
7    and got me on my lunch, so I don't see
8    where I needed to go more in depth of,
9    Okay, this is my lunch, this is how much
10   I missed.  I mean, I was on my lunch,
11   they came and got me, so -- I mean, she's
12   the supervisor.  Wouldn't you as a
13   supervisor . . .
14   Q. So you didn't tell her that you missed a
15   portion of your lunch break to help the
16   customer?
17        MR. ARENDALL:  Object to the
18   form.
19   Q. You can answer.
20   A. Huh?
21   Q. You can answer.  So you didn't tell her
22   that you had missed a portion of your
23   lunch break?

98

1    A. I mean, I would tell her I was at
2    lunch --
3    Q. Okay.
4    A. -- and they came and got me.
5    Q. Okay.  Did you ever say, I missed five
6    minutes of my lunch break?
7    A. No.  I didn't go in depth on how many
8    minutes.  I just said they came and got
9    me on my lunch.
10   Q. Okay.  So you never told her how much of
11   your lunch break you were missing?
12   A. No.
13   Q. Okay.  Did you ever ask her if you should
14   put time down on eTime for that portion
15   of your lunch break that you say were
16   missing?
17   A. No.  I just assumed that she would handle
18   it.  I mean, it's not something I -- I
19   put in -- like I said, I couldn't change
20   my time.  I can only clock in and clock
21   out.  So me asking her can I change it,
22   that would have been -- that would have
23   been just a stupid question to ask if I

99

1    can change it, because I can't change it.
2    Q. So you didn't ask Nicole to change your
3    time to reflect the time that you had
4    spent on --
5    A. I wouldn't --
6    Q. -- your lunch break?
7    A. -- ask because I assumed that that was
8    her job.
9    Q. Okay.  So you didn't ask her?
10   A. No, ma'am.
11   Q. Okay.  Did you ever check to see if your
12   time had been changed to be paid for
13   those times?
14   A. I checked --
15   Q. -- you spent --
16   A. -- it several times and it wasn't -- it
17   wasn't changed.
18   Q. When did you check?
19   A. I mean, there was times that I would go
20   there if she sent an e-mail, please check
21   your time and approve, so then you'll
22   sign in and check.
23   Q. When were these several times that Nicole

100

1    asked you to go in and check your time?
2    A. If it was a missed time clock, if eTime
3    was down.  That's pretty much it.
4    Q. Okay.  So on these three to four
5    instances where you say that you told
6    Nicole that your lunch break -- that
7    someone came to get you on your lunch,
8    did you check your eTime to see if those
9    instances if your lunch had been changed
10   to reflect the work?
11   A. At first I would check, but it didn't
12   change so, I mean, I just, you know.  I
13   wasn't going to make a big deal of it.  I
14   needed to keep my job.  I wasn't going to
15   just, you know . . .
16   Q. When you said at first you would check,
17   when would you check?
18   A. Probably more at the -- closer to the pay
19   period, because it's biweekly, so to
20   ensure that, you know, it was correct, I
21   would just go there gradually.  I -- I
22   wasn't going to check my time sheet all
23   the time.  I just . . .

25  (Pages 97 to 100)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                              April 15, 2015

---

101

1  Q. So when you said at first you would
2     check, do you remember around what year
3     it was?
4  A. Last year I think I checked it more than
5     I did beginning of the years, I guess,
6     because I was -- the way that commission
7     structure changed, I guess I was taking,
8     you know, commission.  But I didn't make
9     it a habit to check it.  I really didn't.
10    If something went wrong, I was more of
11    the type of -- of somebody reminding me
12    to go in there and do something, you
13    know, but . . .
14 Q. So you said there were times when you
15    would check it; correct?
16 A. Uh-huh.
17 Q. And you would see that it hadn't been
18    changed?
19 A. (Witness nods head.)
20 Q. Okay.  Did you ever say anything to --
21 A. No.
22 Q. -- Nicole?  You approved the time?
23 A. Yes.

---

102

1  Q. You said that one of the reasons was that
2     you didn't want to make a big deal of it.
3     Did you think it would be a big deal if
4     you had raised the issue?
5  A. Maybe.
6  Q. Maybe?  But you don't know?
7  A. (Witness shakes head.)
8  Q. Did you ever go to -- and you said you
9     never went to Charter HR to ask --
10 A. No.
11 Q. -- them about any of this?
12 A. Uh-uh.  (Witness shakes head.)
13 Q. Never used the 800 number?
14 A. I was not a fan of HR Ethics.  I don't --
15    you know, didn't use it.
16 Q. Why aren't you a fan of HR Ethics?
17 A. I just thought that for, like, more
18    bigger issues.  I don't know.  I just
19    didn't.
20 Q. Okay.  So you didn't think that this was
21    a big issue?
22 A. No.  I mean, there was other stuff.  I
23    don't know.  I just didn't use it.  And

---

103

1     especially with HR not being there, you
2     know, you're having to e-mail somebody,
3     call somebody, just -- I just didn't.
4  Q. Okay.
5         MS. SRIVASTAVA:  Will you mark
6     this 6?
7         (Defendant's Exhibit 6 was
8         marked for identification.)
9  Q. She'll hand you a copy of this --
10 A. Uh-huh.
11 Q. -- in a moment.  So, Ms. Lopez, the court
12    reporter handed you a document that are
13    your answers to defendant's first set of
14    interrogatories.  You can skip ahead to
15    Interrogatory No. 9.  It's on page 8.
16 A. Uh-huh.
17 Q. Okay.  And Interrogatory 8, which is also
18    on page 9.
19 A. Okay.
20 Q. It says that you gave notice to Nicole
21    Johnson on a weekly basis, though not
22    necessarily on a specific day.  Your
23    notice to Nicole Johnson that employees

---

104

1     were interrupting her meal period
2     occurred verbally.  Your weekly notice to
3     Nicole Johnson consisted of being
4     interrupted during her meal period on
5     average three times per five-day work
6     week.
7         Was there anything in that answer
8     you want to change now that you've told
9     me that you only spoke to Nicole Johnson
10    about it three to four times during the
11    course of your employment?
12 A. I don't have an answer.
13        MR. ARENDALL:  Object to the
14    form.
15 Q. You can answer.
16        MR. ARENDALL:  That's why I don't
17    like videos.  I got to get my voice
18    warmed up.
19 A. Okay.  Can you repeat your question?
20 Q. Yeah.
21 A. I'm sorry.
22 Q. So you read your response to this
23    Interrogatory No. 8; correct?

26 (Pages 101 to 104)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                         April 15, 2015

---

105

1  **A.** Okay.
2  **Q.** And it says that you gave notice to
3      Nicole Johnson on a weekly basis, though
4      not necessarily on a specific day.  Says
5      that your notice to Nicole Johnson that
6      employees were interrupting her meal
7      period occurred verbally.
8  **A.** Okay.
9  **Q.** Plaintiff's weekly notice to Nicole
10     Johnson consisted of being interrupted
11     during her meal period on average three
12     times per five-day work week.
13         I just asked you a couple of
14     questions about the conversations that
15     you had with Nicole --
16  **A.** Uh-huh.
17  **Q.** -- about when employees were interrupting
18     you on your lunch break.
19  **A.** Uh-huh.  (Witness nods head.)
20  **Q.** And I asked you to estimate how many
21     times you had those conversations with
22     Nicole.
23  **A.** Oh, okay.

---

106

1  **Q.** Okay.
2  **A.** I got it.
3  **Q.** Yeah.  And you told me that you'd had
4      probably three to four conversations with
5      her over the time that you worked with
6      Charter; correct?
7  **A.** I . . .
8  **Q.** So do you want to change this answer?
9      because this answer says that you gave
10     her weekly notice.
11  **A.** It wasn't weekly notice.  I'm not sure.
12  **Q.** Okay.  So the three to four times is
13     accurate?
14  **A.** Yes.
15  **Q.** Okay.  We're done with that.
16         MS. SRIVASTAVA:  Can we just take
17     a quick five-minute break?
18         VIDEOGRAPHER:  We are off the
19     record.  The time is now 11:28 a.m.
20         (Short recess.)
21         VIDEOGRAPHER:  We are back on the
22     record.  The time is 11:39 a.m.
23  **Q.** (By Ms. Srivastava) Ms. Lopez, one of the

---

107

1      things you testified to earlier today was
2      that the lunch-break interruptions didn't
3      happen when Nicole was on site; correct?
4          MR. ARENDALL:  Object to the
5      form.
6  **Q.** You can answer.
7  **A.** Okay.  It also happened -- I'm -- okay.
8      You need to understand, I was the go-to
9      person --
10  **Q.** Uh-huh.
11  **A.** -- when Nicole was not available.  So
12     even if Nicole was either on a meeting on
13     site or if she was in her office, they
14     were told that I -- they need to come to
15     me first.  So even if she was in the
16     office and she was busy, they came and
17     got me.  They were told ahead of time,
18     you know, she's going to be in a meeting,
19     don't interrupt, it's going to be a
20     two -- one- or two-hour meeting whenever
21     Linda or whoever will come in town for
22     whatever meeting they were having.  But I
23     was the go-to person, so they -- they

---

108

1      were told to come to me first.
2  **Q.** Okay.  And they could come to you at any
3      point throughout the day?
4  **A.** Yes.
5  **Q.** Okay.
6  **A.** Any time.  I was the go-to person.
7  **Q.** Did they sometimes come to you in the
8      morning?
9  **A.** I was always -- I was there.  I was the
10     lead.
11  **Q.** Okay.
12  **A.** So if they have any question, again, it
13     was me.
14  **Q.** Okay.  So not all of the interruptions
15     were during your lunch break; correct?
16  **A.** Well, I was on the clock then, so it
17     really wasn't interruption so, you
18     know . . .
19  **Q.** So not all of the questions that you
20     answered for the employees happened while
21     you were on your lunch break; right?
22  **A.** Uh-uh.
23  **Q.** No?  Okay.  And if you had to estimate

---

27 (Pages 105 to 108)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                            April 15, 2015

---

109

1       how many --
2   **A.** Her watch.
3   **Q.** -- interruptions -- oh.
4   **A.** That's okay.
5   **Q.** If you were going to estimate for us how
6       many interruptions you had while Nicole
7       was on site, is that something you'd be
8       able to do?
9   **A.** I want to say --
10          MR. ARENDALL:  Are you asking --
11  **A.** -- yes.
12          MR. ARENDALL:  -- during meal
13      breaks?
14          MS. SRIVASTAVA:  Yes.
15          MR. ARENDALL:  Okay.
16  **A.** What was the question again?
17  **Q.** And the question was, if we were going to
18      ask you to estimate how many times your
19      lunch breaks were interrupted while
20      Nicole was on site at Vestavia Hills, is
21      that something you would be able to do?
22  **A.** Two to three times a week.
23  **Q.** Two to three times a week while Nicole

---

110

1       was at Vestavia Hills?
2   **A.** Oh, crap.  I want to say -- I couldn't
3       really tell you.  I mean, again, I was
4       the go-to person so they knew they had to
5       come to me --
6   **Q.** Uh-huh.
7   **A.** -- you know.
8   **Q.** Okay.  And I understand that you were the
9       go-to person, but what I'm really trying
10      to focus on is trying to put a number on
11      the number of interruptions that you say
12      happened during your lunch break.  And
13      one of the --
14  **A.** Oh, Nicole --
15  **Q.** -- things --
16  **A.** -- was there.
17  **Q.** -- that you testified to earlier today is
18      that you weren't often interrupted when
19      Nicole was on site; correct?
20  **A.** I don't remember if I said that.  I --
21          MR. ARENDALL:  Yeah.  Object to
22      the form.
23  **Q.** Okay.  You testified this morning that if

---

111

1       Nicole was in a meeting then you would be
2       interrupted and your lunch break --
3   **A.** Well, meetings happen at the office, so
4       she was there; she just wasn't available
5       for them to help them.  That's -- you
6       understand what I'm saying?
7   **Q.** Uh-huh.
8   **A.** The meeting was at the office, but she
9       would not be reachable, I guess is what
10      you call it.
11  **Q.** Okay.  So this two to three times per
12      week estimate that you're giving me --
13  **A.** Uh-huh.
14  **Q.** -- does that include the times that
15      Nicole was on site --
16  **A.** Yes.
17  **Q.** -- but --
18  **A.** Yes.
19  **Q.** -- unavailable?
20  **A.** Now I'm understanding what you're saying.
21  **Q.** Okay.
22  **A.** Yes.
23  **Q.** Do you know how many of these two to

---

112

1       three times a week involved days that
2       Nicole was on site --
3   **A.** I --
4   **Q.** -- versus --
5   **A.** -- can't --
6   **Q.** -- off site?
7   **A.** I can't -- I don't -- I mean, there was
8       times that she was regular, like she was
9       set a Tuesday she would go to one
10      location every Tuesday, but that could
11      change because something come up so she
12      wouldn't go on a Tuesday, so I can't
13      really recall specific.
14  **Q.** Do you remember if the interruptions were
15      more frequent or less frequent when
16      Nicole was on site?
17  **A.** I really couldn't tell you.  I mean . . .
18  **Q.** This morning you testified that you were
19      hardly ever interrupted when Nicole was
20      on site, and I'm just trying to get a
21      sense of if that's still your testimony
22      now.
23          MR. ARENDALL:  I just want to

---

28  (Pages 109 to 112)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                April 15, 2015

113

1   give an instruction to my client on the
2   record, and that is when Rita says you
3   testified earlier, that's her best
4   recollection of what you testified to.
5   You're the one giving the testimony, so
6   whatever you recall you testified to
7   matters.  Okay?
8          THE WITNESS:  Okay.
9          MR. ARENDALL:  Okay.  Go ahead.
10  **A.** What --
11  **Q.** Okay.  So this morning --
12  **A.** Uh-huh.
13  **Q.** -- you had said that the interruptions
14     when Nicole was on site were less
15     frequent than when she was off site.
16          MR. ARENDALL:  Object to the
17     form.
18  **A.** What does that mean?
19  **Q.** You can answer.  Is that correct?
20  **A.** I don't remember what I said.  Oh, my
21     Lord.
22  **Q.** So what do you think now?  Do you have
23     any estimate as to whether or not --

114

1   **A.** I don't -- I don't have an estimate.  I
2      just know that I was interrupted with --
3      with -- with her being there.  And,
4      again, I was the go-to person --
5   **Q.** Okay.
6   **A.** -- so -- and they were told, you know, if
7      Karen is there, just ask Karen.  So --
8   **Q.** Okay.
9   **A.** -- I don't know if that's making any
10     sense.  I'm sorry.
11  **Q.** Okay.  So there were time -- you just
12     know that there were times that you were
13     interrupted when Nicole was on site at
14     Vestavia --
15  **A.** Yes.
16  **Q.** -- Hills; right?
17  **A.** Yes.
18  **Q.** Do you have any estimate as to how many
19     times you were interrupted when Nicole
20     was at Vestavia Hills?
21  **A.** I don't have a time.  I don't have -- no.
22  **Q.** Okay.  Do you have an estimate as to how
23     often you were interrupted when Nicole

115

1   was off site at Tuscaloosa or at any of
2   the other offices?
3   **A.** Two or three times, like I stated
4      earlier.
5   **Q.** Do you know how long the interruptions
6      were when you say that you were
7      interrupted during your lunch break?
8   **A.** I mean, it would take up to 20 to more
9      minutes.  I mean, sometimes, very rarely,
10     would take less than five minutes.  But,
11     no, I didn't time them most of the time,
12     because it was customer service and it
13     was -- entitled looking up the account
14     and -- and seeing, you know, whatever.  I
15     had to go look at the computer.  It would
16     take more than -- up to or more than 20
17     minutes.
18  **Q.** Okay.  So sometimes it was less than five
19     minutes and sometimes it was over 20?
20  **A.** Uh-huh.  Yes.
21  **Q.** And you don't recall which days were
22     which?
23  **A.** No, ma'am.

116

1   **Q.** Okay.  I'd just like to go back to your
2      interrogatory responses.  Let me add one
3      more exhibit.
4          (Defendant's Exhibit 7 was
5          marked for identification.)
6   **Q.** So first if you could take a look at
7      the -- the interrogatory responses that
8      we had marked earlier.
9   **A.** Uh-huh.
10  **Q.** If you turn to page 4, there's an
11     Interrogatory No. 2 that asks you for any
12     work week during which you claim to have
13     worked hours or parts of hours for
14     Charter for which you weren't paid since
15     July 31, 2011, to state the total number
16     of hours including any parts of hours
17     that you claim to have worked during such
18     work week; correct?
19  **A.** Okay.
20  **Q.** Okay.  And then -- and the answer that
21     you provided, it said, Plaintiff will
22     supplement with a chart detailing the
23     missed-meal periods that have occurred

29 (Pages 113 to 116)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                     April 15, 2015

---

117

1    without compensation through her
2    employment; correct?
3  **A.** Okay.
4  **Q.** Okay.  So the exhibit that we just
5    marked, which I believe is Exhibit 7, do
6    you know if this is the chart that that
7    interrogatory response is referring to?
8  **A.** This was prepared by my lawyer.
9  **Q.** Okay.
10        MR. ARENDALL:  It is.
11        MS. SRIVASTAVA:  Okay.
12 **Q.** Do you know how this chart was put
13    together?  If you know.
14        MR. ARENDALL:  You want me to
15    answer it?  She probably --
16        THE WITNESS:  Please.
17        MR. ARENDALL:  -- doesn't know.
18        THE WITNESS:  Yes, yes.
19        MS. SRIVASTAVA:  No.  I --
20        MR. ARENDAL:  Okay.  If you don't
21    really want to know, that's fine.
22        MS. SRIVASTAVA:  Well, I want to
23    know Karen's recollection.

---

118

1  **Q.** Do you know how this --
2  **A.** Well, it was --
3  **Q.** -- was put together?
4  **A.** It was kind of explained to me.  The
5    total hours worked and the total hours
6    deducted from the lunch taking the one --
7    I really can't explain it.  I mean, I
8    understood it, but I can't really explain
9    it.  I'm not, you know . . .
10 **Q.** So you don't really understand the chart?
11 **A.** I mean, when explained to me, yes.  But I
12    can't explain it to you.  I mean, I
13    understand it, how it's --
14 **Q.** Okay.
15 **A.** -- broken down, but I can't . . .
16 **Q.** Okay.
17 **A.** I don't want to explain it wrong to you.
18    I guess that's what I'm saying.
19 **Q.** Do you remember when this chart was made?
20 **A.** I do not, no.
21 **Q.** It wasn't made while you were working at
22    Charter; correct?
23 **A.** No.

---

119

1  **Q.** Okay.  So it's some after-the-fact
2    creation?
3  **A.** Yes.
4  **Q.** So looking at the first line that's on
5    page 3, the week beginning August 5,
6    2012.
7  **A.** Okay.
8  **Q.** There's a line across it, and it says,
9    Estimate when taking one to two lunches
10    per week.  Do you know which days of
11    August 5, 2012 you worked through your
12    lunch?
13 **A.** That's a very long time.  No, ma'am.  I
14    mean . . .
15 **Q.** Do you know what you would have done
16    during your lunch breaks during that
17    week?
18 **A.** I'm sorry.  What would I have done?
19 **Q.** Right.  So this is an estimate when
20    taking one to two lunches per week.  So
21    does that mean that you're saying that
22    you worked one to two -- I'm sorry.  That
23    you worked three -- two to three

---

120

1    lunches --
2  **A.** Okay.
3  **Q.** -- for that week?
4  **A.** I get it.  Yes.
5  **Q.** Yeah.  Okay.  So do you remember --
6  **A.** Yes.
7  **Q.** -- what you would have done during those
8    two to three lunches that week?
9        MR. ARENDALL:  Other than the
10    general things she's testified to
11    already?
12        MS. SRIVASTAVA:  Uh-huh.
13 **Q.** You don't remember which employee would
14    have interrupted you --
15 **A.** No, ma'am.
16 **Q.** -- what you would have done?  No?
17 **A.** Just the normal interruptions, Hey,
18    Karen, you know, can you help.  I don't
19    have specifics.  I -- no.
20 **Q.** Okay.  And you don't -- again, you don't
21    remember how long those interruptions
22    lasted?
23 **A.** It could have been up to 20 -- up to 20

---

Gore Perry Reporting and Video

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                    April 15, 2015

---

121

1    minutes.
2    **Q.** Uh-huh.  Or it could have been less than
3        five?  Okay.  It just depends on the
4        week?
5    **A.** How busy we were, depending on the
6        situation, the customer.
7    **Q.** Okay.  You don't have any other records,
8        correct, to help you remember --
9    **A.** No.
10   **Q.** -- what you were doing during your lunch
11       breaks on those weeks?
12   **A.** (Witness shakes head.)  Uh-uh.
13   **Q.** No?  Okay.  So I just have a couple of
14       questions that I wanted to ask you that
15       have to do with your termination.  And I
16       know your counsel wanted to say something
17       on the record.  At some point, your
18       employment with Charter ended; correct?
19   **A.** Yes.
20   **Q.** Okay.  Do you remember when that was?
21   **A.** June 28th.
22   **Q.** Okay.
23   **A.** Or May 28th -- June.

---

122

1    **Q.** Can you just describe for me generally
2        the reason that you were -- that you
3        understand you were terminated?
4    **A.** Yes.  I was terminated for a package that
5        was not properly delivered or whatever
6        you call it.
7    **Q.** Do you mind saying that again?  I'm
8        sorry.
9    **A.** It was due to a -- a package that was
10       delivered to the office.
11   **Q.** Okay.  And what happened with that
12       package?
13   **A.** The package was misplaced.  I opened the
14       package.
15   **Q.** And then what happened?
16   **A.** I'm not sure what -- I mean, I opened the
17       package.  It was -- it was -- it belonged
18       to someone else.
19   **Q.** And then what happened?
20   **A.** I got terminated.  I mean, is that what
21       you want?  I mean, I was terminated
22       because the package was never found.
23   **Q.** Okay.  Do you know what happened to the

---

123

1    package?
2    **A.** No, I do not.
3    **Q.** Okay.  Do you --
4    **A.** I did open the box, but the -- but the
5        contents of that was left at work.
6    **Q.** Okay.  Do you remember being asked about
7        the package back in May 2014?
8    **A.** Yes.
9    **Q.** Okay.  Who asked you about the package in
10       May 2014?
11   **A.** Like when they put my leave or --
12   **Q.** When was the first time that you were
13       asked about the package that was
14       delivered to Vestavia Hills?
15   **A.** Valerie had called me and asked me where
16       the mail was.
17   **Q.** Who's Valerie?
18   **A.** She works at Charter.
19   **Q.** Do you know what her role is?
20   **A.** CSR.
21   **Q.** Customer service rep?
22   **A.** Yes, customer --
23   **Q.** Okay.

---

124

1    **A.** -- service rep.
2    **Q.** She called you on the phone?
3    **A.** Yes.
4    **Q.** Had you already left for the day?
5    **A.** Yes.  It was my half a day.
6    **Q.** Okay.  What did she ask you?
7    **A.** Where was the mail.
8    **Q.** And what did you say?
9    **A.** Excuse me.  I put it in Verna -- Verna's
10       desk -- office, desk.
11   **Q.** And then what happened?
12   **A.** And that was it.  She said she couldn't
13       find it.
14   **Q.** Okay.  Do you remember being asked if the
15       package -- about the package another day?
16   **A.** Yes.
17   **Q.** Okay.  When was that?
18   **A.** The next day, I believe they asked me
19       where the box was.
20   **Q.** Who asked you where the box was?
21   **A.** I think it was Valerie.  I'm not sure.
22       They were asking about the box the next
23       day.

---

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

125

1   **Q.** Do you remember what you said?
2   **A.** Yeah.  I said I didn't see any box.
3   **Q.** Okay.  Did you tell them that you had
4       seen the box and opened it?
5   **A.** No.  I told them that I -- I haven't seen
6       the box.
7   **Q.** Okay.  So that wasn't true?
8   **A.** Yes.
9   **Q.** It was -- it wasn't true?
10      MR. ARENDALL:  I forgot.  I
11      was -- I'm offering a belated objection.
12      We're complying with the Court's order on
13      this regarding the termination, but I
14      don't want that to act as a waiver of my
15      objection to the admissibility of this
16      dealing with her claims in this lawsuit
17      or as a prejudice to her EEOC charge.
18      And so I just want to enter that.  Sorry.
19      I was asleep at the wheel.
20      MS. SRIVASTAVA:  That's okay.
21  **Q.** So you had told them that you hadn't seen
22      the box; correct?
23  **A.** Right.

126

1   **Q.** Okay.  And that wasn't true; correct?
2   **A.** Correct.
3   **Q.** Okay.  Do you remember having an
4       unemployment hearing after you were
5       terminated?
6   **A.** What do you mean?  No.
7   **Q.** Do you remember having a telephonic
8       conference with the Alabama Department of
9       Labor about unemployment compensation?
10  **A.** No.  I applied for unemployment and it
11      was -- how do you say?  It was accepted
12      or whatever you -- however you say it,
13      and then I was informed, I think via
14      mail, letter, that I was not qualified.
15  **Q.** Okay.  And what was the reason that you
16      were given for not being qualified?
17  **A.** Charter had declined it or denied --
18      however -- said declined or denied.
19  **Q.** Did you ever have an interview as part of
20      that application for unemployment
21      insurance?
22  **A.** (Witness shakes head.)
23  **Q.** Did you ever talk to anyone about the

127

1       reason for your termination?
2   **A.** Yes, yes, yes, yes, I believe so, yes,
3       yes.
4   **Q.** Okay.  So can you describe for me what
5       that conversation was?
6   **A.** They spoke to -- I don't know the
7       names -- the lady from the department of
8       labor and then someone from Charter.
9   **Q.** Did they ask you about the reason why you
10      were terminated?
11  **A.** No.  They stated the reason, or they had
12      asked the person from Charter, I believe.
13  **Q.** Okay.  Did you have an opportunity to
14      explain your side of the story during the
15      unemployment compensation hearing?
16  **A.** I think so, yes.
17  **Q.** Do you remember what you said?
18  **A.** No.  I'm not sure.  It was supposed to
19      continue, but then they didn't call me so
20      I -- it wasn't a big deal.  I mean . . .
21  **Q.** Do you know whether or not you told the
22      unemployment compensation people about
23      the package?

128

1   **A.** No.  They discussed that there, like the
2       person from the State of Alabama spoke to
3       the person from Charter.
4   **Q.** Okay.  So you were never asked about the
5       package during the unemployment process?
6   **A.** It wasn't asked.  They -- they discussed
7       it.  Like I said, they discussed.  I
8       don't think they -- they asked me.  I'm
9       not sure they asked me.  And then they
10      just said that I was not qualified for
11      compensation and whatnot, so . . .
12  **Q.** Okay.  So you never told the unemployment
13      compensation people that you had never
14      seen the package?
15  **A.** I don't think they asked me.  Like I
16      said, I think they discussed it -- you
17      know, I was listening, but they were
18      discussing it back and forth.  I think
19      there was a third person there, manager
20      in North Carolina.  What is his name?
21      Oh, God.  I don't remember his name.
22      Brandy, Brad, Brian -- Brian -- Brian
23      something, North Carolina.  He's the -- I

32 (Pages 125 to 128)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                        April 15, 2015

---

129

1    think the operations manager.
2  **Q.** Operations manager for Charter?
3  **A.** Front counter.  I guess front counter.
4    Yeah.  I think he would be Linda
5    Tidsmore's boss.
6  **Q.** Who's Linda Titsmore?
7  **A.** Ma'am?
8  **Q.** Who's Linda Titsmore?
9  **A.** Tidmore.  It's her supervisor, her
10   manager, her -- I don't know titles.
11   Manager.  She's -- Brian Huff.  Brian --
12 **Q.** Brian Huff?
13 **A.** -- Huff, yes.
14 **Q.** Okay.  But you don't remember whether or
15   not they asked you any questions about
16   the package?
17 **A.** Uh-uh.  (Witness shakes head.)
18 **Q.** Okay.  Are you aware that there's
19   security footage from that day?
20 **A.** Yes.
21 **Q.** Okay.  Have you seen the security footage
22   from that day?
23 **A.** No.

---

130

1  **Q.** Do you know whether or not the security
2    footage supports your initial claim that
3    you never saw the package?
4  **A.** Do I do what?
5  **Q.** Do you know whether or not the security
6    footage supports your initial statement
7    to --
8  **A.** Oh, no.  I haven't seen it.  But, I
9    mean -- I haven't seen the video.
10 **Q.** So you don't know?
11 **A.** (Witness shakes head.)
12 **Q.** Okay.
13       MS. SRIVASTAVA:  Just take a
14   two-minute break.
15       VIDEOGRAPHER:  I have to change
16   the tape.
17       MS. SRIVASTAVA:  Oh, you have to
18   change the tape?  Okay.
19       VIDEOGRAPHER:  This ends
20   Videotape No. 2 of the deposition of
21   Karen Lopez-Easterling.  The time is now
22   12 o'clock p.m.
23       (Off the record.)

---

131

1        VIDEOGRAPHER:  This marks
2    beginning of Videotape No. 3 of the
3    deposition of Karen Lopez-Easterling.
4    The time is now 12:06 p.m.
5  **Q.** (By Ms. Srivastava) Ms. Lopez, I'm just
6    going to show you a few short clips from
7    the security video.  Just going to show
8    you a few short tapes from the security
9    video footage.  Only take -- they're
10   spread out, so please bear with me.  This
11   one's marked 01659.  Can you see --
12 **A.** It's got a -- got a glare or something.
13   Okay.
14 **Q.** Is that better?
15 **A.** Yes.
16 **Q.** Okay.  Is that you in the bottom right-
17   hand screen?
18 **A.** Uh-huh.
19 **Q.** Okay.  Over here on the right, is that
20   the Macy's package that was delivered to
21   the store?
22 **A.** Yeah.
23 **Q.** I'm just going to let it run through

---

132

1    because it's . . .
2        Is that where you were breaking down
3    the box?
4  **A.** It was opening the box.
5  **Q.** You're reading the package slip there?
6    And this one is marked --
7  **A.** No.  I think that was part of the mail.
8    I don't think . . .
9  **Q.** So you don't think that came from inside
10   of the box, the letter that you just put
11   in the top drawer?
12 **A.** Uh-uh.  That was part of the mail.
13 **Q.** You're unpacking the box here; correct?
14 **A.** Yes.  That's breaking down the box.
15 **Q.** Uh-huh.  Do you know what was inside the
16   box?
17 **A.** Some kind of box.  I don't -- uh-uh.
18 **Q.** So where are you taking the broken- --
19 **A.** There's a --
20 **Q.** -- down box?
21 **A.** -- trash they dumped most of it.
22 **Q.** Is it your normal practice to open
23   packages that get delivered to the front

---

33 (Pages 129 to 132)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

---

133

1    counter?
2    **A.** Yes.  Most of the time the customer will
3      return remotes, modems, or boxes.
4    **Q.** Okay.  This is another clip.  It's
5      120000.  Could you tell when you opened
6      this box that it wasn't a remote or a
7      modem or something --
8    **A.** I knew it --
9    **Q.** -- else?
10   **A.** -- after I opened it.  I wasn't paying
11     attention to the box.
12   **Q.** Is that the box that you took out of the
13     box right there on the left?  Is that you
14     looking at it?
15   **A.** No, that's not.
16   **Q.** You don't believe that that box --
17   **A.** No.  That's a remote.
18   **Q.** -- came from the cardboard box?  I can
19     play it again.
20   **A.** Yeah, please.
21   **Q.** Yeah.  See the box over here (indicating)
22     you're lifting up and looking at right
23     there?

---

134

1    **A.** I guess it is.
2    **Q.** You guess --
3    **A.** I don't know.
4    **Q.** -- it is?  You don't know?
5    **A.** Is it -- I -- sure.
6    **Q.** Well --
7    **A.** Well, I mean, you know, I really . . .
8    **Q.** You want to watch it again?
9    **A.** Please.
10   **Q.** Okay.  Put it over there.
11   **A.** Okay.  That's not it.  That's -- guess it
12     is, because it looks black.  I mean, I
13     don't -- I don't remember but yes, I
14     guess.  Yeah.
15   **Q.** Do you remember when you opened the
16     package what you saw?
17   **A.** It was a box.
18   **Q.** Okay.  Was it the box that you were
19     looking at in that video clip?
20   **A.** Yes.
21   **Q.** Did you know what the box was?
22   **A.** I didn't.  It was more of opening the box
23     and just knowing that it didn't belong to

---

135

1      Charter, so . . .
2    **Q.** What did you do with the box once you
3      opened it, the box inside the box that
4      you broke down?
5    **A.** Put it in my drawer.
6    **Q.** Did you tell Valerie when she called that
7      you had opened the box and put the
8      package --
9    **A.** No.
10   **Q.** -- in the drawer?  So you lied to
11     Valerie?
12   **A.** Uh-huh.  (Witness nods head.)
13   **Q.** Okay.  Did you -- when you were asked
14     about the package during Charter's
15     investigation, did you tell them that you
16     had broken down the box and --
17   **A.** No.
18   **Q.** -- put the package in your drawer?
19   **A.** No.
20   **Q.** No?  So you lied during the
21     investigation?
22   **A.** (Witness nods head.)
23   **Q.** Okay.  And you don't remember if you were

---

136

1      asked about the package during the
2      unemployment compensation --
3    **A.** I don't --
4    **Q.** -- hearing?
5    **A.** -- remember that one, no.
6    **Q.** Okay.  Why did you lie about handling the
7      package?
8    **A.** Embarrassment.
9    **Q.** I just have a couple more questions, so I
10     really just want to walk you through a
11     couple of the documents that I think have
12     to do with counseling about timekeeping.
13   **A.** Okay.
14         MS. SRIVASTAVA:  Will you mark
15     this as Exhibit 7 -- 8.
16         (Defendant's Exhibit 8 was
17         marked for identification.)
18   **Q.** So that's an e-mail marked Charter
19     00000675.  It's an e-mail from Nicole to
20     you.  If you look at the bottom one on
21     April 5, 2013.  She's asking you to
22     remember to log in and log out daily at
23     the beginning and end of your shift and

---

34 (Pages 133 to 136)

137

1    lunches.  And is that your response at
2    the top --
3    **A.** Okay.
4    **Q.** -- saying okay?
5    **A.** Okay.
6    **Q.** So you understood that it was your
7    responsibility to log in and out for the
8    day and for lunches?
9    **A.** Yeah.  I was clocking in and clocking
10   out.
11   **Q.** Okay.
12   **A.** Yeah.
13   **Q.** And you understood that that was your
14   responsibility under the Charter
15   timekeeping system?
16   **A.** Yes.
17   **Q.** Do you remember when you would review
18   your timekeeping hours on a biweekly
19   basis if a certification popped up?
20   **A.** Don't --
21   **Q.** If any window popped up on the screen
22   saying that you were certifying that the
23   hours were accurate and true?

138

1    **A.** Probably.  I'm not sure.
2    **Q.** Okay.  Probably but you're not sure?
3    **A.** Yeah, I'm not sure.
4         MS. SRIVASTAVA:  Mark this as
5    Exhibit 9.
6         (Defendant's Exhibit 9 was
7         marked for identification.)
8    **Q.** And it's marked Charter 0000611.  It says
9    that -- it lays out a couple of different
10   instances where there are attendance
11   issues --
12   **A.** Uh-huh.
13   **Q.** -- including being late for work, late
14   for work, late for work, and then second
15   to last from the bottom from July 18,
16   2013, you were two minutes late for
17   lunch, issues clocking in.  Informed that
18   I will keep in notes.  Do you remember
19   having this conversation?
20   **A.** Yes.
21   **Q.** Do you remember who it was with?
22   **A.** (Witness shakes head.)
23   **Q.** Was it Nicole?

139

1    **A.** Two minutes late from lunch.  Yeah.
2    Okay.
3    **Q.** And then on February 7, 2014, late from
4    lunch five minutes.  Received a phone
5    call before clocking in.
6    **A.** Uh-huh.  (Witness nods head.)
7    **Q.** Do you remember having that conversation
8    with Nicole?
9    **A.** Yeah.  I let her know that I got a call
10   before I --
11   **Q.** Uh-huh.
12   **A.** -- was due to clock -- to clock in, yes.
13   **Q.** Yeah.  And that was a call about -- from
14   your son's school; correct?
15   **A.** It had to be something, because I
16   normally, typically, do not answer calls
17   unless it was my husband or my -- or for
18   my son.
19   **Q.** Got it.  Okay.  Do you know if your time
20   for that day was adjusted because you had
21   clocked back in late from lunch?  Do you
22   know if you were paid less because you
23   had clocked back in late for lunch or if

140

1    you were paid for your full day of work?
2    **A.** No.  I mean, wouldn't it be -- I mean,
3    wouldn't they have that in the record?  I
4    mean --
5    **Q.** So you don't know without looking at
6    records?
7    **A.** I mean, I was late.  Why would it be
8    adjusted?  I mean, I -- I don't
9    understand your question.  I'm sorry.
10   **Q.** Yeah.  No, that's okay.  So usually you
11   got paid for a what, an eight-hour day;
12   correct?
13   **A.** Right.
14   **Q.** Okay.  So if you take an hour and five
15   minutes for lunch --
16   **A.** Right.
17   **Q.** -- you're actually only working --
18   **A.** Under 40 hours.
19   **Q.** Right.
20   **A.** Uh-huh.
21   **Q.** Right.  And do you know if your time was
22   ever adjusted down?
23   **A.** I don't know.  No, don't know.

35 (Pages 137 to 140)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                                   April 15, 2015

141

1  **Q.** So it might have been?
2  **A.** Sure.
3  **Q.** Or you might have been paid for that
4      time?
5  **A.** I can't tell you.
6  **Q.** You can't tell?
7  **A.** I don't know.
8  **Q.** You don't know?
9  **A.** I don't know.
10 **Q.** You never checked your pay stubs?
11 **A.** No.  I don't know.
12 **Q.** Never checked your time?
13 **A.** (Witness shakes head.)  Uh-uh.
14 **Q.** Okay.  Okay.  And you mentioned earlier
15     today that you didn't keep records of the
16     amount of time you worked but didn't
17     report on your time sheets; right?
18 **A.** Right.
19 **Q.** And you didn't keep any records of when
20     you took your lunch breaks; right?
21 **A.** (Witness shakes head.)
22 **Q.** Okay.  So we'd have to reconstruct it
23     from memory?

142

1  **A.** (Witness nods head.)
2  **Q.** And is there anything else other than
3      what we've talked about today that you
4      think would help us figure out which days
5      you worked through your lunch break and
6      which days you didn't?
7  **A.** I don't know.
8  **Q.** You don't?
9  **A.** Uh-uh.
10 **Q.** Okay.  We'd have to depend on what you
11     say; correct?
12 **A.** Sure.  Yes.
13 **Q.** Correct?
14 **A.** Correct.
15 **Q.** Okay.  You lied to Valerie about the
16     package; correct?
17 **A.** Uh-huh.  (Witness nods head.)
18 **Q.** Okay.  And you lied during the
19     investigation about the package; correct?
20 **A.** Uh-huh.  (Witness nods head.)
21 **Q.** Okay.  So how do we know that you're not
22     lying now about the time that you worked
23     during lunch break?

143

1  **A.** This is completely different from the
2      package and my time.  And Nicole's aware
3      that I was the go-to person at all times.
4      She knows that I worked and she knows I
5      was a hard worker, so I'm not lying.  So
6      that's all I can tell you.  I was a hard
7      worker.  I was at work -- when I was at
8      work, I worked.  And you expect me to
9      work, that's what I was going to do.
10     And, I mean, more than happy to ask the
11     people that I worked with that I helped
12     trained.  You can ask them if they
13     interrupted me, which they can either say
14     no, I -- that she didn't help me or yes,
15     she did help me.  I --
16 **Q.** Okay.
17 **A.** It's up to you guys.
18 **Q.** Okay.  So who else do you think that we
19     could talk to that would help support
20     your claims?
21 **A.** I mean, Ranisha Crume was a -- was an
22     early person -- I mean a new person.  I
23     don't know.  I don't know who's all

144

1      there.  I really don't, so I couldn't
2      tell you who to talk to because I don't
3      know who's left.
4  **Q.** Okay.  Of the people who were there when
5      you were there, who should we talk to?
6  **A.** I'm sorry.  The people that were there --
7  **Q.** That were there when you were there.  And
8      I know you just said that --
9  **A.** Who was --
10 **Q.** -- not everybody --
11 **A.** -- somebody --
12 **Q.** -- is left.
13 **A.** There was a DeAndre Williams, there was
14     Gina Hinkle, there was -- I sometimes
15     helped Eden.  Eden is not there anymore
16     but if she have a question -- she was
17     senior, so she pretty much knew what to
18     do.  There was -- Ranisha.  Kiantra
19     worked -- was one of the workers.
20 **Q.** Ranisha Kiantra?
21 **A.** Ranisha, Kiantra.  Who else worked there?
22     Virginia worked there --
23 **Q.** Virginia?

36 (Pages 141 to 144)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

---

145

1   **A.** -- that works -- Virginia.  Like I said,
2       I don't know.
3   **Q.** Okay.  What would Ramisha -- is that it?
4   **A.** Ranisha?
5   **Q.** Yeah.  I'm sorry.  Is that the whole
6       list -- Ramisha Crume, DeAndre Williams,
7       Gina Hinkle, Eden, Ranisha Kiantra, and
8       Virginia?
9   **A.** Valerie worked there, too.
10  **Q.** Okay.  Okay.  What would Ranisha be able
11      to tell us?
12  **A.** That she needed assistance and that I
13      helped.  I mean . . .
14  **Q.** Anything else?
15  **A.** (Witness shrugs.)
16  **Q.** Okay.  For DeAndre Williams, what would
17      DeAndre be able to tell us?
18  **A.** The same; if he needed assistance with
19      customers and I was at lunch, he would
20      come look for my assistance.
21  **Q.** Okay.  And Gina Hinkle, what would she be
22      able to tell us?
23  **A.** The same.  Every single one of them

---

146

1       should be able to tell you the same, that
2       I did assist them when they needed help.
3   **Q.** Okay.  These aren't people that you named
4       in your interrogatory responses, were
5       they?
6   **A.** I don't think I mentioned any of them.
7       MR. ARENDALL:  Well, technically
8       you got the names because you asked who
9       she worked with, so --
10      MS. SRIVASTAVA:  I understand
11      that.
12      MR. ARENDALL:  That's -- I'm just
13      making it clear.
14      MS. SRIVASTAVA:  Yeah.  This
15      question is a little different, though --
16      MR. ARENDALL:  All right.
17      MS. SRIVASTAVA:  -- because one
18      of the things that we asked in
19      interrogatory responses was to identify
20      anyone that would help support her
21      claims.
22  **Q.** Okay.  So the seven people that you just
23      listed, is that who would be able to --

---

147

1       THE WITNESS:  Am I supposed to
2       give names?  I'm sorry.
3       MR. ARENDALL:  Go ahead.  Sure.
4   **Q.** That's -- is a fair --
5       MR. ARENDALL:  You answer the
6       question.
7   **A.** I'm sorry.
8   **Q.** If your answer is incomplete, please give
9       us the rest of the information.  Is there
10      anyone else that you'd like to add to
11      that list?
12  **A.** I don't know anybody --
13  **Q.** Okay.
14  **A.** -- else that might have worked there.
15  **Q.** Okay.  Would any of the seven people that
16      you named for us know whether or not you
17      put down on your time sheet the time that
18      you spent during your lunch break helping
19      them?
20  **A.** Would they know if I did?
21  **Q.** Uh-huh.
22  **A.** I don't think they would.
23  **Q.** Okay.  Would they know whether or not you

---

148

1       talked to Nicole about the times that
2       they would ask you questions and ask you
3       for help?
4   **A.** I'm not sure.  I don't think they would.
5   **Q.** Okay.  Do you think that they would know
6       whether or not they were interrupting you
7       on your lunch break?
8   **A.** Yeah.
9   **Q.** Okay.  Do you think they would know or be
10      able to recall how long you spent helping
11      them while you were on your lunch break?
12  **A.** They may or may not.
13  **Q.** Okay.  But you don't recall; correct?
14  **A.** No.
15  **Q.** Okay.  If Charter wanted to write you a
16      check today for all of the time that you
17      claim that you worked through your lunch
18      break without pay, do you know what that
19      amount would be?
20  **A.** No, ma'am.
21      MS. SRIVASTAVA:  I don't have
22      anything further.
23      MR. ARENDALL:  Would you -- I

37 (Pages 145 to 148)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

149

1    have got a few questions.
2         MS. SRIVASTAVA:  Yeah.
3            EXAMINATION
4    BY MR. ARENDALL:
5    Q. Would you refer Charter on writing a
6       check to the answers to
7       interrogatories -- I believe it was
8       Exhibit 7 -- where damages were
9       calculated by your attorneys?
10   A. Yes.
11   Q. Okay.
12   A. This it?
13   Q. Yes.
14   A. Okay.
15   Q. Okay.  I've got a few other questions.
16      Were there occasions where Ms. Johnson
17      would have seen you working during your
18      unpaid meal break?
19   A. She would have.
20   Q. Okay.
21   A. Yes.
22   Q. On those occasions, did she ensure that
23      you were paid for that meal break?

150

1    A. Did she what?
2    Q. Did she make sure you got paid for
3       working through your meal break?
4    A. I don't think so.  Uh-uh.  I don't think
5       so.
6    Q. Did she ask or tell you to fill out
7       anything dealing with your time records
8       in order to make --
9    A. No.
10   Q. -- sure you got paid for it?
11   A. No.
12   Q. Did she tell you on any occasion to clock
13      back in if your meal break was shortened
14      because you had to do work on behalf of
15      Charter during your unpaid meal break?
16   A. No.
17   Q. Did you ever fill out anything called
18      time sheets?
19   A. We don't have time sheets.
20   Q. Okay.  The e-filing system through the
21      computer is the way time was maintained?
22   A. Right.
23   Q. All right.  On occasions that Ms. Johnson

151

1    would not be present and you performed
2    work during your unpaid meal breaks, as
3    you answered the questions of defense
4    counsel today, on those occasions when --
5    was there anyone else to perform
6    Ms. Johnson's duties of customer service
7    and checking accounts, reestablishing
8    service, setting up payment plans, and
9    the type things you talked about you
10   would do during your meal break, was
11   there anybody else present to do those
12   functions other than you during your meal
13   break?
14   A. No.
15   Q. Is that something that Ms. Johnson would
16      have known, that there was no one else to
17      do it except for you?
18   A. Yes.
19   Q. When she came back from wherever she's
20      been out on those occasions, would she
21      ask you have you done anything during
22      your unpaid meal break that's for the
23      benefit of Charter?

152

1    A. No.
2    Q. Did she ever ask -- tell you when she
3       would come back, Look, if you did any
4       work for Charter during your meal break,
5       here's what you need to do to make sure
6       you get paid?
7    A. No.
8    Q. Did she ever ask you on a weekly or
9       biweekly basis did you do any work during
10      your unpaid meal breaks during this time
11      frame in order to ensure you got paid?
12   A. No.
13   Q. Were you ever informed by Charter or
14      given by Ms. Johnson any type of a form
15      called a time correction form that you
16      could fill out to get paid for work
17      performed during unpaid meal breaks?
18   A. No.
19   Q. Did you ever have anyone with Charter, HR
20      or anybody, ever come to you and say, If
21      you are required to perform work during
22      unpaid meal breaks, here's what you need
23      to do in order to get paid?

38 (Pages 149 to 152)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                      April 15, 2015

153

1  **A.** No.
2  **Q.** Did you during your training sessions
3     that you took on the computer, did you
4     ever -- do you recall ever being informed
5     of anything that you were to do to get
6     paid for work performed off the clock
7     other than tell your supervisor?
8  **A.** No.
9  **Q.** Did you ever see a policy at any point
10    that ever told you to do anything other
11    than tell your supervisor you weren't
12    getting paid in order to get paid for
13    work performed off the clock?
14 **A.** No.
15 **Q.** Now, you testified earlier that you only
16    told Ms. Johnson three or four times
17    about specific things you had done during
18    your meal breaks; correct?
19 **A.** Uh-huh.
20 **Q.** Is that correct?
21 **A.** Correct.
22 **Q.** Okay.  So why did you quit doing that
23    every week since you're performing work

154

1     every week?
2  **A.** It wasn't being acknowledged so I just
3     didn't do it anymore.  It wasn't
4     acknowledged.
5  **Q.** When you did tell Ms. Johnson about it,
6     did you get paid?
7  **A.** No.
8  **Q.** Did any policy that we've gone over today
9     tell you what to do if you tell your
10    supervisor and you still don't get paid?
11 **A.** No.  It just says tell your supervisor --
12    supervisor.
13 **Q.** When you did not get paid after telling
14    her those three or four times, did you
15    know what to do past that to get paid?
16 **A.** No.
17 **Q.** Did you understand that you had any other
18    responsibility other than taking care of
19    customers in your job as customer service
20    representative during your meal break?
21 **A.** I'm sorry.  Repeat that question.
22 **Q.** Yes.  Did -- why did you work during your
23    unpaid meal breaks?

155

1  **A.** Customers needed assistance, and if I was
2     the only one available, then I did it.
3  **Q.** Did you do that for your benefit?
4  **A.** No.  Company's benefit.  Not for my
5     benefit.
6  **Q.** And were you paid for doing that?
7  **A.** No.
8  **Q.** And did Ms. Johnson make any proactive
9     efforts to ensure that you were getting
10    paid for that?
11 **A.** No.
12 **Q.** Is there any way, in your mind, that
13    Ms. Johnson could truthfully testify
14    during her deposition that she didn't
15    know you were doing that work during your
16    unpaid meal breaks?
17 **A.** I mean, if she tells the truth, she can
18    tell, yes, I -- I did work.  But, I mean,
19    it's entirely up to her.
20 **Q.** Let's -- let's be clear.  In your mind --
21 **A.** Uh-huh.
22 **Q.** -- if Ms. Johnson tells the truth during
23    her deposition --

156

1  **A.** Uh-huh.
2  **Q.** -- would she testify that she was aware
3     that you were performing work during your
4     unpaid meal breaks during the last three
5     years?
6  **A.** Yes.
7  **Q.** And that it was for the benefit of the
8     company?
9  **A.** Yes.
10        MR. ARENDALL:  That's all.
11        MS. SRIVASTAVA:  I just have a
12    few quick follow-up questions from that.
13        EXAMINATION
14    BY MS. SRIVASTAVA:
15 **Q.** You never tried to put down the time that
16    you worked during your meal break;
17    correct?
18 **A.** No.
19 **Q.** You never tried to clock in early; right?
20 **A.** No.
21 **Q.** So you don't know if you would have been
22    paid for that if you had put it down;
23    correct?

39 (Pages 153 to 156)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                          April 15, 2015

157

1   **A.** I wouldn't know if I would clock in?
2   **Q.** You wouldn't -- you don't know if you
3        would have been paid for that time if you
4        had clocked in early?
5   **A.** Yeah, I know that I would have gotten
6        paid, but that was not -- that was not --
7   **Q.** Okay.
8   **A.** -- what was said in the -- my
9        understanding, you have to let the
10       supervisor know.  Nothing say to clock in
11       and clock out.  It says you take your
12       full lunch.  So I was following what I --
13       what I read.
14  **Q.** Okay.  So you knew that if you put it
15       down you would get paid for it; right?
16  **A.** I thought by telling my supervisor about
17       it that that would record it.
18  **Q.** My question is a little different.  You
19       knew that if you put down any time that
20       you would get paid for it; correct?
21  **A.** I knew if I let my supervisor know that I
22       would get paid for it.  Not that I've
23       written down.  I would know that if I let

158

1        my supervisor know, that I would get paid
2        for it.
3   **Q.** Okay.  My question is a little different.
4        If you had clocked in early --
5   **A.** Uh-huh.
6   **Q.** -- for eTime when you came back from your
7        lunch early to help a customer --
8   **A.** Uh-huh.  Right.
9   **Q.** -- you would have been paid for that
10       time; correct?
11  **A.** Yes.  But that was not how it was told to
12       do it.
13  **Q.** Okay.  Who -- who told you to do what?
14  **A.** Based on what I've read here, it says
15       policy is or the procedure is you take
16       your full hour lunch; if not, let your
17       supervisor know.  So it doesn't say if
18       you're interrupted on your lunch, clock
19       in, help the customer, and when you're
20       done, clock back out.  So that was not in
21       the handbook.
22  **Q.** Do you know whether or not it was in the
23       handbook that nonexempt employees would

159

1        be paid for all time worked even if it
2        was during meal break?
3   **A.** Correct.  And it was also my
4        understanding that my supervisor would
5        correct that, and that's what I did.
6   **Q.** Okay.  So the three to four times that
7        you say that you mentioned to Nicole that
8        someone came to get you during your lunch
9        break --
10  **A.** Uh-huh.
11  **Q.** -- did you -- did you need Nicole to go
12       in and change your time to get paid for
13       that time?
14  **A.** Yeah.  She would have to be the one
15       changing it, not me.
16  **Q.** Because you already had chosen not to
17       clock in early on eTime on those days;
18       correct?
19  **A.** No.  I was following procedure.
20  **Q.** Okay.  Because you -- did you think that
21       it was following procedure to not record
22       your time accurately?
23           MR. ARENDALL:  Object to the

160

1        form.
2   **A.** No.  I told my supervisor.
3   **Q.** Did you think that you were recording
4        your time accurately by clocking in for a
5        one-hour lunch break when you actually
6        worked for a portion of that lunch break?
7   **A.** I'm sorry?  Do what?
8   **Q.** Did you think that you were recording
9        your time accurately by saying in eTime
10       that you took a one-hour lunch break --
11  **A.** Uh-huh.
12  **Q.** -- when you're actually now claiming that
13       you worked a portion of that lunch break?
14  **A.** No.  But, again, by me letting my
15       supervisor know, that to me tells me that
16       it was taken care of.
17  **Q.** Uh-huh.
18  **A.** I cannot go in there and change it.
19  **Q.** Okay.
20  **A.** It was not said that I can clock in from
21       my lunch, do whatever I need to do, and
22       then clock back in.  That was not said.
23       I'm entitled to an hour lunch.

40 (Pages 157 to 160)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                        April 15, 2015

161

1   Q. Did you ever ask if you could clock back
2      in?
3   A. She wasn't there the times -- most of the
4      times she wasn't there so no. I just did
5      what business needs. I just did what was
6      natural, just go help.
7   Q. I know you said Nicole wasn't there a
8      lot. Did you have her cellphone?
9   A. Yes.
10  Q. Did you ever try and call her to ask what
11     you --
12  A. Nope.
13  Q. -- should do?
14  A. I just took care of the customer.
15  Q. Okay. Do you know what the open-door
16     policy is at Charter?
17  A. Yes.
18  Q. Okay. What's your understanding of what
19     the open-door policy is?
20  A. You can talk to your supervisor about
21     anything.
22  Q. Okay. Can you talk to anybody else?
23  A. It didn't say that. I mean, I'm a true

162

1      believer -- and that's what I said,
2      supervisor. It doesn't say HR, it didn't
3      say anybody else.
4   Q. Okay.
5   A. It said supervisor.
6   Q. Let's go back to the employee handbook
7      that we had marked earlier before. It's
8      the thick one. On the top of it, it says
9      Employee Handbook.
10  A. This?
11  Q. Uh-huh.
12  A. Uh-huh.
13  Q. Okay. Go to the third page. Sorry.
14     It's -- I don't know if it's the --
15  A. Third page?
16  Q. Uh-huh. This one.
17  A. Okay.
18  Q. Okay. There is an employee relations
19     policy or philosophy. And if you go to
20     the bottom, there's an open-door policy,
21     and it carries on to the next page. It's
22     the page that ends 1263.
23  A. Oh, 63. Okay.

163

1   Q. Uh-huh.
2   A. Uh-huh.
3   Q. So just take a look at that. And then it
4      carries on to the second page.
5   A. Okay.
6   Q. And let me know when you're done with
7      that.
8   A. Oh, read it?
9         (Witness reviews document.)
10  Q. Just let me know when you're done.
11        (Witness reviews document.)
12  Q. And the last sentence in that second
13     paragraph on the page that ends 1264 says
14     you may contact human resources at any
15     point in the resolution process,
16     particularly if you're uncomfortable
17     approaching a member of management, if
18     you disagree with the suggested course of
19     action, or if your supervisor is the
20     subject of concern; correct?
21  A. Uh-huh.
22  Q. So you could have gone to HR?
23  A. According to this, yes.

164

1   Q. Okay. And then the next paragraph says
2      if you're unable to resolve your issue or
3      concern through the suggested management
4      chain, you may also make reports through
5      EthicsPoints. Both are available 24
6      hours a day, seven days a week; correct?
7   A. Uh-huh.
8   Q. Okay. And you never used EthicsPoint;
9      right?
10  A. No. Never.
11  Q. No. Your attorney asked you about a time
12     correction form.
13  A. Right.
14  Q. Did you ever ask for a time correction
15     form?
16  A. There was not one.
17  Q. Okay.
18  A. That's not something we had.
19  Q. Okay. Did you ever send an e-mail to
20     Nicole, to any other supervisor, or to HR
21     or to anyone asking to be paid the time
22     that you say --
23  A. No.

41 (Pages 161 to 164)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                              April 15, 2015

---

165

1   **Q.** -- you worked during your lunch break?
2   **A.** No.
3   **Q.** Okay.  And you testified that there are
4        times when Nicole would have seen you
5        working through your lunch break;
6        correct?
7   **A.** (Witness nods head.)
8   **Q.** Okay.  How often were those times?
9   **A.** I don't know.
10  **Q.** Do you remember when those times were?
11  **A.** I mean, it would be a few times that she
12       would see me up there or somebody --
13       there'd be times when one of them would
14       ask her something and then I was sitting
15       there and they'll ask me something and
16       she would -- she would be helping one of
17       the employees and then I would be helping
18       the other employee.
19  **Q.** Uh-huh.
20  **A.** But specific times, I don't -- I don't
21       have it.
22  **Q.** And how would Nicole have known that you
23       were on your lunch break at that time?

---

166

1   **A.** Sometimes I'll be sitting in the back
2        room.
3   **Q.** Okay.  Sometimes you weren't sitting in
4        the back room?
5   **A.** No.  Uh-uh.
6   **Q.** Okay.  Do you remember what you were
7        doing during those times that you say
8        Nicole was there and saw you working
9        through your lunch break?
10  **A.** Just sitting there maybe eating my lunch
11       or just sitting there already probably
12       eating my lunch and I would just sit in
13       the back room.
14  **Q.** Uh-huh.
15  **A.** Because I really didn't go anywhere,
16       so . . .
17  **Q.** Uh-huh.  An employee would approach you
18       during these times?
19  **A.** They would come back and ask questions,
20       yes.
21  **Q.** Where was Nicole?
22  **A.** She could either be probably on the
23       phone, maybe doing report, doing

---

167

1        balance -- what you call that? --
2        surprise cash count, you know, numerous
3        things.
4   **Q.** Uh-huh.  Do you know if she was listening
5        to what the employee was saying to you?
6   **A.** She may, she may not.  I --
7   **Q.** She might or she might not be?
8   **A.** Uh-huh.  (Witness nods head.)
9   **Q.** Okay.  So she might not know whether or
10       not it's a personal conversation or a
11       work question; right?
12  **A.** Not sure.  I mean . . .
13  **Q.** You don't know?
14  **A.** No, I don't know.
15  **Q.** Okay.  And last question.  Your attorney
16       said that we could refer to the chart
17       that your attorney put together where
18       damages were calculated by your attorney;
19       right?
20  **A.** Uh-huh.  (Witness nods head.)
21  **Q.** But you don't know how that chart was
22       made; right?
23  **A.** I mean, he -- it was explained to me --

---

168

1   **Q.** Uh-huh.
2   **A.** -- but for me to explain it to you, I --
3        I couldn't do it.  I mean --
4   **Q.** Okay.
5   **A.** -- you know, they know how they did it; I
6        don't.
7   **Q.** And from what you've told me here today
8        just during this deposition testimony,
9        you don't remember how many days a week
10       you worked or how long those
11       interruptions were; correct?
12       MR. ARENDALL:  Object to the
13       form.
14  **A.** No.  I said that it could be three -- two
15       to three days.
16  **Q.** It could be two to three days a week?
17  **A.** Uh-huh.  (Witness nods head.)
18  **Q.** And there were days when you worked
19       during your lunch break less than two to
20       three weeks and days when you worked
21       more; right?
22  **A.** No, not what I said.
23  **Q.** No?

---

42 (Pages 165 to 168)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                        April 15, 2015

---

169

1   **A.** I said it could be two to three days that
2      I worked --
3   **Q.** Okay.
4   **A.** -- over my lunch.
5   **Q.** And you don't know whether or not a
6      particular week was two days or another
7      day was three week -- three days; right?
8   **A.** No.
9   **Q.** Okay.  And you don't know how long the
10     interruptions would have been on these
11     two to three days, right, if they were --
12  **A.** Most --
13  **Q.** -- less than five minutes?
14  **A.** Most likely would be -- most of the time
15     would be over 20 minutes or maybe five
16     minutes.
17  **Q.** Okay.
18  **A.** But --
19  **Q.** And you don't know?
20  **A.** I don't know.  But considering the
21     customer and the issue, it --
22  **Q.** Okay.
23  **A.** Most of the time it was more than 20

---

170

1      minutes.
2   **Q.** Okay.
3   **A.** Because you have to go look at the
4      account, you've got to look at the
5      computer, you've got to look at the
6      customer's account overall.  So it was
7      really not just a quick question,
8      yes-or-no answer.
9   **Q.** Was it sometimes a quick question and
10     yes-or-no answer?
11  **A.** Sometimes.
12  **Q.** Okay.
13  **A.** Uh-huh.
14  **Q.** Do you remember which days those were?
15  **A.** No, ma'am.
16  **Q.** Okay.  And don't remember which days were
17     20 minutes or longer either; right?
18  **A.** No.
19  **Q.** Okay.
20         MS. SRIVASTAVA:  That's it.
21         MR. ARENDALL:  Two questions.
22     And this is one of the rare times when a
23     lawyer says two questions and means it.

---

171

1              EXAMINATION
2         BY MR. ARENDALL:
3   **Q.** All right.  First one, did you let Nicole
4      know some three or four times that you
5      had worked through your meal breaks and
6      you still did not get paid?
7   **A.** Right.
8   **Q.** Second one is, did -- did Nicole set the
9      schedule for when you took lunch?
10  **A.** Yes.
11  **Q.** Okay.
12         MR. ARENDALL:  That's it.
13         MS. SRIVASTAVA:  Nothing further.
14         VIDEOGRAPHER:  Okay.  This ends
15     Videotape No. 3 and the deposition of
16     Karen Lopez-Easterling.  The time is now
17     12:40 p.m.
18
19         (The videotaped deposition of
20         Karen Lopez-Easterling concluded
21         at 12:40 p.m. on April 15, 2015.)
22
23

---

172

1              REPORTER'S CERTIFICATE
2
   STATE OF ALABAMA    )
3                      )
   ELMORE COUNTY       )
4
5
        I do hereby certify that the above
6   and foregoing transcript was taken down
    by me in stenotype, and the questions and
7   answers thereto were transcribed by means
    of computer-aided transcription, and that
8   the foregoing represents a true and
    correct transcript of the testimony given
9   by said witness.
10
11      I further certify that I am
    neither of counsel, nor any relation to
12  the parties to the action, nor am I
    anywise interested in the result of said
13  cause.
14
15      I further certify that I am duly
    licensed by the Alabama Board of Court
16  Reporting as a Certified Court Reporter
    as evidenced by the ACCR number following
17  my name below.
18
19
20      /s/ Bridgette W. Mitchell
        Bridgette W. Mitchell
21      Certified Court Reporter and
        Commissioner for the State of
22      Alabama at Large
        ACCR No. 231 - Expires 9/30/15
23      MY COMMISSION EXPIRES 12/19/17

---

43 (Pages 169 to 172)

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                           April 15, 2015

|  | 173 |
|---|---|
| 1 | COURT MEMO |
| 2 | |
| 3 | |
| 4 | |
| 5 | Karen Lopez-Easterling vs. Charter Communications, LLC |
| 6 | |
| 7 | |
| 8 | CERTIFICATE OF OFFICER AND |
| 9 | STATEMENT OF DEPOSITION CHARGES |
| 10 | |
| 11 | DEPOSITION OF Karen Lopez-Easterling |
| 12 | |
| 13 | 4/15/2015 |
| 14 | Name and address of person or firm having custody of |
| 15 | the original transcript: |
| 16 | |
| 17 | Morgan Lewis & Bockius, LLP |
| 18 | 77 West Wacker Drive, Fifth Floor |
| 19 | Chicago, IL 60601 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

|  | 174 |
|---|---|
| 1 | ORIGINAL TRANSCRIPT TAXED IN FAVOR OF: |
| 2 | |
| 3 | Morgan Lewis & Bockius, LLP |
| 4 | 77 West Wacker Drive, Fifth Floor |
| 5 | Chicago, IL 60601 |
| 6 | Total: |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

|  | 175 |
|---|---|
| 1 | Upon delivery of transcripts, the above |
| 2 | charges had not been paid.  It is anticipated |
| 3 | that all charges will be paid in the normal course |
| 4 | of business. |
| 5 | GORE PERRY GATEWAY & LIPA REPORTING COMPANY |
| 6 | 515 Olive Street, Suite 700 |
| 7 | St. Louis, Missouri 63101 |
| 8 | IN WITNESS WHEREOF, I have hereunto set |
| 9 | STATEMENT OF DEPOSITION CHARGES |
| 10 | my hand and seal on this _____ day of _____ |
| 11 | Commission expires |
| 12 | _____ |
| 13 | Notary Public |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

44  (Pages 173 to 175)

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

Page 176

---

**A**

**ability** 69:21 71:15
**able** 17:22 70:5,12
70:16 72:13 78:5
79:2 85:15 87:22
109:8,21 145:10
145:17,22 146:1
146:23 148:10
**accepted** 126:11
**access** 25:20
**account** 30:15 39:3
39:9 115:13 170:4
170:6
**accounts** 151:7
**ACCR** 172:16,22
**accurate** 21:6
68:22 106:13
137:23
**accurately** 30:21
159:22 160:4,9
**acknowledged**
154:2,4
**Acknowledgement**
4:11
**acknowledgment**
19:13
**acquired** 11:8,15
11:16
**act** 125:14
**acting** 44:3 57:22
60:9
**action** 163:19
172:12
**add** 116:2 147:10
**addition** 16:4,7
85:19
**additional** 40:20
85:18
**address** 173:14
**adjusted** 139:20
140:8,22
**admissibility**
125:15
**advance** 77:23

**affirmed** 6:2
**afternoon** 16:10,11
85:15,20
**after-the-fact** 119:1
**agree** 39:22
**agreed** 3:3,21
**ahead** 7:17 8:14
25:13 103:14
107:17 113:9
147:3
**aid** 18:18
**Alabama** 1:2,19,21
2:8 3:10 5:8 12:2
126:8 128:2 172:2
172:15,22
**alcohol** 8:3
**allegedly** 40:13
**allowed** 71:23 78:2
**amount** 40:4 82:8
91:15 141:16
148:19
**answer** 7:9,16,17
80:7,11 95:6
97:19,21 104:7,12
104:15 106:8,9
107:6 113:19
116:20 117:15
139:16 147:5,8
170:8,10
**answered** 108:20
151:3
**answering** 7:21
82:9
**answers** 4:17 6:12
103:13 149:6
172:7
**anticipated** 175:2
**anybody** 10:15
12:17 147:12
151:11 152:20
161:22 162:3
**anymore** 144:15
154:3
**anywise** 172:12

**apologize** 19:3
**apologized** 56:23
**APPEARANCES**
2:1
**appearing** 10:19
**application** 126:20
**applied** 126:10
**approach** 166:17
**approaching**
163:17
**approve** 68:10,10
68:12 99:21
**approved** 101:22
**approving** 68:20
**April** 1:22 5:9
12:23 57:10,11,15
136:21 171:21
**Arby's** 76:6,11
78:17
**ARENDAL** 117:20
**Arendall** 2:5,6 4:8
4:9 5:20,20 8:5,8
54:19,23 55:3,6
64:2,10,15,19,21
65:3,6,8,15,19,21
72:23 97:17
104:13,16 107:4
109:10,12,15
110:21 112:23
113:9,16 117:10
117:14,17 120:9
125:10 146:7,12
146:16 147:3,5
148:23 149:4
156:10 159:23
168:12 170:21
171:2,12
**ARNOLD** 2:6
**arrangement** 39:2
39:7
**arrangements** 58:7
77:20
**arrived** 26:20 73:7
**arriving** 54:1

**asked** 8:14 44:7
46:4 100:1 105:13
105:20 123:6,9,13
123:15 124:14,18
124:20 127:12
128:4,6,8,9,15
129:15 135:13
136:1 146:8,18
164:11
**asking** 31:8 61:5
98:21 109:10
124:22 136:21
164:21
**asks** 116:11
**asleep** 125:19
**assigned** 50:1
**assist** 46:4 146:2
**assistance** 77:19
145:12,18,20
155:1
**assistant** 77:17
**assume** 7:2
**assumed** 98:17
99:7
**attend** 17:7 54:9
81:19 83:2
**attendance** 52:17
52:21 54:1,2,15
86:14 138:10
**attention** 30:5
49:23 133:11
**attorney** 6:10 10:1
10:4 164:11
167:15,17,18
**attorneys** 5:11
149:9
**AT&T** 11:15
**August** 63:6 119:5
119:11
**available** 107:11
111:4 155:2 164:5
**Avenue** 1:18 2:7
**average** 104:5
105:11

**aware** 13:22 36:6
43:20 44:8,11,12
45:20,22 46:5
50:17 72:11 83:3
89:3 129:18 143:2
156:2
**a.m** 1:22 5:10 66:19
67:1 73:7 106:19
106:22

---

**B**

**back** 12:2 18:12
27:19,21 28:13,16
28:18,22 29:2,3
34:23 38:1,19
40:6,6,23 41:2
41:15,19 42:19
43:2,6,13,16 46:5
46:6,11 55:2 60:5
65:22 67:3 70:15
70:23 71:9,15,22
72:1,3 76:14,19
77:1,21 78:15,16
78:16 87:5 89:4,8
89:17,20 90:18,21
93:3 94:16 106:21
116:1 123:7
128:18 139:21,23
150:13 151:19
152:3 158:6,20
160:22 161:1
162:6 166:1,4,13
166:19
**balance** 61:20
167:1
**bankruptcy** 9:1,3
**Based** 158:14
**basically** 57:22
**basis** 67:7,13,18
68:14,17 103:21
105:3 137:19
152:9
**bear** 131:10
**beginning** 5:2

---

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                                    April 15, 2015

Page 177

55:14,15 66:22
101:5 119:5 131:2
136:23
**behalf** 1:16 150:14
**belated** 125:11
**belief** 30:8
**believe** 14:8 36:21
50:23 51:5 53:13
60:13 71:20,23
73:14 74:10 117:5
124:18 127:2,12
133:16 149:7
**believed** 52:10
**believer** 162:1
**belong** 134:23
**belonged** 122:11
**benefit** 151:23
155:3,4,5 156:7
**best** 14:9 28:6
36:18 131:3
**better** 96:22 131:14
**big** 100:13 102:2,3
102:21 127:20
**bigger** 102:18
**Birmingham** 1:18
2:8
**bit** 73:18,19 79:23
**biweekly** 67:18
68:15,18,19
100:19 137:18
152:9
**black** 134:12
**blue** 77:4
**Board** 172:15
**Bockius** 2:12
173:17 174:3
**boss** 34:4 129:5
**bottom** 19:14 20:12
20:16 131:16
136:20 138:15
162:20
**bought** 76:10
**box** 14:18 123:4
124:19,20,22

125:2,4,6,22
132:3,4,10,13,14
132:16,17,20
133:6,11,12,13,16
133:18,21 134:17
134:18,21,22
135:2,3,3,7,16
**boxes** 133:3
**Brad** 128:22
**branch** 15:5
**Brandy** 128:22
**break** 7:10 16:4,7,9
27:10,15 38:9,14
40:8,16,21 41:19
42:8,14 44:10
45:6,12 46:18
55:18,22 57:15
59:9,20 60:4
66:14 72:1,4,15
74:1,5,9,17 76:13
76:23 77:8 78:6
78:13 80:22 81:6
82:10 83:2,18
84:9,18 85:1 86:9
87:2 88:22,23
89:5,7,9,12 90:5
90:11,15,18 92:22
94:11 97:5,15,23
98:6,11,15 99:6
100:6 105:18
106:17 108:15,21
110:12 111:2
115:7 130:14
142:5,23 147:18
148:7,11,18
149:18,23 150:3
150:13,15 151:10
151:13,22 152:4
154:20 156:16
159:2,9 160:5,6
160:10,13 165:1,5
165:23 166:9
168:19
**breaking** 132:2,14

**breaks** 7:6 15:22
16:3,6,8 21:14
63:19 66:6 73:3
73:18 74:18 75:2
78:23 79:7,11,17
80:1,15 82:14
85:14,16,18 86:5
109:13,19 119:16
121:11 141:20
151:2 152:10,17
152:22 153:18
154:23 155:16
156:4 171:5
**Brenda** 12:14
**Brian** 128:22,22,22
129:11,11,12
**Bridgette** 1:19 3:8
6:13 172:20,20
**briefly** 11:10
**bring** 76:8
**broke** 135:4
**broken** 118:15
132:18 135:16
**brought** 49:23 76:9
78:9
**building** 36:22 87:1
88:21
**business** 37:13
52:19 161:5 175:4
**busy** 86:6,7 107:16
121:5

──────────
**C**
**cable** 77:20
**calculated** 149:9
167:18
**call** 44:4,18 45:9
48:4 50:2 51:2,21
56:6 58:5 60:19
62:14 80:19 84:16
84:20 90:23 91:2
94:4,7,7 103:3
111:10 122:6
127:19 139:5,9,13

161:10 167:1
**called** 22:11 51:8
77:1 94:5 123:15
124:2 135:6
150:17 152:15
**calls** 11:14 139:16
**car** 77:3,6,8,10,11
78:16
**cardboard** 133:18
**care** 80:14 84:10
93:17 154:18
160:16 161:14
**Carla** 33:10,13,16
33:19 34:1 49:4
49:12,18
**Carolina** 128:20,23
**carries** 162:21
163:4
**case** 1:8 3:22 4:1
5:5 6:12 72:20
73:13,15
**cash** 61:21,22 62:6
77:1 167:2
**caught** 43:11
**cause** 172:13
**cellphone** 84:3
161:8
**certain** 7:15 74:6
**CERTIFICATE**
172:1 173:8
**certification**
137:19
**Certified** 172:16,21
**certify** 172:5,11,15
**certifying** 68:21
137:22
**chain** 34:3 52:6
164:4
**chance** 67:16
**change** 17:15 52:18
53:9,11 69:21
98:19,21 99:1,1,2
100:12 104:8
106:8 112:11

130:15,18 159:12
160:18
**changed** 11:9 15:7
15:9,11,14 99:12
99:17 100:9 101:7
101:18
**changing** 159:15
**charge** 59:5 125:17
**charges** 173:9
175:2,3,9
**chart** 116:22 117:6
117:12 118:10,19
167:16,21
**Charter** 1:10 2:18
2:19 5:5,16,18
6:11 11:1,4,11,17
11:21 12:4,9,22
13:18 14:18 15:10
15:19 20:3,10,12
22:18 23:15 24:4
24:21 25:10,14
35:15,22 41:9
46:1 51:1 54:2
63:5 64:7 65:14
102:9 106:6
116:14 118:22
121:18 123:18
126:17 127:8,12
128:3 129:2 135:1
136:18 137:14
138:8 148:15
149:5 150:15
151:23 152:4,13
152:19 161:16
173:5
**Charter's** 20:22
21:3,9,17 135:14
**check** 67:21 68:8
77:22 99:11,18,20
99:22 100:1,8,11
100:16,17,22
101:2,9,15 148:16
149:6
**checked** 99:14

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling

April 15, 2015

Page 178

101:4 141:10,12
**checking** 151:7
**Chicago** 2:14
173:19 174:5
**choice** 61:3
**chosen** 159:16
**chronic** 86:10
**cigarette** 38:11,15
86:2
**circumstances**
21:13
**Civil** 3:7,19 4:4
**claim** 116:12,17
130:2 148:17
**claimed** 73:5
**claiming** 160:12
**claims** 73:1 125:16
143:20 146:21
**clarification** 7:4
**clarify** 7:9
**clear** 8:12 146:13
155:20
**clearly** 6:15
**client** 24:16 113:1
**clip** 133:4 134:19
**clips** 131:6
**clock** 21:13 22:2,5
22:5,6,6 26:4,5,12
26:12,20 27:2,4,7
27:9,13,15,16,21
28:12,13 29:2,3,4
29:8,9 31:21,22
41:1,14,18,22
42:19,22 43:2,6
43:10 45:19,19
46:2,3,5 48:20
53:18 55:13,13,21
56:8,10 61:18,18
68:3 70:8,20,23
71:7,9,10,15,22
72:1,3 89:17,19
98:20,20 100:2
108:16 139:12,12
150:12 153:6,13

156:19 157:1,10
157:11 158:18,20
159:17 160:20,22
161:1
**clocked** 29:13,13
29:17 31:19 38:17
47:19 70:1,1,4,15
89:16,17 90:17
139:21,23 157:4
158:4
**clocking** 22:9,9
54:18,18 55:11,11
55:17,18 57:14
67:8,8 70:11
89:23,23 90:4
93:3 137:9,9
138:17 139:5
160:4
**clock-in** 67:12
**close** 31:13,22 32:5
43:14 47:15 60:10
62:6,16
**closed** 60:21
**closer** 19:5 100:18
**closing** 61:22
**code** 22:22
**cold** 77:5
**Colette** 34:8,11
86:14 87:16 88:13
**Colette's** 88:10
**collecting** 58:6
**com** 51:8
**come** 28:22 32:7,10
32:13 36:2 37:4
37:23 38:1 43:13
44:9 55:1 76:14
77:11 80:2,9
107:14,21 108:1,2
108:7 110:5
112:11 145:20
152:3,20 166:19
**coming** 40:23 60:5
80:20 84:8 90:21
**command** 34:3

52:6
**commence** 73:6
**commencing** 1:22
**commission** 3:11
101:6,8 172:23
175:11
**Commissioner**
172:21
**communicate** 13:6
**communications**
1:10 2:18,19 5:5
5:16,19 6:11 9:23
173:5
**company** 156:8
175:5
**Company's** 155:4
**compensated** 63:23
66:11
**compensation**
117:1 126:9
127:15,22 128:11
128:13 136:2
**complete** 24:12
**completely** 43:2,7
70:18 143:1
**complying** 125:12
**computer** 24:5,8,9
25:21 39:6,11,13
39:16 115:15
150:21 153:3
170:5
**computer-aided**
172:7
**concern** 163:20
164:3
**concluded** 171:20
**conference** 126:8
**considered** 40:22
89:15,18
**considering** 169:20
**consisted** 104:3
105:10
**constant** 83:6
**consult** 35:19,20

**contact** 163:14
**contacted** 56:9
**contained** 64:22
65:16
**contents** 123:5
**continue** 127:19
**continued** 43:7
**conversation** 36:19
37:3 56:13 57:5
57:13 86:17 127:5
138:19 139:7
167:10
**conversations**
53:23 56:2,15
86:12 87:7 93:7
93:20 94:1 95:3,8
96:17 105:14,21
106:4
**convicted** 8:17,21
**Cooper** 1:17
**copied** 42:21
**copy** 103:9
**corner** 76:7,18
**correct** 9:10 16:11
21:15,16 28:3
29:14 46:13 49:5
58:1 59:7 67:19
69:8,11,12 70:7
70:14,15,17,21
71:1,9,16 73:17
84:1,2 93:9
100:20 101:15
104:23 106:6
107:3 108:15
110:19 113:19
116:18 117:2
118:22 121:8,18
125:22 126:1,2
132:13 139:14
140:12 142:11,13
142:14,16,19
148:13 153:18,20
153:21 156:17,23
157:20 158:10

159:3,5,18 163:20
164:6 165:6
168:11 172:8
**correction** 152:15
164:12,14
**corrections** 28:4,6
**correctly** 48:21
**counsel** 2:17 3:3,21
5:15,18 121:16
151:4 172:11
**counseled** 93:2
**counseling** 136:12
**Counselings/infr...**
4:21
**count** 167:2
**counter** 1:2 14:12
14:16,22,22 16:19
18:9 58:10 74:19
74:22 129:3,3
133:1
**COUNTY** 172:3
**couple** 10:5 15:7
52:22 53:17 55:21
67:3 72:18 105:13
121:13 136:9,11
138:9
**course** 15:10 23:17
29:21 89:19
104:11 163:18
175:3
**court** 1:1 5:7,22
6:13 19:12 23:7
103:11 172:15,16
172:21 173:1
**Court's** 125:12
**cover** 65:13
**crap** 110:2
**Crawford** 34:8,11
86:14
**creation** 119:2
**credit** 77:22
**crime** 8:18,21
**Crume** 143:21
145:6

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

Page 179

**CSR** 123:20
**current** 10:20
**custody** 173:14
**customer** 11:13,18
  27:12 28:11,15
  37:14 38:20 39:1
  39:22 40:1,5,17
  41:2,16,23 42:6
  43:1,4,12 44:18
  46:10 47:1 57:2,4
  61:6 77:16,21
  80:4 81:9,19 82:9
  84:9,11,17 85:1
  93:8,14 94:11
  96:11,12,13 97:5
  97:16 115:12
  121:6 123:21,22
  133:2 151:6
  154:19 158:7,19
  161:14 169:21
**customers** 14:19
  15:2 58:3 60:6
  61:1,10,20 83:19
  93:13 145:19
  154:19 155:1
**customer's** 81:15
  170:6
**cutting** 84:18

────────────
    **D**
**daily** 13:6 67:7,13
  136:22
**damages** 149:8
  167:18
**date** 4:12 5:9 19:16
  63:10
**dated** 64:11 65:1
**dates** 23:6 36:17
  63:6
**David** 2:5 5:20 7:14
  63:2
**day** 21:7 26:23 29:9
  44:17,20 45:13,13
  46:11,12,14,14

55:14 59:2 82:11
  86:18 87:23 88:11
  94:18 103:22
  105:4 108:3 124:4
  124:5,15,18,23
  129:19,22 137:8
  139:20 140:1,11
  164:6 169:7
  175:10
**days** 15:16,18 17:5
  17:11,13,15 27:14
  29:1 39:8,9 53:16
  69:10 73:9 78:4,8
  82:16 85:3,5,6
  112:1 115:21
  119:10 142:4,6
  159:17 164:6
  168:9,15,16,18,20
  169:1,6,7,11
  170:14,16
**deal** 100:13 102:2,3
  127:20
**dealing** 125:16
  150:7
**DeAndre** 37:22
  144:13 145:6,16
  145:17
**decision** 78:3 80:8
**decisions** 15:1 78:1
  97:3
**declined** 126:17,18
**deducted** 118:6
**Defendant** 1:11,16
  2:10
**defendant's** 4:10
  4:11,13,14,15,16
  4:17,18,19,20
  18:23 19:9 23:11
  35:9 103:7,13
  116:4 136:16
  138:6
**defense** 151:3
**delivered** 122:5,10
  123:14 131:20

132:23
**delivery** 175:1
**denied** 126:17,18
**department** 126:8
  127:7
**depend** 142:10
**depending** 17:15
  17:19 58:21 75:8
  81:22 82:7,10,11
  121:5
**depends** 121:3
**deposit** 30:6,13
**deposition** 1:14 3:5
  3:7,16,23 5:3 7:14
  9:19 10:19 66:17
  66:23 130:20
  131:3 155:14,23
  168:8 171:15,19
  173:9,11 175:9
**depth** 97:8 98:7
**describe** 122:1
  127:4
**Desiree** 2:17 5:17
  19:2
**desk** 22:4 82:23
  124:10,10
**detail** 28:23 73:19
**detailing** 116:22
**difference** 14:21
**different** 17:16
  31:8 44:7 80:3
  94:18 138:9 143:1
  146:15 157:18
  158:3
**direct** 30:6,13
**disagree** 163:18
**disappearing** 86:17
**discharged** 9:5,7
**disciplined** 89:1
  91:20 92:7 93:3
**discuss** 52:20 87:17
**discussed** 9:21
  52:17,23 53:2
  56:20 128:1,6,7

128:16
**discussing** 128:18
**dispatch** 12:8,16
  13:1,4,9 14:1
  49:12,17 86:20,23
  88:20
**dispatcher** 11:13
  11:16,17
**District** 1:1,2 5:7,8
**divided** 49:11,15
**Division** 1:3 5:9
**document** 18:18
  19:12,20,22 20:9
  20:20 24:14 63:14
  103:12 163:9,11
**documents** 10:6,9
  136:11
**document's** 23:13
**doing** 18:14 27:12
  45:5 88:5 90:3
  121:10 153:22
  155:6,15 166:7,23
  166:23
**Dollars** 13:11
**doors** 61:1,10
**dot** 51:8
**drawer** 61:21
  132:11 135:5,10
  135:18
**drawers** 61:21,22
  62:7
**Drive** 2:13 173:18
  174:4
**drive-through**
  78:22
**drop** 14:17
**dropping** 73:1
**due** 39:10 122:9
  139:12
**duly** 6:2 172:15
**dumped** 132:21
**duties** 13:4 151:6

────────────
    **E**

128:16

**E** 22:11
**earlier** 45:9 49:1
  55:20 65:16 73:11
  90:6 107:1 110:17
  113:3 115:4 116:8
  141:14 153:15
  162:7
**early** 71:16 72:4
  73:8 84:9 92:3
  95:5 143:22
  156:19 157:4
  158:4,7 159:17
**EASTERLING**
  1:15
**eat** 76:20 78:10
**eating** 77:10 166:10
  166:12
**Eden** 144:15,15
  145:7
**EEOC** 125:17
**effective** 4:12 63:6
**efforts** 155:9
**eight** 15:6,7,8,13
**eighteen** 13:10,10
**eight-hour** 140:11
**Eight-thirty** 15:13
**either** 4:2 37:20
  45:1 75:9 76:23
  82:5 107:12
  143:13 166:22
  170:17
**electronic** 63:22
  66:9
**eleven** 75:7,7,9,14
**ELMORE** 172:3
**Embarrassment**
  136:8
**employed** 11:6
**employee** 4:11,12
  19:13 20:2,10
  34:23 37:7,10,16
  38:22 39:4 40:3
  40:12 42:6 63:18
  63:22 66:6,10

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                          April 15, 2015

Page 180

77:15 80:13 93:16
96:10 120:13
162:6,9,18 165:18
166:17 167:5
**employees** 21:1,6
21:12 28:10 36:21
53:5 61:14 64:5
80:19 81:5 82:22
103:23 105:6,17
108:20 158:23
165:17
**employee's** 63:21
**employment** 11:20
13:18 15:10 65:13
104:11 117:2
121:18
**ended** 11:21 121:18
**ends** 25:14 66:16
130:19 162:22
163:13 171:14
**ensure** 100:20
149:22 152:11
155:9
**entail** 58:2
**enter** 125:18
**Enterprise** 4:15
24:15,22 25:15
**entire** 16:15 78:5
79:12
**entirely** 155:19
**entitled** 15:23 16:3
16:6 47:5 73:23
115:13 160:23
**Entry** 23:18
**errors** 30:1
**especially** 43:23
103:1
**Esquire** 2:5,11
**estimate** 17:11
95:12 105:20
108:23 109:5,18
111:12 113:23
114:1,18,22 119:9
119:19

**ethics** 51:1,8,16
102:14,16
**EthicsPoint** 51:9
51:13,17 164:8
**EthicsPoints** 164:5
**eTime** 4:15,20
22:11,12,13,21
23:3,17 24:1,15
24:23 25:8,15,20
25:21 26:5 29:13
29:17,22 30:10
31:10,17 41:1,12
41:14,18 43:17
46:1 47:20,22,23
48:7,10,17,19
61:14,17 67:4,9
69:2,5,8,16,22
72:10 98:14 100:2
100:8 158:6
159:17 160:9
**event** 63:17 66:5
**everybody** 48:11
55:12 62:3 74:16
74:21 144:10
**everyday** 52:18
87:8
**evidence** 3:17
**evidenced** 172:16
**Exactly** 65:18
67:13
**EXAMINATION**
4:7 6:6 149:3
156:13 171:1
**Excuse** 124:9
**exhibit** 4:10,11,13
4:14,15,16,18,19
4:20 18:22,23
19:9 35:9 54:20
63:4 64:10 103:7
116:3,4 117:4,5
136:15,16 138:5,6
149:8
**exhibits** 4:10 23:11
63:3

**expect** 143:8
**expires** 172:22,23
175:11
**explain** 96:12 118:7
118:8,12,17
127:14 168:2
**explained** 118:4,11
167:23
**explore** 28:23
**e-filing** 150:20
**e-mail** 4:20 18:1,2
18:6 42:20 43:8
50:19,20,21 84:5
84:7,12 99:20
103:2 136:18,19
164:19
**e-mails** 54:16,17
55:9
**e.g** 21:13

_____

**F**

**fact** 86:3
**fair** 7:4 147:4
**fall** 9:12
**fan** 102:14,16
**far** 15:2 21:22 58:5
**FAVOR** 174:1
**February** 139:3
**Federal** 3:6,18 4:3
**fee** 78:1
**field** 13:7
**fifteen** 73:8 76:16
**fifth** 2:13 24:20
173:18 174:4
**figure** 142:4
**figured** 47:11
**file** 9:3
**filed** 5:6 8:23
**filing** 87:4
**fill** 150:6,17 152:16
**find** 36:3 37:23
77:13 80:9 83:15
86:22 87:22
124:13

**fine** 8:15 66:5
117:21
**finish** 61:9,11,19
**firm** 173:14
**first** 4:17 6:2 7:9
11:3,5,6 19:11
23:13 33:23 34:3
34:8,17 63:8,9,16
81:8 100:11,16
101:1 103:13
107:15 108:1
116:6 119:4
123:12 171:3
**five** 15:6,7,14,17,18
17:5 31:20 58:19
58:20,21 59:5
61:12 81:23 82:2
82:4,6 85:10 89:6
89:11 95:13 98:5
115:10,18 121:3
139:4 140:14
169:13,15
**five-day** 104:5
105:12
**five-minute** 89:7
106:17
**five-thirty** 15:13
**fix** 29:7 48:20
**Floor** 2:7,13 173:18
174:4
**focus** 110:10
**folks** 49:2 50:7
**following** 157:12
159:19,21 172:16
**follows** 6:5
**followup** 93:13,18
93:19
**follow-up** 156:12
**footage** 129:19,21
130:2,6 131:9
**foregoing** 172:6,8
**forget** 27:11,13,14
27:20
**forgot** 29:3 42:19

43:2,7 55:21
59:22 125:10
**forgotten** 56:11
**form** 3:13 4:11
8:11 19:13 97:18
104:14 107:5
110:22 113:17
152:14,15 160:1
164:12,15 168:13
**formality** 3:11
**forth** 128:18
**forward** 22:19
**found** 122:22
**four** 58:13,14,15
95:16,18 96:17
100:4 104:10
106:4,12 153:16
154:14 159:6
171:4
**frame** 152:11
**frequent** 112:15,15
113:15
**front** 11:2 14:12,12
14:16,21,22 16:19
18:9 22:4 37:12
43:3 57:23 58:10
74:19,21 82:22
129:3,3 132:23
**full** 16:1 28:20
58:17 76:12 140:1
157:12 158:16
**fullest** 36:18
**functions** 151:12
**further** 3:20 148:22
171:13 172:11,15

_____

**G**

**Gads** 12:14
**Gadsden** 12:14,14
**Gale** 1:17
**Gardendale** 17:10
**GATEWAY** 175:5
**general** 120:10
**generally** 15:22

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                          April 15, 2015

122:1
**gentleman** 49:8
**Georgia** 50:14
**getting** 153:12
  155:9
**Gina** 37:21 144:14
  145:7,21
**give** 6:15 35:6
  36:18 83:9 113:1
  147:2,8
**given** 64:5 126:16
  152:14 172:8
**giving** 69:2 111:12
  113:5
**glare** 131:12
**go** 7:16 8:14 18:12
  24:20 28:16 33:1
  33:13,16,19 34:2
  34:10,16,19 35:15
  37:12 38:19 39:5
  39:10,12 42:10
  49:7,19 50:3,6
  52:9,15 54:2,11
  56:6 61:7,11 67:3
  67:20 71:20 72:16
  73:19 74:22 75:10
  75:13 76:2,4,11
  76:14,20 81:15,18
  83:15 84:16 86:19
  89:8 90:6 92:16
  97:8 98:7 99:19
  100:1,21 101:12
  102:8 112:9,12
  113:9 115:15
  116:1 147:3
  159:11 160:18
  161:6 162:6,13,19
  166:15 170:3
**God** 57:7 128:21
**going** 7:2 18:17
  28:18,22 46:11
  53:16 59:20 64:2
  65:22 67:11 72:18
  88:8 89:4 96:2

100:13,14,22
  107:18,19 109:5
  109:17 131:6,7,23
  143:9
**gonna** 54:8
**good** 73:11
**GORE** 175:5
**gotten** 157:5
**go-to** 107:8,23
  108:6 110:4,9
  114:4 143:3
**grab** 7:7
**gradually** 100:21
**grasp** 83:8
**guess** 23:1 42:20
  48:4,15 50:1 56:4
  56:8 92:13 101:5
  101:7 111:9
  118:18 129:3
  134:1,2,11,14
**guys** 143:17
**guy's** 33:11

### H
**habit** 101:9
**half** 13:14 124:5
**halfway** 23:16
**hand** 103:9 131:17
  175:10
**handbook** 4:12
  20:10 35:1 64:8
  64:11,23 65:17
  158:21,23 162:6,9
**handbooks** 20:2
**handed** 19:12 20:9
  103:12
**handle** 52:12 57:4
  98:17
**handling** 136:6
**hands** 83:11 96:22
**happen** 17:19
  37:21,22 48:9,14
  80:18 107:3 111:3
**happened** 37:6,9

37:19 40:2 46:15
  49:21 89:5 90:22
  94:2 107:7 108:20
  110:12 122:11,15
  122:19,23 124:11
**happening** 96:16
**happy** 7:1 143:10
**harassment** 51:18
**hard** 19:6 143:5,6
**head** 32:6 35:2
  36:14 42:16 51:23
  62:20,22 70:3
  75:18 79:22 85:2
  93:10 95:19 96:7
  101:19 102:7,12
  105:19 121:12
  126:22 129:17
  130:11 135:12,22
  138:22 139:6
  141:13,21 142:1
  142:17,20 165:7
  167:8,20 168:17
**hear** 8:14 19:6
**hearing** 126:4
  127:15 136:4
**help** 14:19 18:18
  19:23 23:7 28:11
  28:15 36:3 37:15
  38:19 41:2,15,23
  42:10 43:23 44:13
  44:17,23 46:9
  53:8,10,14 61:3
  62:6 82:23 83:16
  84:9,17 85:1
  96:11 97:5,15
  111:5 120:18
  121:8 142:4
  143:14,15,19
  146:2,20 148:3
  158:7,19 161:6
**helped** 37:11 40:17
  46:7 143:11
  144:15 145:13
**helping** 42:5,23

43:3,11 60:6
  83:19 147:18
  148:10 165:16,17
**hereto** 4:2
**hereunto** 175:8
**hey** 46:8,17 87:11
  88:7 120:17
**Hills** 12:10 14:14
  15:5 16:13,16,21
  17:3,12 26:21
  33:7 49:2,8 57:18
  69:11 76:21
  109:20 110:1
  114:16,20 123:14
**Hinkle** 37:21
  144:14 145:7,21
**hired** 13:9,13 18:11
  18:13
**hires** 44:1
**history** 11:11
**hold** 83:11 96:21
**holiday** 32:11,13
**holidays** 32:21
**honestly** 7:21
**hour** 13:11 16:2
  28:18,20 41:6
  46:17 47:5 71:11
  71:18,19 74:2
  79:12 140:14
  158:16 160:23
**hourly** 13:8 21:5,11
  23:18 24:15
**hours** 10:5 13:15
  15:4,11 21:1,7
  26:10 29:12,16,22
  30:2,16,23 53:21
  63:20 66:8,8 68:4
  68:21 69:4,5,14
  72:9 116:13,13,16
  116:16 118:5,5
  137:18,23 140:18
  164:6
**hour-long** 71:12
**house** 58:18 76:7

76:12
**HR** 33:5 49:2,10,11
  49:12,13 50:6,8,9
  50:18,22 51:21
  64:4,6 72:12,16
  90:2,6,8 102:9,14
  102:16 103:1
  152:19 162:2
  163:22 164:20
**HTML** 23:17 24:16
**Huff** 129:11,12,13
**Huh** 97:20
**human** 163:14
**husband** 139:17

### I
**identification** 19:1
  19:10 23:12 35:10
  103:8 116:5
  136:17 138:7
**identify** 146:19
**IL** 173:19 174:5
**Illinois** 2:14
**importance** 54:11
**important** 6:14,20
  6:23
**improve** 53:4,7
**incident** 33:21 45:8
  49:21 61:8 90:19
**include** 111:14
**including** 21:2
  116:16 138:13
**incomplete** 147:8
**INDEX** 4:6
**indicating** 26:7
  65:12 133:21
**individuals** 59:6,16
  60:3,10 62:6
**influence** 8:3
**information** 147:9
**informed** 126:13
  138:17 152:13
  153:4
**initial** 130:2,6

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

**inside** 38:19 39:5
39:11,12 76:20
81:18 132:9,15
135:3
**installation** 78:1
**instance** 37:6,9
38:3 42:13,17
43:15 90:22
**instances** 31:16
61:13 87:21 89:22
100:5,9 138:10
**instructed** 40:3
**instruction** 113:1
**instructs** 7:16
**insurance** 126:21
**interested** 172:12
**interrogatories**
4:18,19 103:14
149:7
**interrogatory**
103:15,17 104:23
116:2,7,11 117:7
146:4,19
**interrupt** 8:6 83:1
107:19
**interrupted** 36:2
47:2 79:14 80:1
80:16 82:14 85:3
85:6 94:10 96:20
104:4 105:10
109:19 110:18
111:2 112:19
114:2,13,19,23
115:7 120:14
143:13 158:18
**interrupting** 104:1
105:6,17 148:6
**interruption** 19:3
89:6 108:17
**interruptions**
83:23 89:4 93:8
96:16 107:2
108:14 109:3,6
110:11 112:14

113:13 115:5
120:17,21 168:11
169:10
**interval** 75:5,6
**interview** 12:13,17
126:19
**interviewed** 12:11
**introduced** 3:23
**investigation**
135:15,21 142:19
**involve** 55:17 59:8
**involved** 112:1
**in-house** 2:17 5:18
**in/clock** 68:3
**irate** 81:10,16
**issue** 48:21 52:13
52:13 62:21 81:22
82:7,11 102:4,21
164:2 169:21
**issues** 14:20 15:2
29:15 33:17,19
48:10 52:5,15
58:4 77:18 82:23
83:7 102:18
138:11,17

**J**

**Jasper** 17:10
**job** 10:20 12:4,7
44:2 99:8 100:14
154:19
**Johnson** 2:19 16:14
16:20,23 17:12,21
18:4 57:19 103:21
103:23 104:3,9
105:3,5,10 149:16
150:23 151:15
152:14 153:16
154:5 155:8,13,22
**Johnson's** 151:6
**joke** 96:20
**July** 116:15 138:15
**June** 23:23 121:21
121:23

**K**

**Karen** 1:5,14 3:5
5:3,4 6:1 28:19
66:18,23 87:17
88:7 114:7,7
120:18 130:21
131:3 171:16,20
173:5,11
**Karen's** 117:23
**keep** 22:3,8 26:3
55:4 82:13 100:14
138:18 141:15,19
**keeping** 42:12
**kept** 64:7 82:19
**Kiantra** 144:18,20
144:21 145:7
**kind** 15:11 26:12
33:19 52:15 58:4
74:15 96:20 118:4
132:17
**knew** 21:22 30:23
36:8 41:11 43:22
56:7 59:10 81:8
110:4 133:8
144:17 157:14,19
157:21
**know** 9:22 17:8
21:22,23 22:1,10
27:22 28:6 30:21
34:4 36:1,17 37:4
37:13,20 38:23
39:7,15,18 40:19
42:7 43:10 45:2
45:17 46:8,10,12
46:16 47:2,21
48:5,6,15,17,17
49:10,16 50:9
51:6 53:4,20,21
54:9 56:4,9,11
57:1 58:7 59:19
60:19 61:7 62:3
69:14,19 71:11
74:12 77:22,23
78:11 80:6 81:2,2

82:17 83:9,17
87:10,11,14,14
88:12,13,14,23
91:2,7,14,14
93:12,14,16,23
94:22 96:5,9,19
96:21,22,22,23
100:12,15,20
101:8,13 102:6,15
102:18,23 103:2
107:18 108:18
110:7 111:23
114:2,6,9,12
115:5,14 117:6,12
117:13,17,21,23
118:1,9 119:10,15
120:18 121:16
122:23 123:19
127:6,21 128:17
129:10 130:1,5,10
132:15 134:3,4,7
134:21 139:9,19
139:22 140:5,21
140:23,23 141:7,8
141:9,11 142:7,21
143:23,23 144:3,8
145:2 147:12,16
147:20,23 148:5,9
148:18 154:15
155:15 156:21
157:1,2,5,10,21
157:23 158:1,17
158:22 160:15
161:7,15 162:14
163:6,10 165:9
167:2,4,9,13,14
167:21 168:5,5
169:5,9,19,20
171:4
**knowing** 69:3
134:23
**known** 151:16
165:22
**knows** 143:4,4

**L**

**labeled** 65:17
**labor** 126:9 127:8
**lack** 83:13
**ladies** 7:7
**lady** 50:12 127:7
**Large** 1:21 3:10
172:22
**lasted** 120:22
**last-minute** 90:23
**late** 40:23 52:22
53:2,17 54:1
57:14 60:17 62:15
74:12,14 76:1
89:15,18 90:18,20
91:14 93:3 138:13
138:13,14,16
139:1,3,21,23
140:7
**lawsuit** 10:16
125:16
**lawyer** 9:20 117:8
170:23
**lays** 138:9
**lead** 11:2,19 14:12
14:16,22 18:9
53:4,6 57:23 60:9
108:10
**leave** 81:16 123:11
**left** 40:19 92:3,14
123:5 124:4
133:13 144:3,12
**letter** 126:14
132:10
**letting** 22:1 47:1
160:14
**let's** 87:17 155:20
155:20 162:6
**Lewis** 2:12 6:10
173:17 174:3
**licensed** 172:15
**lie** 136:6
**lied** 135:10,20
142:15,18

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                        April 15, 2015

Page 183

**lifting** 133:22
**limit** 58:16
**Linda** 34:9,11
  42:20 56:5,8
  86:13 87:16 88:13
  107:21 129:4,6,8
**line** 119:4,8
**LIPA** 175:5
**list** 145:6 147:11
**listed** 146:23
**listening** 128:17
  167:4
**literally** 39:10
  76:17
**little** 19:6 28:23
  31:7 44:6 73:18
  79:23 146:15
  157:18 158:3
**living** 12:1
**LLC** 1:10 5:5 173:5
**LLP** 173:17 174:3
**local** 50:16
**locally** 8:10
**location** 26:21 44:2
  86:7,7 112:10
**locations** 17:6,8,17
  37:2 45:2,3
**lock** 61:9
**locked** 60:23
**log** 24:10 25:6
  136:22,22 137:7
**log-on** 25:2
**long** 10:3 18:10
  39:15 40:11,16
  61:22 76:15 81:21
  82:13 93:20,22
  115:5 119:13
  120:21 148:10
  168:10 169:9
**longer** 73:15 85:7
  170:17
**look** 20:8 24:17
  30:19,19 39:5,11
  39:12 53:6 54:22

56:7 63:10 115:15
116:6 136:20
145:20 152:3
163:3 170:3,4,5
**looking** 34:23
  39:15 68:11 96:10
  115:13 119:4
  133:14,22 134:19
  140:5
**looks** 134:12
**Lopez** 1:14 6:8
  19:11 67:2 103:11
  106:23 131:5
**Lopez's** 65:13
**Lopez-Easterling**
  1:5 3:5 5:3,4 6:1
  19:5 66:18,23
  130:21 131:3
  171:16,20 173:5
  173:11
**Lord** 113:21
**lot** 161:8
**lots** 44:1
**Louis** 50:12 51:22
  175:7
**lunch** 16:2,4,7 22:2
  27:4,7,10,15
  28:16,18,20 31:5
  36:2,7 37:5 38:9
  38:14 40:7,8,16
  40:21,23 41:6,15
  41:19 42:3,5,8,14
  44:10,15,16 45:6
  45:12 46:3,4,7,18
  46:21 47:2,6
  55:18,22 57:15
  59:9,13,16,17,20
  60:1,4,7 70:5,11
  70:16,20,23 71:7
  71:11,12,19 72:1
  72:4,15 73:18,23
  74:4,5,9,12,18,22
  75:2 76:4,8,9,10
  76:13,20,22 77:3

77:8 78:5,9,10,19
78:23 79:7,11,17
80:1,15,22 81:6,9
81:12,14 82:10,14
83:2,18 84:9,18
84:22 89:5,7,9,12
90:4,11,14,18,21
91:5 92:22 93:4
94:11 97:5,7,9,10
97:15,23 98:2,6,9
98:11,15 99:6
100:6,7,9 105:18
108:15,21 109:19
110:12 111:2
115:7 118:6
119:12,16 121:10
138:17 139:1,4,21
139:23 140:15
141:20 142:5,23
145:19 147:18
148:7,11,17
157:12 158:7,16
158:18 159:8
160:5,6,10,13,21
160:23 165:1,5,23
166:9,10,12
168:19 169:4
171:9
**lunches** 74:14 76:1
  119:9,20 120:1,8
  137:1,8
**lunchtimes** 75:3,4
**lunch-break** 107:2
**lying** 142:22 143:5

---

**M**

**Macy's** 131:20
**mail** 123:16 124:7
  126:14 132:7,12
**maintain** 21:6
**maintained** 150:21
**maintaining** 21:20
**making** 114:9
  146:13

**management**
  163:17 164:3
**manager** 12:16
  128:19 129:1,2,10
  129:11
**manner** 4:2
**March** 64:11
**mark** 35:8 103:5
  136:14 138:4
**marked** 19:1,10
  20:12,16 23:12,14
  23:17 24:21 25:15
  35:10 63:4 103:8
  116:5,8 117:5
  131:11 132:6
  136:17,18 138:7,8
  162:7
**marks** 5:1 131:1
**matter** 5:4 86:3
**matters** 113:7
**Maynard** 1:17
**ma'am** 8:19 23:6
  38:7 39:14 42:9
  44:19 45:7 46:15
  51:17 79:9 83:20
  92:23 99:10
  115:23 119:13
  120:15 129:7
  148:20 170:15
**meal** 21:14 63:19
  66:6 73:3 104:1,4
  105:6,11 109:12
  149:18,23 150:3
  150:13,15 151:2
  151:10,12,22
  152:4,10,17,22
  153:18 154:20,23
  155:16 156:4,16
  159:2 171:5
**mean** 9:20 26:3,9,9
  28:8,12 29:20
  30:5,11,11,23,23
  32:16 34:18 36:6
  37:11,12,22 41:5

42:10,11,12,16
46:2 49:20 52:6
52:18 53:22 54:9
56:6,22 58:15,17
59:10,22 60:19,20
60:20 61:7 68:7
77:4,15 78:9 80:4
81:1 82:17 83:7,7
83:20 86:7 87:8
88:21 89:15 91:14
93:22,23 94:3
95:6,15 96:1,19
97:6,10,11 98:1
98:18 99:19
100:12 102:22
110:3 112:7,17
113:18 115:8,9
118:7,11,12
119:14,21 122:16
122:20,21 126:6
127:20 130:9
134:7,12 140:2,2
140:4,7,8 143:10
143:21,22 145:13
155:17,18 161:23
165:11 167:12,23
168:3
**Meaning** 74:20,21
**means** 170:23
  172:7
**meant** 57:1
**medicine** 8:1
**meet** 10:1,3
**meeting** 10:7 54:15
  80:17 107:12,18
  107:20,22 111:1,8
**meetings** 111:3
**member** 163:17
**MEMO** 173:1
**memory** 141:23
**mention** 35:12
**mentioned** 55:20
  57:21 85:13 93:6
  141:14 146:6

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

159:7
mentioning 88:4
met 6:8
Method 24:16
  25:16
mic 19:4
milestones 52:17
mind 19:16 20:8,15
  122:7 155:12,20
mine 74:10
minute 19:19 20:18
  63:10 89:7
minutes 39:18,20
  39:21 40:2,19
  43:5 44:9 45:11
  46:18,20 53:17
  57:3 62:1,4 73:8
  75:11 76:16 81:23
  82:2,4,6,7 85:4,10
  85:11,19 89:11
  90:20 91:4,18
  93:22 98:6,8
  115:9,10,17,19
  121:1 138:16
  139:1,4 140:15
  169:13,15,16
  170:1,17
misplaced 122:13
missed 42:8,15
  84:21 97:4,10,14
  97:22 98:5 100:2
missed-meal
  116:23
missing 30:2,16
  88:11 98:11,16
Missouri 175:7
Mitchell 1:19 3:8
  172:20,20
modem 133:7
modems 133:3
moment 8:6 23:10
  103:11
Monday 46:18
monies 58:6

month 57:9
moon 77:4
Morgan 2:12 6:10
  173:17 174:3
morning 16:10
  73:7 85:14,20
  108:8 110:23
  112:18 113:11
Morris 2:7
move 12:2 14:10
  19:4

_____

**N**
name 5:14 6:9
  22:22 33:10,11,12
  37:18 38:23 49:15
  50:11,14 67:23
  128:20,21 172:17
  173:14
named 146:3
  147:16
names 5:12 11:9
  127:7 146:8 147:2
natural 161:6
naturally 83:15
necessarily 103:22
  105:4
need 3:14 37:13,14
  37:15 71:3 77:19
  107:8,14 152:5,22
  159:11 160:21
needed 17:7,16
  28:16 36:9 40:4
  45:14 46:5,9 53:3
  53:7 58:5 59:12
  77:16 93:13,18,19
  96:13 97:8 100:14
  145:12,18 146:2
  155:1
needing 52:18
needs 37:13 161:5
neither 90:16
  172:11
never 30:6 52:7,9

82:19 90:12 91:20
  92:20 98:10 102:9
  102:13 122:22
  128:4,12,13 130:3
  141:10,12 156:15
  156:19 164:8,10
new 35:3,7 43:23
  44:1 77:21 143:22
newer 64:23
new-hire 13:21
  18:14
Nicole 2:19 16:14
  16:15,20,23 17:18
  36:10,23 42:21
  43:9 44:7,18,20
  45:4,9 46:16
  48:20 56:14,17
  57:19,21 59:4,15
  60:8 62:14 69:10
  69:13 71:4 80:8
  80:10,10,12,16,19
  83:3,23 88:9,15
  89:21 90:10 93:8
  93:21 94:4,13,21
  96:8 97:4 99:2,23
  100:6 101:22
  103:20,23 104:3,9
  105:3,5,9,15,22
  107:3,11,12 109:6
  109:20,23 110:14
  110:19 111:1,15
  112:2,16,19
  113:14 114:13,19
  114:23 136:19
  138:23 139:8
  148:1 159:7,11
  161:7 164:20
  165:4,22 166:8,21
  171:3,8
Nicole's 70:6,12
  84:3 143:2
nine 53:9,11
nods 32:6 35:2
  36:14 62:20 70:3

75:18 93:10 95:19
  96:7 101:19
  105:19 135:12,22
  139:6 142:1,17,20
  165:7 167:8,20
  168:17
nonexempt 63:18
  66:5 158:23
noon 71:7
Nope 84:10 161:12
normal 120:17
  132:22 175:3
normally 48:11
  139:16
North 1:18 128:20
  128:23
Northern 1:2 5:8
Northport 17:10
Notary 1:20 3:9
  175:13
notes 23:19 138:18
notice 1:15 30:16
  103:20,23 104:2
  105:2,5,9 106:10
  106:11
November 11:12
number 51:1,2
  69:3,14 72:9 84:3
  91:17 102:13
  110:10,11 116:15
  172:16
numbering 55:4
numerous 88:19
  167:2

_____

**O**
oath 9:15
object 7:14 8:11
  64:3 97:17 104:13
  107:4 110:21
  113:16 159:23
  168:12
objection 125:11
  125:15

objections 3:12,13
  8:10
obligation 20:23
occasion 31:12
  150:12
occasions 27:20
  32:20 48:14 62:5
  149:16,22 150:23
  151:4,20
occurred 104:2
  105:7 116:23
occurrence 89:19
  91:3,12,21 92:8
October 14:6,7,11
  63:7 64:13 65:1
offer 18:17
offered 3:16 53:8
offering 125:11
office 12:9 14:14
  37:1 50:16 86:6
  94:9,15 107:13,16
  111:3,8 122:10
  124:10
OFFICER 173:8
offices 115:2
oh 22:10 52:22 60:1
  74:8 94:7 105:23
  109:3 110:2,14
  113:20 128:21
  130:8,17 162:23
  163:8
okay 6:17,18 7:13
  7:19 8:14,23 9:5
  9:14,22 10:3,12
  10:23 11:7,10,23
  12:21 14:9 15:4,9
  15:16 16:18 18:12
  18:17 19:19,21
  20:21,22 21:11
  22:17,21 23:5,9
  23:22 24:10,12,14
  25:10,13,20 26:1
  26:8,11,14,18,23
  27:4,6,9 28:5,19

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                                    April 15, 2015

28:22 29:6,8,11
29:15 30:1 31:3,7
31:12,15 32:2,10
32:15,19 33:5,13
34:21 35:5 36:10
36:15 38:1,2,8,12
38:17,19 40:5
41:18 42:7 43:13
43:20 44:6,22
45:4 46:2,16 49:1
49:4,7,22 50:6,9
50:13,17 51:11
52:3 54:7,23 55:6
56:1,13,21 57:13
58:21 59:8,23
61:6,9 62:2,9,12
63:15 64:19 65:8
65:15,19 66:15
67:16,22 68:6,19
69:1,10,13,18,21
70:1,4,20,23 71:3
72:8,12,18,22
73:4,5,12,15,17
73:17,21 74:3,5
74:14 75:1,13,19
75:22 76:4,15
77:18 78:4,8,23
79:20 80:10,15
81:15,18,21 82:8
83:12 84:3,5,7,12
84:14 86:21 87:3
87:6 88:18 91:6,8
91:20 92:2,4,12
92:18,20 93:1
94:10,16,18,20
95:2,11,18,20,23
96:3,8 97:9 98:3,5
98:10,13 99:9,11
100:4 101:20
102:20 103:4,17
103:19 104:19
105:1,8,23 106:1
106:12,15 107:7,7
108:2,5,11,14,23

109:4,15 110:8,23
111:11,21 113:7,8
113:9,11 114:5,8
114:11,22 115:18
116:1,19,20 117:3
117:4,9,11,20
118:14,16 119:1,7
120:2,5,20 121:3
121:7,13,20,22
122:11,23 123:3,6
123:9,23 124:6,14
124:17 125:3,7,20
126:1,3,15 127:4
127:13 128:4,12
129:14,18,21
130:12,18 131:13
131:16,19 133:4
134:10,11,18
135:13,23 136:6
136:13 137:3,4,5
137:11 138:2
139:2,19 140:10
140:14 141:14,14
141:22 142:10,15
142:18,21 143:16
143:18 144:4
145:3,10,10,16,21
146:3,22 147:13
147:15,23 148:5,9
148:13,15 149:11
149:14,15,20
150:20 153:22
157:7,14 158:3,13
159:6,20 160:19
161:15,18,22
162:4,13,17,18,23
163:5 164:1,8,17
164:19 165:3,8
166:3,6 167:9,15
168:4 169:3,9,17
169:22 170:2,12
170:16,19 171:11
171:14
**older** 35:5

**Olive** 175:6
**once** 6:20 61:19
77:4 80:23 87:9
135:2
**ones** 35:5 73:2
**one's** 131:11
**one-hour** 76:13
78:5 160:5,10
**open** 15:5 123:4
132:22
**opened** 122:13,16
125:4 133:5,10
134:15 135:3,7
**opening** 132:4
134:22
**open-door** 161:15
161:19 162:20
**operations** 129:1,2
**opportunity** 71:6
127:13
**order** 125:12 150:8
152:11,23 153:12
**original** 173:15
174:1
**originally** 72:20
73:5,12
**outside** 5:15 21:14
36:22 38:10 40:12
52:8,9 88:21
**overall** 48:13 55:12
170:6
**overtime** 21:2
31:13 32:2,19
47:14 60:12 62:9
69:3,14
**o'clock** 60:22,23
61:6,12,12 130:22

─────── **P** ───────
**package** 122:4,9,12
122:13,14,17,22
123:1,7,9,13
124:15,15 127:23
128:5,14 129:16

130:3 131:20
132:5 134:16
135:8,14,18 136:1
136:7 142:16,19
143:2
**packages** 132:23
**page** 4:7,10 20:16
23:16 24:20 25:13
35:14 63:8,9,17
103:15,18 116:10
119:5 162:13,15
162:21,22 163:4
163:13
**paid** 13:14 28:21
29:16,21 30:8,13
30:17,22 31:1,6,9
32:2,19 36:5,9,11
41:8 46:19 47:3,8
48:21 53:20 60:14
62:12 99:12
116:14 139:22
140:1,11 141:3
149:23 150:2,10
152:6,11,16,23
153:6,12,12 154:6
154:10,13,15
155:6,10 156:22
157:3,6,15,20,22
158:1,9 159:1,12
164:21 171:6
175:2,3
**paragraph** 63:16
163:13 164:1
**paragraphs** 20:19
**part** 10:6,12 53:23
54:12 72:20 73:12
73:15 126:19
132:7,12
**participating** 5:17
**particular** 38:3
42:13 43:12 49:20
169:6
**particularly** 163:16
**parties** 3:4,22

172:12
**parts** 116:13,16
**party** 4:2
**password** 23:1 25:4
25:5 67:11 68:1
**pay** 20:23 30:5,19
30:20 32:17,23
33:14 35:23 39:23
40:5 77:23,23
100:18 141:10
148:18
**paycheck** 30:2
**paying** 133:10
**payment** 39:2,7
58:6 77:20 151:8
**payments** 14:17,18
58:6
**payroll** 29:12 41:11
**PC** 25:11
**pending** 7:9
**people** 50:22 58:9
58:12 74:19 75:8
80:3 86:13 127:22
128:13 143:11
144:4,6 146:3,22
147:15
**perform** 151:5
152:21
**performed** 151:1
152:17 153:6,13
**performing** 153:23
156:3
**performs** 63:18
66:6
**Peri** 2:17 5:18 19:2
19:2,8
**period** 100:19
104:1,4 105:7,11
**periods** 116:23
**permission** 60:16
61:5 62:15 70:6
70:13,17 71:4,17
**PERRY** 175:5
**person** 44:14 75:13

Karen Lopez-Easterling v. Charter Communications, LLC

Karen Lopez-Easterling                                    April 15, 2015

Page 186

75:16,17 107:9,23
108:6 110:4,9
114:4 127:12
128:2,3,19 143:3
143:22,22 173:14
**personal** 167:10
**philosophy** 162:19
**phone** 2:17 11:14
17:23 18:3 19:5
78:12 124:2 139:4
166:23
**pick** 76:14
**place** 22:17
**plaintiff** 1:6 2:4
5:21 116:21
**Plaintiff's** 4:17
105:9
**plans** 151:8
**play** 78:10,11
133:19
**please** 5:12,23 66:4
99:20 117:16
131:10 133:20
134:9 147:8
**point** 9:11 13:23
22:23 91:16 92:5
96:6 108:3 121:17
153:9 163:15
**pointed** 63:2
**points** 7:13
**policies** 54:3
**policy** 4:16 21:3,9
21:18 54:9 63:5
63:12 64:4,7,12
91:12,21 92:8
153:9 154:8
158:15 161:16,19
162:19,20
**popped** 137:19,21
**portion** 84:21
97:15,22 98:14
160:6,13
**position** 13:2,5
14:13,23 18:10

**possible** 19:4
**practice** 20:23
132:22
**predecessor** 64:12
**prejudice** 125:17
**premium** 32:17
**preparation** 10:13
**prepare** 9:18
**prepared** 117:8
**present** 2:16 5:11
17:18 151:1,11
**preshift** 72:19
**pretty** 100:3 144:17
**prevent** 7:20
**print** 30:12
**printed** 30:6
**prior** 11:21 57:15
64:8 65:11
**proactive** 155:8
**probably** 17:14,14
40:18 42:18 50:19
53:9 57:9 58:13
58:19 75:11 76:16
79:3 81:1 87:9
88:4 100:18 106:4
117:15 138:1,2
166:11,22
**problem** 47:20,21
**problems** 47:23
**procedure** 3:7,19
4:4 158:15 159:19
159:21
**process** 14:17 67:5
128:5 163:15
**product** 11:14
**program** 25:21
**promotion** 14:1
**proper** 21:20
**properly** 122:5
**provided** 3:18 4:3
72:10 116:21
**Public** 1:20 3:9
175:13
**pull** 88:7

**purpose** 3:17
**pursuant** 1:15 3:6
**pursuing** 73:2
**put** 23:1 26:1,10
29:22 30:9 41:12
43:17 67:10 69:16
72:13 98:14,19
110:10 117:12
118:3 123:11
124:9 132:10
134:10 135:5,7,18
147:17 156:15,22
157:14,19 167:17
**putting** 67:6,7
**p.m** 130:22 131:4
171:17,21

**Q**

**qualified** 126:14,16
128:10
**question** 6:22 7:3,8
7:10,17 22:7
29:18 31:7 44:6
46:23 65:23 66:3
69:6 77:12 79:15
89:8 98:23 104:19
108:12 109:16,17
140:9 144:16
146:15 147:6
154:21 157:18
158:3 167:11,15
170:7,9
**questions** 3:12,14
6:12,16 7:15
32:23 33:14 34:12
34:19 35:22 44:1
44:4 49:5,9,19
50:4,7 67:4 72:19
80:5,11,21 82:9
88:10 105:14
108:19 121:14
129:15 136:9
148:2 149:1,15
151:3 156:12

166:19 170:21,23
172:6
**quick** 86:1 106:17
156:12 170:7,9
**quit** 153:22
**quite** 95:16

**R**

**R** 2:5
**raised** 102:4
**Ramisha** 145:3,6
**Ranch** 76:7,12
**Ranisha** 143:21
144:18,20,21
145:4,7,10
**rare** 170:22
**rarely** 115:9
**rate** 13:8
**reach** 17:22 18:3,6
50:18
**reachable** 111:9
**read** 20:18 104:22
157:13 158:14
163:8
**reading** 19:16
132:5
**really** 10:11 30:3
30:17 49:13 51:7
52:7 96:23 101:9
108:17 110:3,9
112:13,17 117:21
118:7,8,10 134:7
136:10 144:1
166:15 170:7
**reapply** 12:4,7
**reason** 71:13 122:2
126:15 127:1,9,11
**reasons** 75:23
102:1
**recall** 95:8 112:13
113:6 115:21
148:10,13 153:4
**received** 50:21
139:4

**recess** 66:20 106:20
**recollect** 37:18
**recollection** 14:10
18:20 19:23 36:19
85:9 113:4 117:23
**reconstruct** 141:22
**record** 6:8,19 8:12
21:7,20 25:18
45:11,23 47:10,14
48:16 60:11 61:13
61:15 62:9 73:1
83:21 90:10,13
92:20 106:19,22
113:2 121:17
130:23 140:3
157:17 159:21
**recorded** 6:13 28:8
28:9 31:9 42:18
62:19 63:21 66:9
90:19
**recording** 31:16
68:22 160:3,8
**records** 82:13,19
121:7 140:6
141:15,19 150:7
**reestablishing**
151:7
**refer** 149:5 167:16
**referred** 34:1
**referring** 117:7
**reflect** 99:3 100:10
**refresh** 19:23
**regarding** 125:13
**register** 83:6
**regular** 21:15 29:1
63:20 66:7 112:8
**regularly-schedu...**
15:12
**reject** 72:9
**relation** 172:11
**relations** 162:18
**remember** 9:11
10:9,11 12:11,15
13:8 18:14 20:5,6

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                      April 15, 2015

22:23 23:2,5,6
24:2 33:11 36:15
37:19 38:4,8,22
39:17 40:11,15,15
42:14 43:16 49:15
50:11 51:7 54:7
56:1 57:5,8,16
59:22 79:20 86:12
86:16,20 87:6
91:6,19 92:9,10
92:11 94:1,20
95:2,20 101:2
110:20 112:14
113:20 118:19
120:5,13,21 121:8
121:20 123:6
124:14 125:1
126:3,7 127:17
128:21 129:14
134:13,15 135:23
136:5,22 137:17
138:18,21 139:7
165:10 166:6
168:9 170:14,16
**reminding** 55:12
101:11
**remote** 133:6,17
**remotes** 133:3
**rep** 49:13,18 50:8,9
51:21 123:21
124:1
**repeat** 104:19
154:21
**rephrase** 7:2 29:18
87:15
**report** 141:17
166:23
**reported** 69:5,7
**reporter** 1:20 3:9
5:22 6:14 19:12
23:7 103:12
172:16,21
**REPORTER'S**
172:1

**Reporting** 172:16
175:5
**reports** 164:4
**represent** 5:13 6:11
**representative**
154:20
**representing** 3:4,22
**represents** 172:8
**reprimanded** 43:5
**required** 152:21
**reserved** 3:15
**reserving** 8:10
**resolution** 163:15
**resolve** 164:2
**resources** 163:14
**respect** 73:23 89:23
90:3
**response** 6:16
104:22 117:7
137:1
**responses** 116:2,7
146:4,19
**responsibilities**
14:15
**responsibility** 27:6
27:16 28:3 42:22
43:10 47:12,13,17
137:7,14 154:18
**responsible** 47:16
**rest** 147:9
**result** 172:12
**resume** 89:8
**return** 133:3
**returning** 57:14
**review** 10:6,12
19:19 67:17
137:17
**reviewed** 20:1
**reviews** 19:22
20:20 63:14 163:9
163:11
**revise** 68:9,9
**revised** 4:12 64:13
**revisit** 81:13

**right** 7:11,18 11:21
17:20 18:15,16
19:16 24:11 34:22
35:11 41:12,13,16
41:20 42:1,4
43:18 45:6 49:2
51:9 55:22 59:3
60:1 63:9 65:5
67:14 68:23 69:9
69:9 71:14 73:9
73:13 76:18 78:14
80:12 84:5 85:4
85:22,23 94:6
108:21 114:16
119:19 125:23
131:16,19 133:13
133:22 140:13,16
140:19,21 141:17
141:18,20 146:16
150:22,23 156:19
157:15 158:8
164:9,13 167:11
167:19,22 168:21
169:7,11 170:17
171:3,7
**rightfully** 28:19
**Rita** 2:11 5:14 6:9
8:5 54:19 113:2
**role** 10:23 12:15
14:10,16 123:19
**roles** 14:3,5
**room** 7:7 58:19
74:17 76:23 77:2
78:13,15,16 87:5
166:2,4,13
**rotated** 32:9
**Route** 13:6
**Rules** 3:6,18 4:3
**ruling** 3:15
**run** 29:12 41:11
131:23
**running** 48:7

_____
        S
_____

**s** 172:20
**same-thing** 83:6
**saw** 9:20 130:3
134:16 166:8
**saying** 28:17 31:4
33:21 46:3 50:21
79:13 88:1 94:23
111:6,20 118:18
119:21 122:7
137:4,22 160:9
167:5
**says** 20:22 21:5,11
24:22 63:17 64:12
103:20 105:2,4
106:9 113:2 119:8
138:8 154:11
157:11 158:14
162:8 163:13
164:1 170:23
**schedule** 21:15
53:9,11 59:11,14
63:20 66:8 171:9
**scheduled** 32:14
59:11,17 60:22
73:6 74:5
**school** 91:1 139:14
**screen** 131:17
137:21
**seal** 175:10
**second** 18:20 20:8
24:14 35:6 81:9
138:14 163:4,12
171:8
**security** 129:19,21
130:1,5 131:7,8
**see** 20:4 34:14,16
35:2 39:1 45:5
61:4 81:7,10 97:7
99:11 100:8
101:17 125:2
131:11 133:21
153:9 165:12
**seeing** 33:22 115:14
**seen** 125:4,5,21

128:14 129:21
130:8,9 149:17
165:4
**sell** 11:14 14:18
**send** 54:14 164:19
**senior** 144:17
**sense** 112:21
114:10
**sent** 43:8 54:16
99:20
**sentence** 21:5,11
163:12
**service** 11:13,18
14:18 115:12
123:21 124:1
151:6,8 154:19
**services** 40:6
**sessions** 153:2
**set** 4:17 75:2,4
103:13 112:9
171:8 175:8
**setting** 151:8
**seven** 60:22,23 61:6
61:12 146:22
147:15 164:6
**shakes** 42:16 51:23
62:22 79:22 85:2
102:7,12 121:12
126:22 129:17
130:11 138:22
141:13,21
**sheet** 30:7,12
100:22 147:17
**sheets** 141:17
150:18,19
**She'd** 17:14
**She'll** 103:9
**shift** 15:12 27:3
31:13,23 32:5
47:15 55:15,16
60:11 62:16
136:23
**short** 66:14,20
84:18 106:20

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

131:6,8
**shortened** 71:13
  150:13
**shorter** 31:5
**Shorthand** 1:20 3:9
**short-handed**
  58:18
**show** 31:18,18
  131:6,7
**shrugs** 145:15
**sick** 92:3,13,15,15
  92:16
**side** 88:7 127:14
**sign** 99:22
**signature** 19:14
**single** 145:23
**sit** 16:20 77:6 78:10
  78:17 166:12
**site** 17:19,21 18:4,7
  33:5,9 44:20 45:1
  45:4 60:8 62:17
  80:16,20 84:1
  94:15 107:3,13
  109:7,20 110:19
  111:15 112:2,6,16
  112:20 113:14,15
  114:13 115:1
**sitting** 165:14
  166:1,3,10,11
**situation** 121:6
**six** 15:8 53:9,12
**Sixth** 1:17
**skip** 25:13 103:14
**slide** 24:22 25:14
**slip** 132:5
**smoker** 38:12
  85:22 86:3,10,10
**smoking** 38:10,14
  40:12
**somebody** 33:21
  46:21 81:10,17
  83:15 97:2 101:11
  103:2,3 144:11
  165:12

**son** 92:13,14,15
  139:18
**son's** 91:1 139:14
**sorry** 8:19 16:5,22
  37:8 41:21 66:2
  70:18 94:3 104:21
  114:10 119:18,22
  122:8 125:18
  140:9 144:6 145:5
  147:2,7 154:21
  160:7 162:13
**sound** 23:23 51:9
**Southern** 1:3 5:8
**speak** 6:3,15,21
  81:17
**speaking** 6:19
**specific** 103:22
  105:4 112:13
  153:17 165:20
**specifics** 120:19
**spend** 82:9,21
**spent** 39:15 40:16
  72:14 83:18 90:14
  99:4,15 147:18
  148:10
**spoke** 104:9 127:6
  128:2
**spoken** 10:15
**spread** 131:10
**spring** 9:12
**Srivastava** 2:11 4:7
  4:8 5:14,15 6:7,9
  8:7,15,16 18:21
  19:7,11 35:8
  54:21 55:1,5,7,9
  64:6,14,17,20
  65:2,4,7,9,18,20
  65:22 67:2 73:4
  103:5 106:16,23
  109:14 117:11,19
  117:22 120:12
  125:20 130:13,17
  131:5 136:14
  138:4 146:10,14

146:17 148:21
  149:2 156:11,14
  170:20 171:13
**St** 50:12 51:22
  175:7
**staff** 75:9
**stagger** 74:18
**Stamp** 23:18
**start** 11:3 12:21
  13:1
**started** 11:12 13:20
  20:2 75:6
**state** 1:21 3:10 5:12
  49:14 116:15
  128:2 172:2,21
**stated** 34:14,16
  115:3 127:11
**statement** 130:6
  173:9 175:9
**states** 1:1 5:7 34:22
  35:11
**stationed** 16:23
**stay** 60:10,17 62:15
  62:15
**stayed** 18:9 43:3
**stenotype** 172:6
**step** 86:1
**stipulated** 3:2,20
**stipulation** 1:16
**stipulations** 3:1 8:9
**store** 57:22 60:9,21
  61:2,4 76:21
  131:21
**story** 127:14
**Street** 175:6
**structure** 101:7
**stub** 30:20
**stubs** 141:10
**stuff** 58:7 96:23
  97:3 102:22
**stupid** 98:23
**subject** 163:20
**submissions** 69:2
**substance** 9:22

**suggested** 163:18
  164:3
**Suite** 1:18 175:6
**Summer** 9:13,14
**supervising** 59:5
  60:4
**supervisor** 10:21
  16:12,15 21:21,23
  27:22 28:5 29:4
  33:2,23 34:3,14
  34:15,17,20 35:11
  35:13,19,21 36:4
  43:20 44:3 45:17
  46:8,12 52:4,6,7
  52:16,20 54:12
  55:10 56:2,5
  57:23 69:1 72:8
  72:17 77:16,19
  87:13,14 88:5
  90:7 97:12,13
  129:9 153:7,11
  154:10,11,12
  157:10,16,21
  158:1,17 159:4
  160:2,15 161:20
  162:2,5 163:19
  164:20
**supervisors** 52:14
  57:17
**supervisor's** 28:2
  34:4 47:12,13
**supplement** 116:22
**support** 143:19
  146:20
**supporting** 50:22
**supports** 130:2,6
**supposed** 29:2 41:8
  45:20,22 47:7
  48:6 67:6 74:7
  89:22 90:3 127:18
  147:1
**sure** 9:8 24:2,19
  31:1 34:13 42:17
  50:14 53:22 55:13

55:19,19 57:10
  60:15 67:18 81:1
  81:4 83:3 89:16
  91:10,15,17,18
  92:17 93:23
  106:11 122:16
  124:21 127:18
  128:9 134:5 138:1
  138:2,3 141:2
  142:12 147:3
  148:4 150:2,10
  152:5 167:12
**surprise** 167:2
**swear** 5:23
**switch** 14:3,5
**sworn** 6:2
**system** 22:17 46:1
  48:3 72:10 137:15
  150:20

---

**T**
**tablet** 78:11
**tack** 40:20 89:11
**take** 7:6,10 11:14
  14:18 19:19 20:18
  28:20 59:9,10,12
  59:16,17,20 61:23
  63:10 66:14 68:1
  68:2 71:19,21
  74:9 76:12,15,22
  77:3,7 78:5,19
  79:2 80:14 81:21
  81:23 82:2,4
  85:15,18 86:4,8
  91:3 106:16 115:8
  115:10,16 116:6
  130:13 131:9
  140:14 157:11
  158:15 163:3
**taken** 1:15 3:6,8
  8:1 21:8 160:16
  172:6
**takes** 62:1
**talk** 53:1 88:9 94:8

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

Page 189

94:13 126:23
143:19 144:2,5
161:20,22
**talked** 45:8 73:17
87:21 94:21 142:3
148:1 151:9
**talking** 39:23 43:15
56:17
**Tampa** 12:1
**tape** 130:16,18
**tapes** 131:8
**TAXED** 174:1
**technically** 146:7
**technicians** 13:7
49:12,16
**telephone** 5:17
**telephonic** 126:7
**tell** 6:23 10:18 36:4
45:18 61:5 79:23
81:5,14 83:4 84:7
84:17,20 88:12,15
90:10,13 93:11
96:15 97:4,6,14
97:21 98:1 110:3
112:17 125:3
133:5 135:6,15
141:5,6 143:6
144:2 145:11,17
145:22 146:1
150:6,12 152:2
153:7,11 154:5,9
154:9,11 155:18
**telling** 44:13,15
56:22 59:8 69:18
82:21 154:13
157:16
**tells** 155:17,22
160:15
**ten** 8:16,20 73:7
76:16 82:4 95:13
**terminated** 122:3,4
122:20,21 126:5
127:10
**termination** 121:15

125:13 127:1
**terms** 31:16
**testified** 6:4 83:22
107:1 110:17,23
112:18 113:3,4,6
120:10 153:15
165:3
**testify** 155:13 156:2
**testimony** 112:21
113:5 168:8 172:8
**Thank** 19:8 65:21
**thereto** 172:7
**thick** 162:8
**thing** 52:19 76:7
87:9
**things** 9:21 93:6
107:1 110:15
120:10 146:18
151:9 153:17
167:3
**think** 22:22 28:13
34:10 47:3,7
49:10 51:3,19
63:2 68:8,11 75:5
80:23 81:4 101:4
102:3,20 113:22
124:21 126:13
127:16 128:8,15
128:16,18 129:1,4
132:7,8,9 136:11
142:4 143:18
146:6 147:22
148:4,5,9 150:4,4
159:20 160:3,8
**third** 2:7 23:16
128:19 162:13,15
**thought** 8:13,13
52:12 102:17
157:16
**three** 17:14 58:13
58:13,14,15,20,21
59:5 79:13 90:20
91:4 93:5 95:15
95:18 96:17 100:4

104:5,10 105:11
106:4,12 109:22
109:23 111:11
112:1 115:3
119:23,23 120:8
153:16 154:14
156:4 159:6
168:14,15,16,20
169:1,7,7,11
171:4
**threw** 70:18
**Tidmore** 34:9,11
129:9
**Tidsmore's** 129:5
**till** 18:11
**time** 3:14,16 5:10
11:5,20 13:14
15:6,19 16:16
21:8 22:3,8,18
23:17,18 25:18
26:1,3 30:9,22
31:9,16 32:3 36:5
36:11 37:1 38:9
39:17 40:20,21
41:8 42:9,12
43:17,22 44:8,23
45:23 47:4,8
48:22 49:20 51:20
53:14 56:4,10
57:3 58:16 60:14
66:18 67:1,6,10
67:17,20,20 68:12
68:20 69:6,7,15
69:22 72:13,14
73:20 74:6,17,22
82:8,21 83:18
90:11,14 91:23
92:14,21,21 96:14
98:14,20 99:3,3
99:12,21 100:1,2
100:22,23 101:22
106:5,19,22
107:17 108:6
114:11,21 115:11

115:11 119:13
123:12 130:21
131:4 133:2
139:19 140:21
141:4,12,16,17
142:22 143:2
147:17,17 148:16
150:7,18,19,21
152:10,15 156:15
157:3,19 158:10
159:1,12,13,22
160:4,9 164:11,14
164:21 165:23
169:14,23 171:16
**timecard** 63:22
66:10
**timekeeping** 4:16
20:19 22:15 24:17
47:16,18 54:12
63:5 67:5 136:12
137:15,18
**times** 11:8 15:7,14
28:7,7 36:1,17
48:2 52:22 55:21
60:18,20 61:2
77:13 79:14 82:1
86:4,8 90:17 92:6
93:1 94:20,22
95:2 99:13,16,19
99:23 101:14
104:5,10 105:12
105:21 106:12
109:18,22,23
111:11,14 112:1,8
114:12,19 115:3
143:3 148:1
153:16 154:14
159:6 161:3,4
165:4,8,10,11,13
165:20 166:7,18
170:22 171:4
**Time-Entry** 24:16
25:15
**titles** 129:10

**Titsmore** 129:6,8
**today** 7:22 8:1,3
10:19 107:1
110:17 141:15
142:3 148:16
151:4 154:8 168:7
**today's** 9:19
**told** 10:21 28:14
36:6 37:3,15 41:5
42:20 45:14 53:3
56:23 69:17 94:22
98:10 100:5 104:8
106:3 107:14,17
108:1 114:6 125:5
125:21 127:21
128:12 153:10,16
158:11,13 160:2
168:7
**top** 63:9 132:11
137:2 162:8
**total** 116:15 118:5
118:5 174:6
**town** 107:21
**traffic** 73:10 74:15
76:1
**trained** 143:12
**training** 4:14 13:21
18:15 23:2,13
24:1,12,18 82:22
83:9,13 97:1
153:2
**trainings** 24:3
**transcribed** 172:7
**transcript** 4:14
9:16 23:14 172:6
172:8 173:15
174:1
**transcription** 172:7
**transcripts** 175:1
**trash** 132:21
**trial** 4:1 9:16
**tried** 92:20 156:15
156:19
**true** 68:22 125:7,9

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

Page 190

126:1 137:23
161:23 172:8
**truth** 6:3,3,4
155:17,22
**truthfully** 7:21
155:13
**try** 45:11 51:21
86:22 161:10
**trying** 55:3 82:23
110:9,10 112:20
**Tuesday** 112:9,10
112:12
**turn** 23:15 40:5
116:10
**turning** 20:15
77:20
**Tuscaloosa** 115:1
**twelve** 74:10 75:7
75:10,17,19 89:16
**Twenty** 39:20
**twice** 80:23
**two** 16:8 49:2 74:11
74:11 75:20 79:3
79:3,4,6,11,13,17
85:13 90:20
107:20 109:22,23
111:11,23 115:3
119:9,20,22,23
120:8 138:16
139:1 168:14,16
168:19 169:1,6,11
170:21,23
**two-hour** 107:20
**two-minute** 130:14
**type** 101:11 151:9
152:14
**types** 77:18
**typically** 62:1
139:16

─────────
U
─────────
**Uh-huh** 8:7 18:19
20:11,14 25:9
32:6 35:16,18,20

36:14 49:6 50:3
62:20 63:13 64:14
70:3,10 71:8
72:21 87:18 88:3
88:15 89:1 93:10
94:12 96:7 101:16
103:10,16 105:16
105:19 107:10
110:6 111:7,13
113:12 115:20
116:9 120:12
121:2 131:18
132:15 135:12
138:12 139:6,11
140:20 142:17,20
147:21 153:19
155:21 156:1
158:5,8 159:10
160:11,17 162:11
162:12,16 163:1,2
163:21 164:7
165:19 166:14,17
167:4,8,20 168:1
168:17 170:13
**uh-uh** 95:22 102:12
108:22 121:12
129:17 132:12,17
141:13 142:9
150:4 166:5
**unable** 164:2
**unavailable** 111:19
**uncomfortable**
163:16
**understand** 6:22
7:1,3 9:14 13:13
29:11 66:13 67:5
68:19 107:8 110:8
111:6 118:10,13
122:3 140:9
146:10 154:17
**understanding**
13:17,19 15:22
16:1 21:3,4,9,10
21:17,19,21 22:7

34:2,18 36:8 41:7
41:10 45:16 51:19
64:1,16,18,22
65:10 66:11 71:18
73:22 74:2 91:11
111:20 157:9
159:4 161:18
**understood** 118:8
137:6,13
**unemployment**
126:4,9,10,20
127:15,22 128:5
128:12 136:2
**uninterrupted** 78:6
79:1,8,12,18
**United** 1:1 5:7
**unpacking** 132:13
**unpaid** 149:18
150:15 151:2,22
152:10,17,22
154:23 155:16
156:4
**use** 7:6 18:3,6 22:8
22:12,21 51:13
102:15,23
**user** 67:23
**username** 25:3,4
**usual** 8:9
**usually** 140:10

─────────
V
─────────
**Valerie** 42:23 43:1
57:2 123:15,17
124:21 135:6,11
142:15 145:9
**varied** 82:5,5
**varies** 58:15
**vary** 17:19 82:10
**verbal** 6:15
**verbally** 104:2
105:7
**Verna** 124:9
**Verna's** 124:9
**version** 64:8,23

65:11,12,16
**versus** 5:4 17:12
85:10 112:4
**Vestavia** 12:10
14:14 15:4 16:13
16:16,21 17:1,12
26:21 33:7 49:2,8
57:18 69:11 76:21
86:6 109:20 110:1
114:14,20 123:14
**video** 130:9 131:7,9
134:19
**videographer** 5:1
5:22 66:13,16,21
106:18,21 130:15
130:19 131:1
171:14
**videos** 10:12
104:17
**Videotape** 5:2
66:17,22 130:20
131:2 171:15
**videotaped** 171:19
**View** 23:18 24:15
**Virginia** 144:22,23
145:1,8
**voice** 104:17
**vs** 1:8 173:5

─────────
W
─────────
**W** 172:20,20
**Wacker** 2:13
173:18 174:4
**waiver** 125:14
**walk** 11:10 86:21
136:10
**want** 8:11 9:22
15:3 39:23 52:11
81:16,17 88:13
91:1 102:2 104:8
106:8 109:9 110:2
112:23 117:14,21
117:22 118:17
122:21 125:14,18

134:8 136:10
**wanted** 18:12 39:1
39:2 43:14 67:3
71:7 81:10 97:2
121:14,16 148:15
**wants** 88:13
**warmed** 104:18
**warmer** 77:5,7
**wasn't** 17:21 28:8,9
28:14,18 35:3
41:5 42:11 45:14
46:20 49:13,18
50:8,8,15 56:23
57:21 59:4 60:8
62:17,21 69:11
80:8 83:13,23
87:8,10,12,12,15
87:16 88:1,6 97:1
99:16,17 100:13
100:14,22 106:11
108:17 111:4
118:21 125:7,9
126:1 127:20
128:6 133:6,10
154:2,3 161:3,4,7
**watch** 109:2 134:8
**water** 7:7
**way** 21:23 49:10
69:3,13,19 83:17
83:21 87:11 101:6
150:21 155:12
**weather** 77:5,7
**website** 51:5,6
**week** 15:16,18 17:5
17:19 46:17 67:17
79:4,16 104:6
105:12 109:22,23
111:12 112:1
116:12,18 119:5
119:10,17,20
120:3,8 121:4
153:23 154:1
164:6 168:9,16
169:6,7

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

weekends 32:8,9
weekly 68:14
  103:21 104:2
  105:3,9 106:10,11
  152:8
weeks 53:20 79:6
  79:10,20 121:11
  168:20
went 30:14,15
  33:23 40:6,8
  41:19 44:17 49:4
  49:21 52:4 72:16
  74:16 78:22 84:10
  90:7 91:18 93:16
  101:10 102:9
weren't 36:5
  110:18 116:14
  153:11 166:3
West 2:13 173:18
  174:4
we'll 38:1 43:13
  55:1,7 61:9
we're 6:19 8:10
  28:22 40:22 63:8
  73:2 106:15
  125:12
we've 58:18 61:9
  142:3 154:8
whatnot 7:7 48:3
  74:15 128:11
wheel 125:19
WHEREOF 175:8
whichever 78:16
whoever's 61:3
Williams 144:13
  145:6,16
window 137:21
winter 9:12
witness 5:23 19:22
  20:20 32:6 35:2
  36:14 42:16 51:23
  62:20,22 63:14
  70:3 75:18 79:22
  85:2 93:10 95:19

96:7 101:19 102:7
102:12 105:19
113:8 117:16,18
121:12 126:22
129:17 130:11
135:12,22 138:22
139:6 141:13,21
142:1,17,20
145:15 147:1
163:9,11 165:7
167:8,20 168:17
172:9 175:8
work 11:11 13:6
  15:16,18 21:13,15
  27:19 31:12 32:7
  32:10,13 41:9
  43:8 44:15 48:3
  53:2,14,16 63:18
  63:20 66:6,7,8
  72:19 73:6,8 80:4
  100:10 104:5
  105:12 116:12,18
  123:5 138:13,14
  138:14 140:1
  143:7,8,9 150:14
  151:2 152:4,9,16
  152:21 153:6,13
  153:23 154:22
  155:15,18 156:3
  167:11
worked 13:15 21:1
  21:7 22:1,18
  30:15,17,22 31:1
  31:5 32:3,20 44:9
  45:23 46:17,20
  47:14 58:9 63:20
  66:9 68:4 69:4,15
  90:11,14 92:21
  106:5 116:13,17
  118:5 119:11,22
  119:23 141:16
  142:5,22 143:4,8
  143:11 144:19,21
  144:22 145:9

146:9 147:14
148:17 156:16
159:1 160:6,13
165:1 168:10,18
168:20 169:2
171:5
worker 143:5,7
workers 144:19
working 11:3 12:21
  13:1,23 20:3 22:4
  24:4 35:21 36:7
  72:14 118:21
  140:17 149:17
  150:3 165:5 166:8
works 123:18 145:1
wouldn't 26:6,17
  28:12,12 48:3
  77:6 83:1,7 97:12
  99:5 112:12 140:2
  140:3 157:1,2
Wow 91:13
write 45:19 48:16
  148:15
writing 149:5
written 157:23
wrong 101:10
  118:17

_____

Y

yeah 23:21 24:13
  25:2 26:19 29:19
  29:21 31:1 35:11
  46:2 47:19 49:20
  50:23 54:4 55:5
  57:12 58:22 60:1
  60:13 64:20 65:6
  65:7 66:3 69:7
  70:10 76:2 79:3
  81:14 82:5 85:6
  91:22,22 92:13
  95:14 104:20
  106:3 110:21
  120:5 125:2 129:4
  131:22 133:20,21

134:14 137:9,12
138:3 139:1,9,13
140:10 145:5
146:14 148:8
149:2 157:5
159:14
year 9:8,12 11:22
  12:1,23 14:6
  37:20 57:8,9 87:9
  91:9 95:3,20
  101:2,4
years 8:17,20 96:1
  101:5 156:5
Yesterday 10:2
yes-or-no 170:8,10

_____

0

0.5 91:16
00000675 136:19
00000701 23:15
00001089 25:14
0000611 138:8
0001086 24:21
0001257 20:13
01659 131:11

_____

1

1 4:10 5:2 18:22,23
  66:17
1:05 89:18
10 4:19
10:40 66:19
10:52 67:1
103 4:16
11:28 106:19
11:30 75:11,16
11:39 106:22
116 4:18
12 63:7 64:13
  130:22
12/19/17 172:23
12:06 131:4
12:30 71:9,10
12:40 171:17,21

120000 133:5
1263 162:22
1264 163:13
1268 20:16
1330 20:15
136 4:19
138 4:20
149 4:8
15 1:22 5:9 40:18
  62:1,4 85:19
  171:21
15-minute 16:8,9
  85:14 86:9
156 4:8
171 4:9
18 4:10 138:15
19 4:11
1901 1:17
1996 11:6,12

_____

2

2 4:11,19 19:9
  64:10 65:17 66:22
  116:11 130:20
2:14-CV-01493-...
  1:8 5:6
20 39:18,21 40:2
  44:9 45:11 46:17
  46:17,20 93:22
  115:8,16,19
  120:23,23 169:15
  169:23 170:17
2005 9:4
2008 9:8,9 63:6
2009 11:22,23
2010 9:8,9 12:3,22
  13:20 14:7,11
  18:11 22:19 23:23
  63:7 64:11,13
  65:3 95:5 96:6
2011 11:17,21
  116:15
2012 119:6,11
2013 91:10 136:21

Karen Lopez-Easterling v. Charter Communications, LLC
Karen Lopez-Easterling                                    April 15, 2015

Page 192

138:16
**2014** 18:11 57:11
  57:15 95:5 96:6
  123:7,10 139:3
**2015** 1:22 5:9
  171:21
**2018** 2:7
**23** 4:13,14
**231** 172:22
**24** 164:5
**2400** 1:18
**268** 35:17
**28th** 121:21,23

_____
**3**
**3** 4:13,19 23:11
  64:11 119:5 131:2
  171:15
**3.0** 63:12
**3/1/14** 4:13
**3/3/10** 4:12
**30** 30:17 43:4 57:3
  75:11 82:6 85:11
**30-minute** 75:5
**31** 116:15
**35** 4:15
**35203** 2:8

_____
**4**
**4** 4:14,19 23:11
  116:10
**4/12/2010** 19:18
**4/15/2015** 173:13
**4/5/13** 4:20
**40** 13:15 30:18,23
  53:21 140:18

_____
**5**
**5** 4:15 35:8,9 63:4
  64:22 65:4,15
  119:5,11 136:21
**5:30** 31:20,21
**515** 175:6

_____
**6**

**6** 4:7,16 103:6,7
**6/10** 23:20
**6/10/2010** 23:19
**60601** 2:14 173:19
  174:5
**63** 162:23
**63101** 175:7

_____
**7**
**7** 4:18 63:6 116:4
  117:5 136:15
  139:3 149:8
**700** 175:6
**704** 23:15
**77** 2:13 173:18
  174:4

_____
**8**
**8** 4:19 103:15,17
  104:23 136:15,16
**800** 51:2 102:13

_____
**9**
**9** 4:20 73:7 103:15
  103:18 138:5,6
**9/30/15** 172:22
**9:43** 1:22 5:10